**GREGORY P. JOSEPH LAW OFFICES LLC**
Gregory P. Joseph (GJ-1210) (gjoseph@josephnyc.com)
Peter R. Jerdee (PJ-1240) (pjerdee@josephnyc.com)
Rachel M. Cherington (RC-3673) (rcherington@josephnyc.com)
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:  (212) 407-1200

*Attorneys for Citibank, N.A.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITIBANK, N.A., <br>       *Plaintiff,* <br> -against- <br> MORGAN STANLEY & CO. INTERNATIONAL, PLC, <br>       *Defendant* | 09 Civ 8197 (SAS) ECF CASE <br><br> **COMPLAINT** |

Plaintiff Citibank, N.A. ("Citibank"), for its Complaint against defendant Morgan Stanley & Co. International, PLC (formerly Morgan Stanley & Co. International Limited) ("Morgan Stanley"), alleges on personal knowledge as to itself and its own conduct and on information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT

1. This action arises out of Morgan Stanley's breach of a credit default swap agreement entered into between Morgan Stanley and Citibank in July 2006 (the "CDS"), which obligates Morgan Stanley to pay Citibank nearly $250 million as a result of a payment default on a revolving credit facility that Citibank provided to the issuer of collateralized debt obligations ("CDO").  Citibank purchased the CDS from Morgan Stanley for the precise purpose of

protecting against the risk of the losses that have materialized but which Morgan Stanley now refuses to pay, in breach of its contractual obligations under the CDS.

2.  The CDS is memorialized in a July 21, 2006 agreement (the "CDS Confirmation") executed by the parties long before the current market turmoil. The purpose of the CDS was to hedge against losses Citibank might suffer between July 2006 and August 2009 under a credit agreement for a revolving credit facility that Citibank entered into with the CDO, which is known as Capmark VI, in July 2006. In exchange for providing this protection, Citibank paid Morgan Stanley approximately $750,000 over the three-year term of the CDS Confirmation.

3.  The Capmark VI CDO suffered an event of default in August 2008 and its portfolio continued to decline thereafter. As a result, in March 2009, Citibank decided that the CDO collateral should be liquidated to pay off as much as possible of the $366 million then owing to Citibank under the credit agreement for the revolving credit facility. The proceeds of the liquidation were insufficient to cover the amounts Citibank was owed. Accordingly, pursuant to the CDS Confirmation, Citibank exercised its right under the CDS Confirmation to require Morgan Stanley to pay the shortfall that would make Citibank whole for its losses.

4.  Citibank has performed all of its obligations under the CDS Confirmation and satisfied all conditions precedent to Morgan Stanley's payment obligation, yet Morgan Stanley refuses to pay Citibank the amounts it is owed. Morgan Stanley accepted approximately $750,000 in payments from Citibank in exchange for providing credit protection against losses that Citibank might suffer under the revolving credit facility. That was the precise purpose of the CDS Confirmation — it was the protection Citibank paid for. Having accepted the benefits of

the payments made pursuant to the CDS Confirmation, Morgan Stanley must honor its payment obligation and pay Citibank for the protection it purchased.

## PARTIES

5.  Plaintiff Citibank is a national bank with its main office located in Las Vegas, Nevada. Citibank's principal place of business is located at 399 Park Avenue, New York, NY 10022.

6.  Defendant Morgan Stanley is a public limited company organized under the laws of the United Kingdom with its principal place of business in London, England.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this claim under 28 U.S.C. § 1332(a)(2) because this dispute is between a citizen of Nevada and a citizen of the United Kingdom and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.  Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in New York, including the parties' negotiation of the CDS Confirmation and the liquidation of the underlying CDO obligation. Additionally, pursuant to the ISDA Master Agreement between Citibank and Morgan Stanley, dated as of January 19, 1996, as amended (the "ISDA Master Agreement"), which is incorporated by reference in, and forms part of, the CDS Confirmation, Defendant Morgan Stanley has submitted to the "non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."

# FACTS

9. Morgan Stanley and Citibank entered into the CDS on July 21, 2006, to provide Citibank with protection against certain credit events occurring on a revolving credit facility that Citibank made to the Capmark VI CDO. A CDO is an asset-backed security secured by a portfolio of fixed-income assets such as residential mortgage backed securities ("RMBS"), loans or other securities. The rights to the cash flow from the CDO assets are divided into a number of classes, or tranches, that are sold to investors by the CDO issuer. Generally, the senior tranches receive payment before the junior and equity tranches. Losses on the underlying assets are applied in reverse order of seniority and the junior tranches protect the senior tranches from losses on the underlying portfolio. To compensate for the greater risk, the junior tranches are paid higher coupons (interest rates).

10. The Capmark VI CDO was issued by Capmark VI LTD. (the "Issuer") in late July 2006. The Capmark VI CDO included a variety of collateral debt securities, including RMBS, CDOs, REIT (real estate investment trust) debt securities, synthetic securities and real estate interests (which included both commercial mortgage loans and commercial real estate (CRE) debt obligations) (together, the "CDO Collateral"). The Capmark VI CDO was then divided into five tranches — Classes A-1, A-2, B, C and Income Notes (together, the "Notes"). At the time of issuance, Fitch Ratings Inc. and Standard & Poor's (together, the "Ratings Agencies") rated the Class A-1 Notes as AAA, the Class A-2 Notes as AA, the Class B Notes as A-, and the Class C Notes as BBB. All Notes were scheduled to mature in 2038. Citibank affiliate Citigroup Global Markets Inc. ("Citigroup") was the Initial Purchaser of the Rated Notes (Classes A through C) and Placement Agent for the Income Notes. In those roles, Citigroup sold interests in

the Notes to various institutional and other accredited investors when the CDO was issued in July 2006. As further described below, the revolving credit facility provided by Citibank was senior to all of the Notes in the CDO's capital structure.

### Citibank Enters into a Credit Agreement with Capmark VI LTD.

11. At closing of the Capmark VI CDO transaction in July 2006, Citibank entered into an agreement with Capmark VI LTD. (as Issuer) (the "Credit Agreement") to provide up to $366 million of revolving credit to the CDO (the "Revolving Facility"). Under the Credit Agreement, the Revolving Facility was scheduled to mature in 2038, at the same time as the Notes. In addition to its role as Lender, Citibank is the Administrative Agent under the Credit Agreement, *i.e.*, to act on behalf of the group of Lenders in the event that the Revolving Facility was syndicated to other lenders, in whole or in part. (The Revolving Facility was not syndicated. Citibank at all times remained the sole Lender.)

12. The purpose of the Revolving Facility was to fund (i) purchases of cash-purchased collateral debt securities and (ii) payments to counterparties under certain other swap transactions (not including the CDS that is the subject of this action) in accordance with the terms of the July 24, 2006 indenture among Capmark VI LTD. as issuer, Capmark VI (Delaware Corp.) as co-issuer, and LaSalle Bank National Association ("LaSalle Bank") as Trustee (the "Indenture"). (As Trustee, LaSalle Bank acted as custodian of the CDO Collateral held for the benefit of the various parties, including the holders of the Notes and the Lender under the Revolving Facility, Citibank.)

13. Generally, under the terms of the Credit Agreement and the Indenture, payments under the Revolving Facility are senior in priority to payments under the Notes and interest and principal payments, when made, are first made to Citibank, as Lender. After Citibank (as

5

Lender) is paid in full, interest and principal payments are made to each of the Classes of Notes (in descending order of seniority) until all are paid.

14.     At all material times, Citibank's maximum commitment under the Revolving Facility was $366,000,000.

## Credit Default Swaps

15.     A credit default swap is a contractual form of risk protection.  It is a financial instrument by which one private party (the protection buyer) pays a premium to another party (the protection seller) in exchange for the protection seller assuming the risk that a third party (the reference entity) might default on its payment obligations under a financial instrument (typically a bond or loan, known as the reference obligation) or that the reference entity or reference obligation might experience another "credit event" specified in the credit default swap. The protection buyer makes periodic payments, usually in monthly or quarterly installments, to the protection seller.

16.     If during the term of the credit default swap, no credit event occurs, then the protection seller keeps the periodic payments paid and incurs no further obligations.  The occurrence of a credit event triggers the protection seller's obligation to pay the protection buyer. The credit default swap is then "settled," with the buyer receiving payment from the seller.  In general, the credit events triggering the protection seller's obligation to pay the protection buyer include a failure by the reference entity to pay principal and/or interest on the reference obligation.  Bankruptcy or restructuring of the reference obligation may also constitute credit events triggering settlement of a credit default swap.

**Citibank Purchases the CDS from Morgan Stanley**

17.     In this case, Citibank is the protection buyer (the "Buyer"); Morgan Stanley is the protection seller (the "Seller"); the reference entity is Capmark VI LTD (the "Reference Entity"); and the reference obligation is the Revolving Facility (the "Reference Obligation"). As Buyer, Citibank paid Morgan Stanley approximately $750,000 for CDS protection. Morgan Stanley made a bet in this case that no credit events would occur with respect to the Reference Obligation.

18.     Under the terms of the CDS Confirmation, Morgan Stanley agreed to provide protection for losses Citibank might incur under the Revolving Facility as a result of certain credit events occurring between July 2006 and August 2009. Upon the occurrence of certain credit events occurring on the Reference Obligation and satisfaction of other conditions precedent, Morgan Stanley agreed to "physically settle" the CDS transaction, and pay up to $366 million to Citibank, which would represent the full amount of the Revolving Facility lending commitment made by Citibank under the Credit Agreement. (Under a physical settlement process, upon the occurrence of a credit event, the protection seller pays the protection buyer an amount equal to the outstanding notional amount of the credit default swap in exchange for the buyer's delivery of the reference obligation to the protection seller.)

19.     In exchange for this protection, Citibank paid (in quarterly installments) to Morgan Stanley a fixed rate of .07 percent per year on $366 million (the Aggregate Commitment, as defined in the CDS Confirmation). Citibank has complied with its obligation and made approximately $750,000 in quarterly payments to Morgan Stanley for the CDS protection that it purchased.

**A Failure to Pay Principal Credit Event Occurs**

20. Under the terms of the CDS Confirmation, Citibank is entitled to payment from Morgan Stanley upon four circumstances (each defined as a "Credit Event"):

    (i) Bankruptcy of the Capmark VI CDO (as defined in the 2003 ISDA Credit Derivates Definitions (the "2003 Definitions"), which are incorporated by reference into the CDS);

    (ii) Restructuring of obligations of the Capmark VI CDO (as defined in the 2003 Definitions);

    (iii) Failure by the Capmark VI CDO to pay interest, commitment fees, and certain other costs (as defined in the CDS Confirmation) due under the Revolving Facility prior to August 2009; or

    (iv) Failure by the Capmark VI CDO to pay principal when due under the Revolving Facility ("Failure to Pay Principal").

21. A Failure to Pay Principal has occurred. That constitutes a Credit Event. Citibank is therefore entitled to payment under the CDS Confirmation.

22. A "Failure to Pay Principal" is defined in the CDS Confirmation as "(i) a failure by the Reference Entity [Capmark VI LTD.] to pay an Expected Principal Amount on the Final Amortization Date or the Stated Maturity Date, as the case may be, or (ii) payment on any such day of an Actual Principal Amount that is less than the Expected Principal Amount."

23. The "Final Amortization Date" is defined in the CDS Confirmation to mean, in relevant part, "the date on which the assets securing the Reference Obligation or designated to fund amounts due in respect of the Reference Obligation are liquidated, distributed or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full."

24. On March 6, 2009, pursuant to Section 5.5(a)(ii) of the Indenture, Citibank directed the Trustee to liquidate the CDO Collateral securing the Revolving Facility and the Notes. The CDO Collateral was liquidated in full on July 13, 2009, and the proceeds were fully distributed by July 20, 2009. Consequently, the Final Amortization Date occurred on July 20, 2009, once the CDO Collateral had been liquidated and the proceeds distributed in full.

25. Because the proceeds resulting from liquidation and paid on the Revolving Facility (the Actual Principal Amount) were less than the amount outstanding on the Revolving Facility (the Expected Principal Amount), a Failure to Pay Principal Credit Event occurred and Citibank is due the difference between the Expected Principal Amount and the Actual Principal Amount — approximately $250 million. Once the Credit Event occurred, and Citibank completed all conditions to settlement, the parties were obligated to settle the CDS, and Morgan Stanley was obligated to pay Citibank pursuant to the terms of CDS Confirmation.

### Events Leading Up to the Credit Event

26. Due in significant part to the global financial crisis, the CDO's performance declined substantially after July 2006. On August 5, 2008, an Event of Default under Section 5.1(h) of the Indenture occurred when the Class A Principal Coverage Ratio (as defined under the Indenture) fell below 100%. (Essentially, the aggregate principal balance of all the CDO securities dropped below the sum of Citibank's $366 million commitment under the Revolving Facility.) The Trustee then issued a Notice of Event of Default on August 6, 2008, informing Citibank as Administrative Agent under the Credit Agreement of such Event of Default. The Capmark VI CDO continued to perform poorly after August 2008 and the § 5.1(h) Event of Default was never remedied.

27. Pursuant to Section 5.5(a)(ii) of the Indenture, where (as here) an Event of Default has occurred and continues while a class of Rated Notes is outstanding, the Trustee is obligated to retain the CDO Collateral securing the Notes unless 66-2/3 % of the Controlling Class direct the sale and liquidation of the CDO Collateral.

28. Citibank constituted 100% of the Controlling Class under the Indenture because at all relevant times Citibank was the Administrative Agent under the Credit Agreement and thus the Revolving Facility Agent (as defined in the Indenture), and because at all relevant times the Revolving Facility remained outstanding.

29. Therefore, once the Event of Default occurred and continued without cure, Citibank, as Revolving Facility Agent under the Indenture, directed the Trustee to liquidate the CDO Collateral.

30. Citibank initiated the liquidation process on March 9, 2009 by providing a liquidation notice (the "Liquidation Notice") to the Trustee, directing the Trustee to sell and liquidate all of the CDO Collateral. Citibank provided a copy of the Liquidation Notice to Morgan Stanley on March 9, 2006. On March 11, 2009, the Trustee published a Notice of Acceleration of Rated Notes and Direction to Liquidate Collateral advising that Citibank, as Revolving Facility Agent acting as a majority of the Controlling Class had directed the Trustee to liquidate the CDO Collateral. The Trustee posted this Notice on its website on March 11, 2009.

31. The public auction of the CDO Collateral began in May 2009 and continued into July 2009, with the final assets being sold on July 13, 2009.

32. On July 20, 2009, one week after disposition of the final assets, the Trustee distributed the proceeds of the liquidation of the CDO Collateral to the secured parties in the

order of priority set forth in the Indenture.  As discussed above, Citibank, as Lender under the Credit Agreement had first priority of repayment, followed by the Class A-1 Noteholders and the more junior noteholders.  The liquidation proceeds were insufficient to cover the entire $366 million outstanding under the Revolving Facility, leaving a shortfall of $245,368,966.51.

33. As a result of this shortfall, and following a three-business-day grace period, a Failure to Pay Principal Credit Event occurred on July 23, 2009.  Once this Failure to Pay Principal Credit Event occurred, Citibank began the settlement process so that Citibank could be paid by Morgan Stanley under the CDS.

### Conditions to Settlement Have Been Satisfied

34. Once a Credit Event has occurred under the CDS Confirmation, there are conditions with which Citibank must comply in order to trigger Morgan Stanley's payment obligations.  These are referred to in the CDS Confirmation and the 2003 ISDA Definitions as "Conditions to Settlement."  The CDS Confirmation specifies that this CDS is to be settled using the physical settlement process.  The CDS Confirmation and 2003 ISDA Definitions (which are incorporated in, and form part of, the CDS Confirmation) provide for three Conditions to Settlement applicable to physical settlement with which Citibank was required to comply.  First, Citibank was required to provide a Credit Event Notice to Morgan Stanley.  Second, Citibank was required to provide a Notice of Publicly Available Information to Morgan Stanley confirming the occurrence of the Credit Event.  Third, Citibank was required to provide a Notice of Physical Settlement to Morgan Stanley.  Citibank timely complied with all three of these Conditions to Settlement.

**Citibank Has Honored Its Obligations in the Settlement Process**

35.     Once Citibank provided these three required notices to Morgan Stanley, Citibank began the process of physically settling the CDS.

36.     On July 30, 2009, in order to physically settle the CDS Confirmation, in accordance with the process for physical settlement applicable to the CDS, Citibank delivered an undivided 100% participation interest in and to all of its rights and obligations under the Credit Agreement to Morgan Stanley by providing Morgan Stanley with all transfer documentation required to effect delivery of the Reference Obligation by participation (the "Loan Settlement Documents").  In addition, under the process for physical settlement under the CDS Confirmation, on July 30, 2009, Citibank also delivered a Purchase Price Letter, which specified $245,368,966.51 — the amount of Revolving Facility debt that remained outstanding following application of the liquidation proceeds — as the amount that Morgan Stanley is required to pay Citibank for the delivery of the participation interest in the Reference Obligation (the "Purchase Price").  The delivery of the Loan Settlement Documents and the Purchase Price letter satisfied Citibank's obligation to physically settle the CDS Confirmation.

**Morgan Stanley Has Dishonored its Obligations in the Settlement Process**

37.     Under the process applicable to physical settlement under the CDS Confirmation, Morgan Stanley was required to execute and deliver the required Loan Settlement Documents to Citibank by August 6, 2009.  Morgan Stanley failed to execute and deliver the Loan Settlement Documents to Citibank by August 6, 2009.

38.     In addition, under the process for physical settlement under the CDS Confirmation, after Morgan Stanley received the Loan Settlement Documents from Citibank, Morgan Stanley was required to pay the relevant Purchase Price (as provided in the Purchase

12

Price Letter) to Citibank by August 6, 2009. Morgan Stanley failed to do so on or before August 6, 2009, and still has not made this payment.

### **Additional Termination Event Declared**

39. Under the CDS Confirmation, Morgan Stanley's failure to return executed Loan Settlement Documents to Citibank and pay the Purchase Price by August 6, 2009 resulted in an "Additional Termination Event" under the ISDA Master Agreement between the parties, with the transaction at issue (the CDS) as the only affected transaction. Citibank notified Morgan Stanley accordingly on August 7, 2009 and, as a result of the Additional Termination Event, and in accordance with the ISDA Master Agreement, designated August 7, 2009 as the Early Termination Date in respect of the CDS Confirmation. Pursuant to the ISDA Master Agreement, Citibank provided a Calculation Notice to Morgan Stanley notifying Morgan Stanley that Citibank had declared an Additional Termination Event and that Morgan Stanley was required to pay $245,368,966.51 (the "Early Termination Amount," an amount identical to the Purchase Price) to Citibank no more than two business days after the Early Termination Date (*i.e.*, by August 11, 2009). Morgan Stanley failed to pay the Early Termination Amount as required, in further breach of its obligations to Citibank under the terms of the CDS Confirmation.

40. In addition, Morgan Stanley owes Citibank interest on the Early Termination Amount accruing from August 7, 2009 in accordance with the terms set forth in the ISDA Master Agreement.

41. Despite the fact that Citibank has abided by all conditions to settlement identified in the CDS Confirmation, ISDA Master Agreement and 2003 ISDA Definitions, Morgan Stanley has refused to pay the more than $245 million it owes. Accordingly, Citibank has brought this

claim against Morgan Stanley to seek payment of all amounts owed pursuant to the CDS Confirmation.

## CLAIM FOR RELIEF

### Breach of Contract

42. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

43. On July 24, 2006, Citibank and Morgan Stanley entered into a CDS Confirmation, pursuant to which Citibank purchased protection on a $366 million Credit Agreement.

44. Citibank has fulfilled all of its obligations under the CDS Confirmation and related documents, and has satisfied all conditions precedent to Morgan Stanley's payment obligations.

45. As discussed above, Morgan Stanley has breached its contractual obligations by failing to pay Citibank $245,368,966.51 to pay Citibank for the protection it purchased in order to hedge its exposure under the Credit Agreement.

46. By reason of the foregoing, Citibank has been damaged and, accordingly, is entitled to judgment against Citibank for damages in an amount to be determined at trial.

WHEREFORE, plaintiff Citibank respectfully requests judgment against the Defendant, as follows:

(a) Compensatory damages in an amount to be determined at trial;

(e) The costs of this action, including reasonable attorneys' fees; and

(c) Any other, further or different relief as the Court may consider just.

Dated: New York, New York
September 25, 2009

**GREGORY P. JOSEPH LAW OFFICES LLC**

By: _____
Gregory P. Joseph (GJ-1210)
(gjoseph@josephnyc.com)
Peter R. Jerdee (PJ-1240) (pjerdee@josephnyc.com)
Rachel M. Cherington (RC-3673) (rcherington@josephnyc.com)
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200

*Attorneys for Citibank N.A.*