UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITIBANK, N.A.,

                    Plaintiff and Counter-
                    Defendant,

        -against-                                        09 Civ. 8197 (SAS)

MORGAN STANLEY & CO.
INTERNATIONAL, PLC,

                    Defendant and
                    Counterclaimant.

---

**MSIP'S MEMORANDUM OF LAW IN OPPOSITION TO CITIBANK'S
MOTION FOR JUDGMENT ON THE PLEADINGS, AND IN
<u>SUPPORT OF MSIP'S CROSS-MOTION</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................5

I.   Citibank's Loan To Capmark VI ....................................................................5

II.  Citibank Enters Into A Three Year Credit Default Swap With MSIP ...............................7

III. MSIP Negotiates For And Obtains Controlling Class Rights............................................8

IV.  Capmark VI Suffers An Event Of Default But Continues To Meet Its Obligations
     Under The Revolving Facility ..........................................................................10

V.   Citibank Breaches The Swap Agreement By Directing The Trustee To Liquidate
     The CDO In Order To Accelerate Losses Under The Facility And Trigger A
     Premature Credit Event................................................................................10

ARGUMENT .......................................................................................................11

I.   Legal Standard For Motion For Judgment On The Pleadings .........................................11

II.  Citibank Failed to Demonstrate That Its Interpretation Of The Confirmation And
     Credit Agreement As Permitting Liquidation Without MSIP's Consent Is
     Unambiguously Correct ................................................................................13

     A.   The Plain Terms Of The Confirmation And Credit Agreement Confer
          Controlling Class Rights Under The Indenture On MSIP ....................................13

     B.   Citibank's Post Hoc Claim Of Having Given A "Direction" To Liquidate
          Rather Than A "Consent" Does Not Support Its Position ....................................15

     C.   Citibank's Claim That Section 6.07 Has No Application Absent
          Syndication Of The Revolving Facility Is Unavailing ........................................18

III. MSIP's Interpretation Of The Confirmation And Credit Agreement Do Not
     Render The Failure To Pay Principal Credit Event Illusory.............................................20

     A.   MSIP Could Reasonably Have Been Expected To Consent To Liquidation
          Under Certain Circumstances ...................................................................21

     B.   The Relevant Term That Was "Specially Negotiated" In This case Is
          Section 6(d) Of The Confirmation, Not The Failure To Pay Principal
          Credit Event ......................................................................................21

i

C.    Citibank Has Failed To Demonstrate That The Swap Does Not Achieve Its Goal Of Obtaining Regulatory Capital Relief ......................................................23

IV.   Citibank's Motion Fails To Address MSIP's Reformation Defense, Which Cannot Be Dismissed On The Pleadings.......................................................................................25

CONCLUSION.............................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Aetna Casualty & Surety Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005)................................................................13

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009)..........................................................................12

*Baum v. County of Rockland*,
    337 F. Supp. 2d 454 (S.D.N.Y. 2004)................................................17

*Beal Savings Bank v. Sommer*,
    8 N.Y.3d 318 (N.Y. 2007) ...................................................................20

*Carballo ex rel. Cortes v. Apfel*,
    34 F. Supp. 2d 208 (S.D.N.Y. 1999)......................................11, 23, 25

*Chimart Associates v. Paul*,
    66 N.Y.2d 570 (1986) ...........................................................................25

*Dessert Beauty, Inc. v.  Platinum Funding Corp.*,
    519 F. Supp. 2d 410 (S.D.N.Y. 2007) ................................................12

*Frater v. Tigerpack Capital, Ltd.*,
    No. 98 Civ. 3306, 1998 WL 851591 (S.D.N.Y. Dec. 9, 1998)..........5, 12

*Johnson v. Rowley*,
    569 F.3d 40, 43 (2d Cir. 2009)......................................................12, 16

*Juster Associates v. Rutland*,
    901 F.2d 266 (2d Cir. 1990)................................................................11

*In re IBP, Inc. Shareholders Litigation*,
    789 A.2d 14 (Del. Ch. 2001)................................................................22

*Mellon Bank, N.A. v. United Bank Corp. of N.Y.*,
    31 F.3d 113 (2d Cir. 1994)...................................................................12

*Reape v. New York News, Inc.*,
    504 N.Y.S.2d 469 (N.Y.App.Div. 1986) .......................................17, 19

*Rothenberg v. Lincoln Farm Camp, Inc.*,
    755 F.2d 1017 (2d Cir. 1985)..............................................................20

*Sheppard v. Beerman*,
    18 F.3d 147 (2d Cir. 1994)....................................................................5

*Society for Advancement of Education, Inc. v. Gannett Co., Inc.*,
    No. 98 Civ. 2135 (LMM), 1999 WL 33023 (S.D.N.Y. Jan. 21, 1999)....................12

*Steadfast Insurance Co. v. Stroock & Stroock & Lavan LLP*,
  277  F. Supp. 2d 245 (S.D.N.Y. 2003)......................................................11, 16, 21, 22, 23, 25,

*Sutton v. East River Savings Bank*,
  55 N.Y.2d 550 (1982) ........................................................................................................17

*Trans Pacific. Leasing Corp. v. Aero Micronesia, Inc.*,
  26 F. Supp. 2d 698 (S.D.N.Y. 1998)...................................................................................22

*World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co.*,
  345 F.3d 154 (2d Cir. 2003)................................................................................................12

## **Rules**

Rule 12(c)..................................................................................................................................12

Rule 12(b)(6).............................................................................................................................12

## **Other Authorities**

16 N.Y. Jur. 2d, *Cancellation of Instruments* § 87 (2009)..........................................................25

BLACK'S LAW DICTIONARY 143, 323 (8th ed. 2004) ...............................................................15

RESTATEMENT (SECOND) OF CONTRACTS § 203(d) (1981) .........................................................22

Defendant and Counterclaimant Morgan Stanley & Co. International, PLC ("MSIP") respectfully submits this memorandum of law in opposition to the motion for judgment on the pleadings filed by Plaintiff and Counter-Defendant Citibank, N.A. ("Citibank"), and in support of the motion for judgment on the pleadings filed by MSIP.

## PRELIMINARY STATEMENT

Notwithstanding the substantial dollar amount at issue, this is fundamentally a straightforward contract case. The provisions at issue, while complex, are clearly written and defined, and the parties' contemporaneous understanding of the function of those provisions is recorded and indisputable. Citibank's only hope of success therefore lies in over-simplifying the operation of the provisions at issue and obfuscating the allegations in MSIP's Counterclaim— allegations the Court is required to accept as true at this stage of the proceedings—in an attempt to convince the Court that it is entitled to judgment on the pleadings.

At the heart of this case is a three-year Swap Agreement that MSIP and Citibank entered into in July 2006,[1] pursuant to which MSIP agreed to provide Citibank with credit protection against the occurrence of certain specified "Credit Events" with respect to a Revolving Facility. In March 2009, with the Swap only five months away from terminating without the occurrence of a Credit Event, Citibank engineered a premature payment default under the Revolving Facility by authorizing the liquidation of the borrower—the Capmark VI Ltd. CDO ("Capmark VI")—in order to manufacture a Credit Event in an attempt to pass hundreds of millions of dollars of losses to MSIP that might otherwise have been borne by Citibank. By providing such authorization to have Capmark VI liquidated, however, Citibank breached express obligations under Section 6(d) of the Swap Confirmation requiring it to obtain MSIP's prior written consent

---

[1] Capitalized terms not defined in the Preliminary Statement bear the meanings given them in the Statement of Facts.

1

before providing such an authorization, thereby causing the failure of a condition precedent to any payment obligation by MSIP.

In seeking a judgment on the pleadings, Citibank advances a scattershot of arguments as to why its having authorized the direction to liquidate Capmark VI without MSIP's approval did not breach Section 6(d) of the Swap Confirmation in the hopes that perhaps one will hit the target. None even comes close.

Citibank's primary argument is that Section 6(d) of the Swap Confirmation was not implicated by Citibank's conduct because Section 6(d) governs, in relevant part, instances in which Citibank provides a "consent" under the Credit Agreement, whereas, according to Citibank's argument, it provided a "direction" to liquidate Capmark VI under the Indenture. This argument, raised for the first time in Citibank's Memorandum and not alleged in the Complaint, elevates form over substance while, remarkably, falling short even as to form by ignoring both the express definition of the term "consent" in the Swap Agreement as well as the clear conditions precedent under the Credit Agreement to the giving of any direction to liquidate under the Indenture.

Specifically, it is undisputed that Section 6(d) of the Swap Confirmation required Citibank to obtain MSIP's prior written approval before Citibank could agree or provide any "consent … with respect to … the [Credit Agreement]." The Swap Agreement expressly defines "consent" so as to capture any method of conferring authority, including by way of an "authorisation." Thus, by its terms, Section 6(d) of the Swap Agreement required Citibank to obtain MSIP's approval before Citibank provided or allowed any authorization under "or with respect to" the Credit Agreement during the Swap's three-year term.

It is further clear that Citibank's authorization was a required condition under the Credit Agreement before any action could be taken by the Trustee to liquidate the CDO's collateral.

2

Under the Indenture, any direction to liquidate had to be made by the "Controlling Class," which was initially designated as the Revolving Facility's "Administrative Agent"—a ministerial role held by Citibank. Section 6.07 of the Credit Agreement, however, expressly circumscribed the Administrative Agent's ability to take any action as the Controlling Class (such as directing a liquidation) by requiring as a precondition that it receive a specific "***authorization***" to so act by the "Required Lenders"—defined as Lenders holding not less than two-thirds of the aggregate commitment under the Revolving Facility. As Citibank at all times held 100% of the aggregate commitment under the Revolving Facility, this provision expressly required Citibank's "authorization" before any direction to liquidate could be given by the Administrative Agent under the Indenture. Citibank, in turn, was therefore contractually obligated under Section 6(d) of the Swap Confirmation to obtain MSIP's approval before providing any such authorization. Thus, fatal to Citibank's primary argument here, its direction to the Trustee pursuant to the Indenture to liquidate, by necessity, required MSIP's approval and its failure to seek or obtain that approval was a breach of the Swap Agreement.

As a fallback to its flawed primary argument, Citibank makes the equally meritless alternative claim that the requirement under Section 6.07 of the Credit Agreement that the Administrative Agent obtain an authorization from the Required Lenders was ineffective since the Revolving Facility was never syndicated and Citibank is therefore the single Lender. Citibank's effort to read an operative provision out of the Credit Agreement on the basis of the use of a plural rather than singular defined term finds no support in the text or purpose of the Credit Agreement. Indeed, the Credit Agreement expressly provides that definitions "shall apply equally to the singular and plural forms." Moreover, if Citibank's argument were credited, it would render a number of other provisions in the Credit Agreement superfluous absent

syndication, which is plainly contrary to the parties' intent as well as the governing principles of contract interpretation under New York law.

Citibank's final and equally unavailing long-shot argument is that the parties must not have intended for MSIP to have approval rights over the liquidation of Capmark VI since they included a "Failure to Pay Principal" Credit Event in the Confirmation which could only be triggered upon such a liquidation. This argument fails as a preliminary matter since it relies on factual assertions outside the Complaint. More fundamentally, Citibank fails to address the fact that there could be situations in which it would have been in MSIP's financial interest to approve a liquidation of Capmark VI, notwithstanding that it triggered a Credit Event. Furthermore, Citibank's contention that the inclusion of a "Failure to Pay Principal" Credit Event in the Swap Agreement would be irreconcilable with the transfer of liquidation approval rights to MSIP is refuted by Citibank's having indisputably transferred liquidation approval rights under a contemporaneous and nearly identical swap transaction that included the same "Failure to Pay Principal" Credit Event as included in the Capmark VI Swap Confirmation.

For these and other reasons set forth below, Citibank's motion for judgment on the pleadings falls well shy of the mark and should be denied. Indeed, since the agreements at issue are unambiguously in favor of MSIP's position, it is MSIP, not Citibank, that is entitled to judgment at this stage of the proceedings. MSIP therefore respectfully requests that the Court both deny Citibank's requested relief and enter judgment in MSIP's favor.

## STATEMENT OF FACTS[2]

### I.    Citibank's Loan To Capmark VI

The credit default swap at the center of this dispute was entered into between MSIP and Citibank on July 21, 2006 (the "Swap"), and relates to a loan made by Citibank to Capmark VI, a CDO created and underwritten by Citibank in July 2006. Capmark VI's operation, including the rights and obligations of its various stakeholders and the preservation of its collateral, is governed primarily by an indenture entered into among Capmark VI, as issuer, Capmark VI (Delaware) Corp., as co-issuer, and LaSalle Bank National Association, as trustee (the "Trustee"), on July 24, 2006 (the "Indenture").[3] Comp. ¶ 10; Counter. ¶ 59.[4]

In connection with the issuance of various classes of notes and the acquisition of its investment portfolio, Capmark VI entered into a revolving credit facility, pursuant to which Citibank, acting as Lender, agreed to provide the CDO with up to $366 million of revolving credit (the "Revolving Facility"). This Revolving Facility is memorialized by a credit agreement entered into between Citibank, as Lender, and Capmark VI, dated July 24, 2006 (the "Credit Agreement").[5] Citibank is also party to the Credit Agreement in its secondary role as the Revolving Facility's Administrative Agent. Although the Credit Agreement was designed to accommodate a group of lenders (*i.e.*, a lending syndicate) Citibank is, and always has been, the

---

[2]    For the purposes of these motions, the Court must accept as true the allegations in the non-movant's pleading, along with the allegations in the movant's pleading that the non-movant has admitted, and must draw all reasonable inferences in the non-movant's favor. *See Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1998 WL 851591, *1 (S.D.N.Y. Dec. 9, 1998) (Scheindlin J.) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).

[3]    The Indenture is Exhibit A to the Declaration of Rachel M. Cherington, dated January 29, 2010 ("Cherington Decl.").

[4]    In this memorandum, citations to the Complaint take the form "Comp. ¶ __," citations to MSIP's Counterclaims take the form "Counter. ¶ __," citations to Citibank's Reply to Counterclaims take the form "Reply ¶ __," and citations to Citibank's Memorandum take the form "Mem. __."

[5]    The Credit Agreement is Exhibit B to the Cherington Decl.

sole Lender under the Revolving Facility.   Comp. ¶ 11; Counter. ¶ 60.   The term of the Revolving Facility is the same as the CDO; that is, it is scheduled to mature in 2038.

Citibank has two roles under the Credit Agreement.  First, as mentioned above, Citibank is the sole Lender under the Revolving Facility.  Second, Citibank is also designated under the Credit Agreement as the "Administrative Agent," which is responsible for performing certain ministerial functions under the Agreement on behalf of the Lenders.  Citibank thus wears two separate hats under the Credit Agreement—a primary "Lender" hat, and a secondary "Administrative Agent" hat.   Comp. ¶ 11; Counter. ¶ 61.

Amounts due to the Lenders from the CDO under the Revolving Facility are repaid in monthly installments, funded by cash flows from the CDO's investment portfolio.  Comp. ¶ 13; Counter. ¶ 62.  Pursuant to the Indenture, the Lenders under the Revolving Facility rank senior to the CDO's other investors (such as the noteholders or equity holders) in the priority of payments waterfall; that is, the Lenders are entitled to payments from the CDO of amounts owed under the Revolving Facility before the noteholders are entitled to receive any payments owed on the notes, or before the equity holders receive any return on their investment.  This means that on each CDO payment date, interest, commitment fees and principal payments are made first to the Lenders, until those amounts are paid in full, and then to each of the classes of note-holders in descending order of seniority.  Comp. ¶ 13; Counter. ¶ 62.

As is common in CDOs, in Capmark VI the "Controlling Class" rights—which entitle the holder to direct the CDO with respect to certain significant decisions—are effectively held by the stakeholder with the senior-most entitlement to payment: in this case, the Lenders under the Revolving Facility.  Counter. ¶ 63.  The Lenders do not, however, exercise these rights directly. Rather, the Administrative Agent under the Credit Agreement (*i.e.*, Citibank) exercises the Controlling Class rights under the Indenture at the behest of the Lenders.  Counter. ¶ 63.

6

This structure for the exercise of Controlling Class rights is created through contractual provisions under both the Indenture and the Credit Agreement.  First, Section 1.1 of the Indenture establishes Citibank, in its role as Administrative Agent, as the Controlling Class by defining "Controlling Class" as the "Revolving Facility Agent," which is in turn defined as "Citibank, N.A., as agent pursuant to the Revolving Facility."  Second, Section 6.07 of the Credit Agreement establishes certain restrictions on the ability of Citibank, as Administrative Agent, to exercise its Controlling Class rights under the Indenture without the authorization of a super-majority of the Lenders.  Specifically, Section 6.07 provides:

> To the extent that the Lenders or the Administrative Agent constitutes the "Controlling Class" for purposes of the Indenture (as defined therein) and is required or authorized to take any action in such capacity thereunder, the Administrative Agent will be authorized to so act for all purposes hereof; *provided* **that such authorization will in each case require that the Administrative Agent receive direction or consent from the Required Lenders.**

(italics in original, bold emphasis added).  "Required Lenders" is defined as the Lenders holding not less than two-thirds of the aggregate commitment under the Revolving Facility.  Credit Agreement § 1.01.  Thus, Citibank, as the Required Lenders, must provide the necessary authorization to the Administrative Agent before the Administrative Agent can take action.

## II.    Citibank Enters Into A Three Year Credit Default Swap With MSIP

On July 21, 2006, Citibank and MSIP entered into the Swap Agreement, a three-year credit default swap that became effective on July 24, 2006 and was scheduled to expire on August 10, 2009.  Citibank's stated purpose in entering into the Swap was to reduce its regulatory capital reserve requirements. Reply ¶ 19; Counter. ¶ 65.  The Swap was governed by the terms of an ISDA Master Agreement between the parties together with a Schedule thereto (as amended from time to time), both dated January 19, 1996 (the "Master Agreement"), and a confirmation between the parties dated July 21, 2006 (the "Confirmation") (together, comprising

the "Swap Agreement").[6]   Under this Swap, MSIP agreed that if a specified "Credit Event" occurred with respect to Capmark VI, MSIP would pay Citibank any losses it sustained under the Revolving Facility.  Comp. ¶ 18; Counter. ¶ 66.  The term of the Swap was limited to three years, rather than the 32-year life of the Revolving Facility (and the CDO itself).  Comp. ¶ 19; Counter. ¶ 68.  Given that the risk of a Credit Event occurring with respect to Capmark VI during its first three years was considered highly remote, MSIP received minimal quarterly payments under the Swap that aggregated each year to a mere seven basis points (*i.e.,* 7/100 of 1%) of the total potential $366 million exposure under the Revolving Facility, amounting to approximately $750,000 during the life of the Swap.  Comp. ¶ 19; Counter. ¶ 68.

Under Section 2(a)(iii) of the Master Agreement, each party's payment obligations under the Swap are subject to the condition precedent that no "Event of Default" (or "Potential Event of Default") has occurred and is continuing.  An Event of Default is defined under Section 5(a)(ii) of the Master Agreement to include the failure by a party to "comply with or perform any agreement" under the Swap Agreement if that failure is not cured within 30 days after notice of such failure is given.  In other words, if one party is in breach of the Swap Agreement, the counterparty's payment obligations are excused until such time as the default is remedied, assuming it is possible to do so.

## III.    MSIP Negotiates For And Obtains Controlling Class Rights

As a condition to entering into the Swap, MSIP demanded it be provided with whatever voting or consent rights Citibank had under the Credit Agreement, in order to ensure Citibank could not take any action that would impact MSIP's rights or obligations under the Swap without MSIP's consent.  Counter. ¶ 69.  Such rights included, most importantly for this case, Citibank's

---

[6]   The Master Agreement and Confirmation are Exhibits D and C respectively to the Cherington Decl.

right as Lender to control the exercise of Capmark VI's Controlling Class rights. This was not an unusual demand for MSIP to make, since it is common for CDO Controlling Class rights to be transferred to whichever party holds the ultimate associated financial risk. Counter. ¶ 69.

Specifically, during the Swap's negotiation, MSIP expressly insisted during oral and written communications with Citibank that Citibank transfer all its "consent" and "voting rights" as Lender under the Credit Agreement to MSIP. Citibank responded in agreement that all such rights would be transferred. Counter. ¶ 70. For instance, on June 22, 2006, the lead negotiator for MSIP sent an e-mail to the lead negotiator for Citibank stating:

> As discussed, we should include language in the doc stating that no amendment, waiver, consent, etc. will be made or given by Citi under the Loan Agreement without the prior written consent of MS (i.e., ***Citi passes along to MS all voting rights it has under the Loan Agreement to MS***).

(emphasis added.) The lead negotiator for Citibank explicitly agreed to these terms, replying to this request by email dated that same day with a simple and unequivocal "OK." Counter. ¶ 70. It is difficult to imagine a clearer contemporaneous recording of the parties' shared intent. As a result of these negotiations, Section 6(d) was added to the Confirmation, with its language tracking that of the above email.

As intended, this provision had the effect of transferring whatever voting or consent rights Citibank had as Lender under the Credit Agreement to MSIP for the three-year duration of the Swap, including Citibank's right to authorize the exercise of Controlling Class rights under the Indenture. Citibank, as Administrative Agent under the Revolving Facility, held the Controlling Class rights under the Indenture, but was precluded from exercising them without the authorization of the Required Lenders (*i.e.*, Citibank). In turn, Section 6(d) of the Confirmation ensured Citibank as the Required Lenders was prohibited from giving such authorization without the prior written consent of MSIP for so long as the Swap was outstanding.

**IV.    Capmark VI Suffers An Event Of Default But Continues To Meet Its Obligations Under The Revolving Facility**

On August 5, 2008, the CDO suffered an Event of Default under Section 5(h) of the Indenture when it failed the Class A Principal Coverage Test as a result of the then-current market value of the securities in Capmark VI's portfolio falling below a specified threshold. Comp. ¶ 26; Counter. ¶ 72.  This default did not involve Capmark VI's failure to meet any payment obligation.  Indeed, notwithstanding the "coverage" default, the CDO continued thereafter to meet its obligations when due, including making its regular payments under the Revolving Facility.  Counter. ¶ 72.  Because the CDO continued to meet its obligations, no Credit Event was triggered under the Swap that would otherwise have required MSIP to take over the Revolving Facility and make payments of any shortfall to Citibank.  There was, furthermore, no reason to conclude that the CDO would not be able to continue meeting its obligations under the Revolving Facility well into the future, and certainly beyond the remaining five months before the Swap was to expire pursuant to its terms in August 2009.  Counter. ¶ 72.

**V.    Citibank Breaches The Swap Agreement By Directing The Trustee To Liquidate The CDO In Order To Accelerate Losses Under The Facility And Trigger A Premature Credit Event**

For seven months following the Event of Default under the Indenture, Citibank took no action to authorize the liquidation of the CDO collateral, hoping Capmark VI would fail to make a scheduled payment under the Revolving Facility and thereby trigger a true default under the Swap.  However, when it became apparent that such a failure was unlikely to occur during the term of the Swap, Citibank embarked on a plan to manufacture a payment default under the Revolving Facility in the hopes of transferring all financial responsibility for the Revolving Facility to MSIP.  In furtherance of that plan, on or about March 9, 2009, Citibank, wearing its "Required Lender" hat, provided authorization pursuant to Section 6.07 of the Credit Agreement

10

to Citibank, wearing its "Administrative Agent" hat, to exercise its putative rights as Capmark VI's Controlling Class and direct the Trustee to liquidate all of the CDO's collateral. Counter. ¶ 82(b). However, notwithstanding its contractual obligation under Section 6(d) of the Confirmation to obtain MSIP's written approval before Citibank could provide such authorization to the Administrative Agent, Citibank never sought, nor received, such approval from MSIP. Reply ¶ 27; Counter. ¶ 73. Citibank's direction to the Trustee to liquidate the CDO therefore constituted a breach of its contractual obligations under the Swap.

On April 20, 2009, MSIP issued a notice to Citibank notifying Citibank that its direction to liquidate the CDO without MSIP's consent constituted a breach of section 6(d) of the Confirmation and effected a Potential Event of Default under the Master Agreement that would mature into an actual Event of Default if not remedied within 30 days. MSIP further informed Citibank that while it remained in breach of the Swap, MSIP's payment obligations were excused pursuant to Section 2(a)(iii) of the Master Agreement. Reply ¶ 28; Counter. ¶ 74.

On July 27, 2009, MSIP notified Citibank that because of Citibank's breach of the Swap Agreement, together with Citibank's failure to remedy this breach within 30 days, an Event of Default had occurred under the Swap and was continuing such that the conditions precedent to MSIP's payment obligations under the Swap were not satisfied, thereby excusing MSIP from making any payments to Citibank in respect of the Swap. Comp. ¶ 34; Counter. ¶ 76.

## ARGUMENT

## I.    Legal Standard For Motion For Judgment On The Pleadings

"A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999) (citing *Juster Assocs. v. Rutland*, 901 F.2d 266 (2d Cir. 1990)); *see also Steadfast Ins. Co. v. Stroock & Stroock & Lavan LLP*, 277

F. Supp. 2d 245, 250 (S.D.N.Y. 2003) (Scheindlin J.).[7]  In ruling on a motion for judgment on the pleadings, the Court must "accept all factual allegations in the [non-movant's pleading] as true and draw all reasonable inferences in [the non-movant's] favor." *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir. 2009); *see also Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1998 WL 851591, *1 (S.D.N.Y. Dec. 9, 1998) (Scheindlin J.).  The motion must fail if the non-movant's pleading "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Johnson,* 569 F.3d at 44 (internal citation and quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).

"[W]hen a contract is ambiguous, i.e., susceptible to at least two fairly reasonable interpretations, and there is extrinsic evidence of the parties' actual intent, its interpretation becomes a question of fact that should not be decided on a Rule 12(c) motion." *Society for Advancement of Educ., Inc. v. Gannett Co., Inc.*, No. 98 Civ. 2135 (LMM), 1999 WL 33023, *4 (S.D.N.Y. Jan. 21, 1999) (citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994)).[8]  "The language of a contract is not ambiguous, however, simply because the parties urge different interpretations, or if one party's view strains the contract language beyond its reasonable and ordinary meaning." *Dessert Beauty, Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 418 (S.D.N.Y. 2007) (Scheindlin J.) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005)) (internal quotation omitted).

---

[7]  The standard for determining whether to grant a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as that governing a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).  *See Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir. 2009); *Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1998 WL 851591, *1 (S.D.N.Y. Dec. 9, 1998) (Scheindlin J.).

[8]  Ambiguity exists "where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) (internal quotation marks omitted).

## II.    Citibank Failed to Demonstrate That Its Interpretation Of The Confirmation And Credit Agreement As Permitting Liquidation Without MSIP's Consent Is Unambiguously Correct

Citibank's motion for judgment on the pleadings is entirely predicated upon its argument that the Confirmation and the Credit Agreement unambiguously permitted Citibank to liquidate Capmark VI during the term of the Swap Agreement without first obtaining MSIP's consent. Citibank's argument fails since it is inconsistent with the plain terms of the relevant contractual provisions, relies upon a misguided distinction between a "consent" and a "direction" and seeks to place improper emphasis on the fact the Revolving Facility was never syndicated.

### A.    The Plain Terms Of The Confirmation And Credit Agreement Confer Controlling Class Rights Under The Indenture On MSIP

As a preliminary matter, Citibank's requested judgment on the pleadings is precluded by a plain reading of the Swap Confirmation and Credit Agreement which, read together, unambiguously demonstrate the parties' intent to confer Controlling Class rights on MSIP during the term of the Swap Agreement.

*First*, the plain terms of Section 6.07 of the Credit Agreement unambiguously reflect the parties' intent that the Administrative Agent under the Credit Agreement be precluded from exercising any Controlling Class rights under the Indenture without the "authorization" of the "Required Lenders."  It is furthermore clear that Citibank constituted the "Required Lenders" under the Credit Agreement since it held more than two-thirds of the aggregate commitment under the Revolving Facility.  Consequently, under Section 6.07 the Administrative Agent could not exercise any Controlling Class rights under the Indenture without the "authorization" of Citibank.

*Second*, the plain terms of the Confirmation unambiguously required Citibank to obtain MSIP's written approval prior to giving any authorization under Section 6.07 of the Credit

Agreement. Specifically, Section 6(d) of the Confirmation provides that "[n]o … consent … with respect to … the [Credit Agreement] will be agreed or consented to by [Citibank] … without the prior written consent of [MSIP]." For the purpose of construing this provision, the term "consent" is expressly defined under the Swap Agreement to effectively capture any method of conferring authority, including through an "authorisation."[9] Thus, applying that express definition of "consent," Section 6(d) could alternatively be read as follows:

> No … [authorization] … with respect to … the [Credit Agreement] will be agreed
> or consented to by [Citibank] … without the prior written consent of [MSIP].

So read, this provision clearly required Citibank to obtain MSIP's prior written consent before giving any authorization to the Administrative Agent under Section 6.07 of the Credit Agreement—including with regard to the liquidation of Capmark VI. Similarly, as the term "consent" is also defined to include the term "action," *see supra* n.9, Section 6(d) can properly be read to prohibit Citibank from taking any action under the Credit Agreement without MSIP's prior written approval. Such a prohibition would certainly prevent Citibank from giving a direction, instruction or order, or taking any other affirmative act.

In light of the express definition of the term "consent" in the Swap Agreement, Citibank's resort to dictionary definitions to construe Section 6(d)'s ambit, Mem. 15-16, is misguided. Yet, even if "consent" in Section 6(d) were not expressly defined, the ordinary meaning of "consent" is still clearly broad enough to encompass an authorization given pursuant to Section 6.07 of the Credit Agreement. As Citibank concedes, "consent" ordinarily means

---

9    "[C]onsent" is defined in the Master Agreement to include a "consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent." Master Agreement § 14. The definitions in Section 14 of the Master Agreement are incorporated in the Confirmation. *See* Master Agreement § 14 (defining terms "as used in this Agreement"), and § 1(c) ("this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement')"); Confirmation preamble ("This Confirmation supplements, forms a part of, and is subject to, the [Master Agreement]").

"[a]greement, approval, or permission as to some act or purpose."  Mem. 15 (quoting BLACK'S LAW DICTIONARY 323 (8th ed. 2004)).  By requiring that the Required Lenders "authorize" any action taken by the Administrative Agent, Section 6.07 of the Credit Agreement effectively meant that Controlling Class rights could not be exercised without Citibank's "approval" so long as it held more than two-thirds of the aggregate commitment under the Revolving Facility.  *See* BLACK'S LAW DICTIONARY 143 (8th ed. 2004) (defining "authorize" as "formally approve").  Thus, under even a plain reading of the provisions in issue, Citibank's consent was required for the exercise of Controlling Class rights, thus triggering Citibank's obligations to get MSIP's consent pursuant to Section 6(d) of the Confirmation.[10]

### B.    Citibank's Post Hoc Claim Of Having Given A "Direction" To Liquidate Rather Than A "Consent" Does Not Support Its Position

Understanding that its motion will fail if the liquidation of Capmark VI came within the ambit of Section 6(d) of the Confirmation, Citibank seeks to argue that Section 6(d) was never implicated because it refers, in part, to instances in which Citibank provides a "consent" under the Credit Agreement whereas, according to Citibank, it instead provided a "direction" to liquidate Capmark VI.  This post hoc hairsplitting justification for Citibank's failure to abide Section 6(d)'s requirements lacks any basis in either facts that can be considered on this motion or the law.

As a threshold matter, Citibank's argument that it gave a "direction" under Section 6.07 of the Credit Agreement to the Administrative Agent (*i.e.*, itself) to direct the Trustee to liquidate

---

[10]    Additionally, it should be noted that parol evidence pled in the Answer and Counterclaims demonstrates that the terms used in Section 6(d) of the Confirmation— "amendment," "waiver," and "consent"—were intended merely as examples, rather than an exhaustive list of the actions that were intended to be subject to MSIP's prior written consent. Counter. ¶ 70 ("we should include language in the doc stating that no amendment, waiver, consent, *etc.* will be made or given by Citi under the Loan Agreement without the prior written consent of MS") (emphasis added).

15

the CDO, as opposed to giving its "consent" to such a direction, Mem. 18-19, cannot be considered on these motions, because the Complaint contains no such allegation. *Steadfast*, 277 F. Supp. 2d at 250-251. While neither party disputes that Citibank, in its role as Administrative Agent, ultimately gave a "direction" to the Trustee pursuant to the Indenture to liquidate Capmark's collateral, Comp. ¶ 29, Counter. ¶ 29, that is different than a "direction" having been given by Citibank, as Required Lenders, to authorize the Administrative Agent pursuant to Section 6.07 of the Credit Agreement to direct the liquidation. Neither party has alleged that Citibank, as Required Lenders, issued such a "direction" pursuant to Section 6.07. Nonetheless, Citibank repeatedly mischaracterizes MSIP as having conceded that Citibank made a Section 6.07 "direction" by referencing MSIP's allegation regarding the Administrative Agent's direction to the Trustee to liquidate, in apparent hope that the Court will not understand the distinction between directions issued by the Required Lenders under the Credit Agreement and directions issued by the Administrative Agent under the Indenture. *See, e.g.,* Mem. 11, 18-19. The distinction is clear, however, and MSIP has thus not made the concession Citibank claims.

Furthermore, Citibank is flat wrong when it asserts that "MSIP does not factually allege that Citibank actually gave a 'consent' pursuant to Section 6.07." Mem. 17. MSIP explicitly pleads in its Counterclaim that Citibank "***consented*** to a direction being given to the Capmark VI Trustee on behalf of the Controlling Class to liquidate the assets held by Capmark VI pursuant to Section 5.5(a)(ii) of the Indenture." Counter. ¶ 82(b) (emphasis added). Indeed, since the Court must accept facts alleged in MSIP's Counterclaims as true for the purposes of Citibank's motion, this allegation alone precludes crediting Citibank's argument at this stage that it gave a "direction" rather than a "consent." *Johnson,* 569 F.3d at 43; *Frater*, 1998 WL 851591 at *1 (Scheindlin J.).

16

In any event, Citibank's focus on the meaning of the terms "consent" and "direction" in Section 6.07 of the Credit Agreement, *see* Mem. 15-16, is misplaced and ultimately beside the point. The plain language of Section 6.07 makes clear that directions and consents are merely two forms that an authorization from the Required Lenders may take. Given that Section 6(d) of the Confirmation prohibits the giving of *any* authorization (or the taking of any action) under the Credit Agreement without the prior written consent of MSIP, it logically follows that this prohibition must apply to *any form* of authorization (*i.e.*, to an authorization in the form of a consent, and to an authorization in the form of a direction).

Similarly, in light of the purpose of Section 6(d)—to, among other things, effect the transfer of Controlling Class rights from Citibank to MSIP for the duration of the Swap—it would be absurd to interpret the term "consent" in that provision in a way that gives MSIP an approval right over an action taken by the Controlling Class if that action is authorized by a "consent" under Section 6.07 of the Credit Agreement, but gives MSIP no approval right over precisely the same action if it is authorized by a "direction." Citibank's farfetched interpretation of Section 6(d) should therefore be rejected "in favor of one which would better accord with the reasonable expectations of the parties." *Reape v. New York News, Inc.*, 504 N.Y.S.2d 469, 470 (N.Y.App.Div. 1986); *see also Baum v. County of Rockland*, 337 F. Supp. 2d 454, 466 (S.D.N.Y. 2004) (defining a reasonable contractual interpretation as one which does not let "form swallow substance.") (citing *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 555 (1982)).

In light of the foregoing, Citibank's interpretation of Section 6(d) of the Confirmation as not applying to an "authorization" given pursuant to Section 6.07 of the Credit Agreement, or, alternatively, as not applying to such authorization given in the form of a "direction," is not

reasonable.[11]  The parties contracted to transfer to MSIP whatever voting or consent rights Citibank had as Lender under the Credit Agreement, including Citibank's right to authorize the exercise of Controlling Class rights under the Indenture.  Citibank's contrary interpretation of the parties' agreement must therefore be rejected and its motion denied.

### C.    Citibank's Claim That Section 6.07 Has No Application Absent Syndication Of The Revolving Facility Is Unavailing

As a fallback to its position that Section 6(d) of the Swap Confirmation was never implicated, Citibank argues that Section 6.07 of the Credit Agreement is also inapplicable since the Revolving Facility was never syndicated.  *See* Mem. 17-18.  Citibank's argument is untenable for a number of reasons.

*First*, there is no textual support for Citibank's interpretation.  Citibank is unable to cite any provision in the Credit Agreement even remotely suggesting that the parties intended compliance with Section 6.07 (or any other section) to be contingent upon syndication.

*Second*, the plain text of the Credit Agreement directly refutes Citibank's interpretation of Section 6.07.  Citibank errs by focusing on the fact that the term "Required Lenders" is defined in the plural.  *See* Mem. 17-18.  While this is correct, the defined terms that comprise the definition of Required Lenders are themselves defined in the singular, evidencing the parties' intent that a single Lender could constitute the "Required Lenders" for the purposes of the Credit Agreement.  Specifically, Section 1.01 of the Credit Agreement defines "Required Lenders" to mean: "as of any date, Lenders holding Commitments constituting not less than 66-⅔% of the Aggregate Commitment on such date."  While Section 1.01 does not define the term "Lenders,"

---

[11]    Citibank alternatively argues that even a "consent" pursuant to Section 6.07 of the Credit Agreement would not trigger Section 6(d) of the Confirmation, see Mem. 19, claiming Section 6(d) is only triggered by a consent to a consent. This argument is not credible since there are no provisions in the Credit Agreement requiring multiple consents and Citibank's interpretation would thus read Section 6(d)'s "consent" trigger out of the Confirmation.

it does define the singular form "Lender" as meaning the "the Initial Lender."  In turn, the "Initial Lender" is specified on Schedule 2.01 of the Credit Agreement as being "Citibank, N.A." Section 1.02, in turn, relevantly provides that "definitions of terms herein shall apply equally to the singular and plural forms of the terms defined."  Consequently, in combination these two Sections make clear that, absent syndication, it was the parties' intent that Citibank be treated as comprising the Required Lenders under the Credit Agreement.

*Third*, under Citibank's interpretation of Section 6.07, Controlling Class rights under the Indenture would pass to MSIP only in the event the Revolving Facility was syndicated, an absurd result that in no way accurately reflects the reasonable expectations of the parties.  The purpose of transferring Controlling Class rights is to ensure those rights are controlled by whichever party holds the ultimate associated financial risk.  Counter. ¶ 69.  Syndication of the Revolving Facility would have no impact on the financial risk held by MSIP under the CDS.  Consequently, it makes no sense for the transfer of Controlling Class rights to be contingent upon syndication. Citibank's interpretation of Section 6.07 of the Credit Agreement should thus be "reject[ed]…in favor of one which would better accord with the reasonable expectations of the parties."  *Reape*, 504 N.Y.S.2d at 470; *see also Baum*, 337 F. Supp. 2d at 466 .

*Fourth*, Citibank's constrained "the plural does not include the singular" interpretation would result in a number of other provisions in the Credit Agreement having no effect absent syndication.  If Sections referring to "Required Lenders" in the plural have no application absent syndication of the Revolving Facility, then Citibank would have had no right to request an opinion from Capmark VI's counsel or special counsel covering additional matters relating to the establishment and funding of the CDO, Credit Agreement § 3.01(c), (d), and, in the case of an Event of Default, would have had no right to direct the Administrative Agent to terminate the Interest-Only Period and reduce the Revolving Facility to the amount already drawn down by the

19

CDO.  Credit Agreement § 5.01.  It makes no sense for either of these rights to be contingent upon syndication of the Revolving Facility. [12]  Consequently, Citibank's interpretation of "Required Lenders" should be rejected in favor of one that "gives a reasonable and effective meaning to all the terms [of the Credit Agreement]."  *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985).

In light of the foregoing, Citibank's interpretation of Section 6.07 of the Credit Agreement as having no application absent syndication of the Revolving Facility is not reasonable.  The Section should be found to apply regardless of syndication, with the result that the Administrative Agent could not exercise its Controlling Class rights under the Indenture without the authorization of Citibank in its capacity as the Required Lenders.

### III.     MSIP's Interpretation Of The Confirmation And Credit Agreement Do Not Render The Failure To Pay Principal Credit Event Illusory

In an effort to paint MSIP's interpretation of the Confirmation and Credit Agreement as unreasonable, Citibank attempts to argue that the Failure to Pay Principal Credit Event in the Confirmation would be illusory if MSIP had approval rights over the liquidation of Capmark VI. Mem. 19-22.  As purported support for this argument, Citibank contends: (1) MSIP would never consent to liquidation during the life of the Swap, Mem. 20; (2) the Failure to Pay Principal Credit Event was "specially negotiated," and should therefore be given greater weight than MSIP's alleged approval rights over the exercise of Controlling Class rights, Mem. 20; and (3) if

---

[12]     Technically, applying Citibank's interpretation of "Required Lenders," Section 6.07 would not apply *even in the event of syndication*, provided one Lender held at least two-thirds of the exposure under Revolving Facility.  For example, if there were three Lenders under the Credit Agreement but one Lender held 67 percent of the Revolving Facility, there would still be only one "Required Lender," with the result that, according to Citibank, Section 6.07 would not apply.  However, as the cases cited by Citibank clearly indicate, such a result would be contrary to the purpose of Section 6.07, as a minority Lender acting as Administrative Agent could exercise its Controlling Class rights under the Indenture in a manner contrary to the will of the majority Lender.  Mem. 18; *see, e.g., Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 332 (N.Y. 2007).

the Failure to Pay Principal Credit Event is illusory, the Swap would not achieve Citibank's goal of relief from regulatory capital requirements.  Mem. 20.  Citibank is wrong on all counts.

### A.    MSIP Could Reasonably Have Been Expected To Consent To Liquidation Under Certain Circumstances

As threshold matter, Citibank's argument that MSIP would never consent to liquidation during the life of the Swap, Mem. 20, cannot be considered on a motion for judgment on the pleadings, because it relies on a speculative factual assertion that is outside the Complaint. *Steadfast*, 277 F. Supp. 2d at 250-251 (Scheindlin J.).  Nowhere in the Complaint does Citibank allege that MSIP would never consent to liquidation.  On the contrary, the pleadings establish that Citibank never even consulted MSIP about such a possibility.

In any event, even assuming *arguendo* that the Court *could* consider Citibank's argument at this stage, the premise that MSIP would never consent to liquidation during the life of the Swap is illogical.  It is readily conceivable that it would have been in MSIP's financial interest to consent to the liquidation of Capmark VI during the life of the Swap.[13]  For example, if it had been forecasted that Capmark VI was going to miss an interest payment under the Credit Agreement at some point prior to the Swap's expiration, MSIP may very well have approved the liquidation of Capmark VI in order to realize the current remaining value of the collateral and avoid further future deterioration in the value of the collateral.

### B.    The Relevant Term That Was "Specially Negotiated" In This case Is Section 6(d) Of The Confirmation, Not The Failure To Pay Principal Credit Event

Once again, as threshold matter, Citibank's argument that the Failure to Pay Principal Credit Event was "specially negotiated," Mem. 7, 21, cannot be considered on a motion for

---

[13]    Moreover, it would have been nonsensical to omit a Failure to Pay Principal Credit Event since the effect of such an omission would have been to *excuse* MSIP from having to make payments under the Swap in the case of any liquidation of Capmark VI.  There is no reason to believe that Citibank would have agreed to permit such a loophole in MSIP's obligations.

judgment on the pleadings, because it relies on a factual assertion that is outside the Complaint. *Steadfast*, 277 F. Supp. 2d at 250-251 (Scheindlin J.).  While the Failure to Pay Principal Credit Event is not a standard Credit Event set forth in the 2003 ISDA Credit Derivatives Definitions, there is no allegation in the pleadings that it was specially negotiated between the parties, as opposed to simply included by default in the draft Confirmation prepared by Citibank.

By contrast, MSIP has alleged that it expressly insisted during oral and written communications with Citibank that Citibank transfer its "consent" and "voting rights" as Lender under the Credit Agreement to MSIP for the duration of the Swap, that Citibank explicitly agreed to these terms, and that Section 6(d) was subsequently added to the Confirmation to memorialize the transfer.  Counter. ¶ 70-71.[14]  Consequently, the principle of contract interpretation cited by Citibank—"separately negotiated or added terms are given greater weight than … terms not separately negotiated"—in fact dictates that the Court give greater weight to Section 6(d) of the Confirmation than the Failure to Pay Principal Credit Event.  Mem. 21 (citing RESTATEMENT (SECOND) OF CONTRACTS § 203(d) (1981); *Trans Pac. Leasing Corp. v. Aero Micronesia, Inc.*, 26 F. Supp. 2d 698, 709 (S.D.N.Y. 1998)).  Moreover, even if the Failure to Pay Principal Credit Event *had* been separately negotiated by Citibank at the outset of negotiations with MSIP, it would be trumped, in the event of any inconsistency, by Section 6(d), because that term was added subsequently to address a specific issue discussed by the parties.  *See, e.g., In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 60 (Del. Ch. 2001) (giving primacy to a contractual provision that was "created specifically" to address an issue raised by party *A* during the course of negotiations over provisions originally included in the draft contract by party *B*, that had been "lifted for the most part from [a] pre-existing [contract].")

---

[14]  Citibank admits that the email exchange between the lead negotiator for MSIP and the lead negotiator for Citibank on June 22, 2006, included the language quoted in paragraph 70 of MSIP's Answer and Counterclaims.  Reply ¶ 24.

**C.    Citibank Has Failed To Demonstrate That The Swap Does Not Achieve Its Goal Of Obtaining Regulatory Capital Relief**

Citibank fares no better in arguing that MSIP's interpretation of the Confirmation and Credit Agreement "is irreconcilable with [Citibank's] admitted goal of achieving regulatory capital relief … with respect to the Revolving Facility." Mem. 22. As a threshold matter, this argument turns on material issues of fact that have yet to be raised, let alone resolved—including the requirements credit default swaps must satisfy in order to qualify for regulatory capital relief, and whether the Swap meets those requirements—with the result that Citibank is not entitled to judgment on the pleadings based on this argument. *Carballo*, 34 F. Supp. 2d at 214; *Steadfast*, 277 F. Supp. 2d at 250 (Scheindlin J.).

Moreover, even assuming *arguendo* that the Court *could* consider Citibank's argument at this stage, Citibank has failed to demonstrate that MSIP's interpretation of Section 6(d) of the Confirmation is inconsistent with the Swap having qualified for regulatory capital relief. The Swap contained two "failure to pay" Credit Events, which together ensured that MSIP assumed the financial risk of any failure by Capmark VI to make any payment legitimately due under the Credit Agreement during the term of the Swap. Since there were clearly scenarios under which a failure to pay could have occurred during the term of the Swap—including, for example, a failure to pay interest if Capmark VI had not performed well enough to make its regular interest payments under the Credit Agreement, or a failure to pay principal in circumstances where it would have been in MSIP's interest to consent to the liquidation of the CDO's collateral— Citibank is incorrect when it asserts there was no "real transfer" of credit risk under the Swap.

Finally, Citibank's regulatory capital relief argument is completely refuted by the fact that, a mere five months after entering into the Capmark CDS, Citibank entered into a second materially identical non-coterminous credit default swap with another Morgan Stanley

23

subsidiary, Morgan Stanley Capital Services, Inc. ("MSCS"), related to a CDO called Tallships Funding, Ltd. ("Tallships") (the "Tallships CDS").[15]  Like Capmark VI, Tallships is a hybrid CDO created by Citibank that makes interest payments to noteholders using funds generated by the cash and synthetic assets it holds as collateral.   The Confirmation memorializing the Tallships CDS (the "Tallships CDS Confirmation") irrefutably contained the precise terms that Citibank here claims it would never have agreed to in the Capmark CDS.  *See* Declaration of Jonathan E. Pickhardt, dated February 26, 2010, Ex. A.   Specifically, the Tallships CDS Confirmation included (1) a Failure to Pay Principal Credit Event (§ 5); (2) a provision identical to Section 6(d) of the Capmark Confirmation that transferred whatever voting or consent rights Citibank had as lender under the Tallships credit agreement to MSCS (§ 6(d)); *and* (3) a provision setting out in detail the procedure Citibank was required to follow when seeking MSCS's approval for any exercise of Controlling Class rights under the Tallships indenture (§ 6(e)).[16]  The fact that Citibank was willing to enter a credit default swap containing precisely the features it claims the Capmark Swap could not have been intended to include only five months after executing the Capmark Swap belies Citibank's interpretation of Section 6(d) of the Confirmation and Section 6.07 of the Credit Agreement in this action.

---

[15]    MSIP recognizes that these facts are outside the pleadings.  However, in light of Citibank's claims in its Memorandum regarding the conflict between its purpose in entering into the Swap and MSIP's interpretation of Section 6(d), *see* Mem. 21-22—claims that are notably absent from the Complaint—MSIP is compelled to bring these critical facts to the Court's attention.  If the Court desires, MSIP is prepared to amend its pleadings to bring these facts officially before the Court should Citibank be unwilling to stipulate to them.

[16]    It is irrefutable under the Tallships CDS that Citibank, as Required Lender under the Tallships credit agreement, could not authorize Citibank as administrative agent to direct the trustee to liquidate the Tallships CDO collateral without the written consent of MSCS.

**IV.    Citibank's Motion Fails To Address MSIP's Reformation Defense, Which Cannot Be Dismissed On The Pleadings**

While MSIP believes the Court need not reach its reformation defense to deny Citibank's motion and grant MSIP's cross-motion for judgment on the pleadings, this does not excuse Citibank's utter failure to address the reformation defense in its Memorandum, as that defense alone compels denial of Citibank's motion.   A party claiming reformation based on mutual mistake need only allege (i) the written agreement to be reformed, (ii) an agreement that was not expressed in that written agreement, and (iii) a mutual mistake of the parties. 16 N.Y. Jur. 2d, *Cancellation of Instruments* § 87 (2009); *Chimart Associates v. Paul*, 66 N.Y.2d 570, 573 (1986).   MSIP has alleged that Citibank and MSIP came to an agreement, via oral and written communications, that the Confirmation would be amended so as to transfer all of Citibank's "consent" and "voting rights" as a Lender under the Credit Agreement to MSIP for the duration of the Swap. Counter. ¶¶ 69-71.   In the event the Confirmation failed to express this agreement, MSIP has pled all three elements of a reformation claim based on mutual mistake, with the result that this claim cannot be dismissed on the pleadings.   *Carballo*, 34 F. Supp. 2d at 214; *Steadfast*, 277 F. Supp. 2d at 250 (Scheindlin J.)

## CONCLUSION

For the foregoing reasons, MSIP respectfully requests that the Court deny Citibank's motion for judgment on the pleadings.   In addition, for the reasons set forth herein, based upon the unambiguous terms of the relevant contractual provisions, MSIP asserts that it is entitled to judgment on the pleadings and dismissal of Citibank's Complaint for failure to state a claim, and MSIP so requests such relief.

DATED:     New York, New York              QUINN EMANUEL URQUHART OLIVER &
           February 26, 2010                         HEDGES, LLP


By: _____
      Michael B. Carlinsky
      Jonathan E. Pickhardt
      Simona Gory

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

michaelcarlinsky@quinnemanuel.com
jonpickhardt@quinnemanuel.com
simonagory@quinnemanuel.com

*Attorneys for Defendant and Counterclaimant*
*Morgan Stanley & Co. International, PLC*