UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITIBANK, N.A.,

                 Plaintiff and Counter-
                 Defendant,

    -against-

MORGAN STANLEY & CO.
INTERNATIONAL, PLC,

                 Defendant and
                 Counterclaimant.

09 Civ. 8197 (SAS)

**AMENDED ANSWER AND COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

---

**AMENDED ANSWER**

       Defendant Morgan Stanley & Co. International, PLC ("MSIP"), by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, answers, upon knowledge as to itself and its own acts, and otherwise upon information and belief, the Complaint of Citibank, N.A. ("Citibank"), as follows:

       1.      MSIP denies the allegations in paragraph 1 of the Complaint, except that it admits entering into a credit default swap (the "Capmark VI Swap") memorialized in an agreement with Citibank executed in July 2006 (the "Capmark VI Confirmation," together with other documents).

       2.      MSIP denies the allegations in paragraph 2 of the Complaint, except admits that the Capmark VI Confirmation is memorialized in an agreement dated July 21, 2006 and that MSIP received approximately $750,000 pursuant to that agreement.

       3.      MSIP denies the allegation in paragraph 3 of the Complaint that Citibank has any right, under the Capmark VI Confirmation or otherwise, to require MSIP to pay any losses

sustained by Citibank as a result of its direction to liquidate the Capmark VI, Ltd. ("Capmark VI") collateral.  MSIP lacks sufficient knowledge to either admit or deny the remaining allegations in paragraph 3 of the Complaint.

4.      MSIP denies the allegations in paragraph 4 of the Complaint, except that it admits receiving approximately $750,000 in payments from Citibank made in accordance with the Capmark VI Confirmation.

5.      MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 5 of the Complaint.

6.      MSIP admits the allegations in paragraph 6 of the Complaint.

7.      MSIP lacks sufficient knowledge to admit or deny the allegations in paragraph 7 of the Complaint, except admits that MSIP is a citizen of the United Kingdom and the amount in controversy exceeds $75,000.

8.      MSIP lacks sufficient knowledge to admit or deny the allegations in paragraph 8 except admits that MSIP consented to the jurisdiction of this Court in the Capmark VI Confirmation.

9.      MSIP admits the allegations in the first sentence of paragraph 9 of the Complaint, except that it denies the allegation as to the underlying purpose of the Capmark VI Swap.  MSIP denies the  allegations in sentences 2 through 5 in paragraph 9 of the Complaint except admits that some collateralized debt obligations operate as described.

10.      MSIP lacks sufficient knowledge to either admit or deny the allegation in paragraph 10 of the Complaint that Citigroup Global Markets Inc. sold collateralized debt obligation notes to investors.  MSIP admits the remaining allegations in paragraph 10 of the Complaint.

11. MSIP denies the allegations in paragraph 11 of the Complaint, except admits the allegations in the first two sentences and lacks sufficient knowledge to either admit or deny that the revolving credit facility was not syndicated, or that Citibank remained at all times the sole lender under the credit agreement between Citibank and Capmark VI Ltd. dated July 24, 2006 (the "Capmark VI Credit Agreement").

12. MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 12 of the Complaint.

13. MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 13 of the Complaint.

14. MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 14 of the Complaint.

15. MSIP denies the allegations in paragraph 15 of the Complaint, except admits that the description accurately describes some credit default swaps.

16. MSIP denies the allegations in paragraph 16 of the Complaint, except admits that the description accurately describes some credit default swaps.

17. MSIP denies the allegations in paragraph 17 of the Complaint, and refers the Court to the Capmark VI Confirmation for an accurate description of the terms thereof.

18. MSIP denies the allegations in paragraph 18 of the Complaint, and refers the court to the Capmark VI Confirmation for an accurate description of the terms thereof.

19. MSIP denies the allegations in paragraph 19 of the Complaint, and refers the Court to the Capmark VI Confirmation for an accurate description of the terms thereof. MSIP admits that it received approximately $750,000 from Citibank pursuant to the Capmark VI Confirmation.

20.     MSIP denies the allegations in paragraph 20 of the Complaint, and refers the Court to the Capmark VI Confirmation for an accurate description of the terms thereof, except admits that the four Credit Events that are designated as applicable under the Capmark VI Confirmation are Bankruptcy, Failure to Pay Principal, Failure to Pay Interest, Commitment Fees or Additional Cost and Restructuring.

21.     MSIP denies the allegations in paragraph 21 of the Complaint.

22.     MSIP denies the allegations in paragraph 22 of the Complaint, and refers the Court to the Capmark VI Confirmation for a full and accurate description of the terms thereof.

23.     MSIP denies the allegations in paragraph 23 of the Complaint, and refers the Court to the Capmark VI Confirmation for a full and accurate description of the terms thereof.

24.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 24 of the Complaint.

25.     MSIP denies the allegations in paragraph 25 of the Complaint.

26.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 26 of the Complaint, except that it admits the trustee under the indenture dated July 24, 2006 (the "Capmark VI Indenture"), issued a Notice of Event of Default on August 6, 2008.

27.     MSIP denies the allegations of paragraph 27 of the Complaint, and refers the Court to the Capmark VI Indenture for a full and accurate description of the terms thereof.

28.     MSIP lacks sufficient knowledge to admit or deny the allegations in paragraph 28 of the Complaint.

29.     MSIP denies the allegations in paragraph 29 of the Complaint, except that it admits Citibank directed the Trustee to liquidate the collateralized debt obligation collateral.

30.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 30 of the Complaint, except admits that Citibank provided a copy of the Liquidation Notice to MSIP on March 9, 2009.

31.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 31 of the Complaint.

32.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 32 of the Complaint.

33.     MSIP denies the allegations in paragraph 33 of the Complaint.

34.     MSIP denies the allegations in paragraph 34 of the Complaint, and refers the Court to the Capmark VI Confirmation for a full and accurate description of the terms thereof.

35.     MSIP lacks sufficient knowledge to either admit or deny the allegations in paragraph 35 of the Complaint.

36.     MSIP denies the allegations in paragraph 36 of the Complaint, except admits that Citibank took certain steps, including the provision of certain notices, that purported to be in furtherance of physical settlement under the Capmark VI Confirmation.

37.     MSIP denies the allegations in paragraph 37 of the Complaint.

38.     MSIP denies the allegations in paragraph 38 of the Complaint.

39.     MSIP denies the allegations in paragraph 39 of the Complaint.

40.     MSIP denies the allegations in paragraph 40 of the Complaint.

41.     MSIP denies the allegations in paragraph 41 of the Complaint.

42.     MSIP incorporates by reference and realleges its responses in paragraphs 1 through 41 above, as if set forth fully herein, in response to paragraph 42 of the Complaint.

43.     MSIP denies the allegations in paragraph 43 of the Complaint.

44.   MSIP denies the allegations in paragraph 44 of the Complaint.

45.   MSIP denies the allegations in paragraph 45 of the Complaint.

46.   MSIP denies the allegations in paragraph 46 of the Complaint.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters where that burden rests on Citibank as Plaintiff, MSIP alleges the following facts upon knowledge as to itself and its own acts, and otherwise upon information and belief, and asserts the following defenses with respect to the Complaint:

### FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

Citibank fails to allege facts sufficient to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
(Failure of Condition Precedent)

Citibank's claim is barred, in whole or in part, because the conditions precedent to MSIP's payment obligations have not been satisfied.

### THIRD AFFIRMATIVE DEFENSE
(Unclean Hands, Estoppel, Laches and Waiver)

Citibank's claim is barred by the equitable doctrines of unclean hands, estoppel, laches, and waiver.

### FOURTH AFFIRMATIVE DEFENSE
(Unjust Enrichment)

Citibank's claim is barred in that any award to Citibank in this action would constitute unjust enrichment.

### FIFTH AFFIRMATIVE DEFENSE
(Implied Covenant of Good Faith)

Citibank's claim is barred, in whole or in part, because it violated the implied covenant of good faith and fair dealing.

## SIXTH AFFIRMATIVE DEFENSE
### (Unconscionability)

Citibank's claim is barred because recovery by Citibank under the Capmark VI Swap at issue would be unconscionable.

## SEVENTH AFFIRMATIVE DEFENSE
### (Reformation)

Citibank's claim is barred because the contract at issue should be reformed to reflect the parties' true intentions.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

Defendant gives notice that it intends to rely upon such other further defenses as may become available during pretrial proceedings in this action and hereby reserves all rights to amend this Answer and all such defenses.

## AMENDED COUNTERCLAIMS

MSIP, by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Counterclaims against Citibank, alleges upon knowledge as to itself and its own acts, and otherwise upon information and belief, as follows:

### NATURE OF THE ACTION

47.     This dispute arises from Citibank's efforts to engineer a premature payment default under a credit facility (the "Revolving Facility" or "Facility") in the hopes of passing off hundreds of millions of dollars of losses to MSIP through a credit default swap (the "Capmark VI Swap Agreement" or "Capmark VI Swap") that was set to expire shortly.  In particular, Citibank breached its express obligations under the Capmark VI Swap when it exercised its putative rights as controlling class of Capmark VI Ltd. — the borrower under the Revolving Facility and a collateralized debt obligation transaction ("Capmark VI CDO" or the "CDO") — to direct the liquidation of the CDO in order to accelerate amounts due to Citibank under the loan, thereby forcing a default by the CDO under that facility and a corresponding credit event under the Capmark VI Swap.

48.     Relying on this engineered credit event, Citibank is now alleging that MSIP owes it over $245 million, notwithstanding the fact that but for Citibank's willful breach of the Capmark VI Swap Agreement, the CDO would have continued to meet its payment obligations under the Revolving Facility for the life of the Capmark VI Swap, and the Capmark VI Swap would have thus expired pursuant to its terms in August 2009 without any credit event being triggered.

49.     The CDO was arranged and underwritten by Citibank and closed on July 24, 2006. Citibank was also the initial noteholder, placement agent and synthetic counterparty for the

Capmark VI CDO.  In addition to these roles, and most significantly for this dispute, Citibank also assumed the role as a "Lender" under a credit agreement which memorialized the Revolving Facility through which the CDO was provided with up to $366 million of revolving credit (the "Capmark VI Credit Agreement").  The Capmark VI Credit Agreement was structured such that the Revolving Facility could be syndicated, although no other lenders were ever added and Citibank remained the sole Lender.  In addition to its role as the sole Lender, Citibank also assumed a ministerial role as the Administrative Agent under the Capmark VI Credit Agreement, pursuant to which it could act as agent for all Lenders, subject to certain conditions.

50.     In order to facilitate an advantageous economic benefit with respect to the amount of reserve capital it was required to set aside because of the Capmark VI Credit Agreement, Citibank also entered into the Capmark VI Swap Agreement — a limited three-year credit default swap under which MSIP agreed to make certain payments to Citibank upon the occurrence of a defined "credit event," such as a default on a payment obligation under the Revolving Facility.

51.     Capmark VI experienced an event of default under the CDO's governing indenture (the "Capmark VI Indenture") in August 2008.  The event of default was caused by the failure of a "coverage ratio" test.  That failure was caused by a decrease in the principal amount of the securities owned by the CDO and not by any failure of the CDO to fulfill any payment obligations, such as those under the Capmark VI Credit Agreement.  To the contrary, the Capmark VI CDO continued to meet all its obligations under the Revolving Facility on each monthly payment date following the August 2008 event of default.  Moreover, there was no indication that it would not continue to meet these obligations into the future, well beyond the remaining term of the Capmark VI Swap.  Significantly, so long as the Capmark VI CDO

continued to meet its obligations under the Revolving Facility, no credit event would occur under the Capmark VI Swap.  Instead, the Swap would expire in August 2009 and Citibank (not MSIP) would bear any future losses under the Revolving Facility.

52.     However, in an effort to expand the intended scope of the Capmark VI Swap and transfer the risk of any such future losses to MSIP, Citibank determined to engineer a premature payment default under the Capmark VI Credit Agreement in order to precipitate a credit event before the Capmark VI Swap's expiration.  Accordingly, in March 2009, with only five months left on the Capmark VI Swap, Citibank, in its role as Capmark VI's Controlling Class, directed the liquidation of the CDO, knowing full well this would trigger the obligation on the part of the Capmark VI CDO to repay immediately the entire $366 million loan to Citibank under the Revolving Facility, an obligation that the CDO could not meet under then-present market conditions.  Following the liquidation, just as Citibank had planned, the Capmark VI CDO defaulted on its obligations under the Revolving Facility, thereby creating $245 million of losses — losses that would not have matured had Citibank not directed the CDO's liquidation.

53.     Citibank's direction to liquidate the CDO was in express violation of its contractual obligations to MSIP under the Capmark VI Swap.  Specifically, the Capmark VI Swap expressly precluded Citibank from consenting to the provision of a liquidation direction without obtaining MSIP's prior written consent.  Citibank never requested, and MSIP never gave, any such consent.  Citibank's direction to liquidate Capmark VI was therefore an express breach of the Capmark VI Swap, calculated to shift over $245 million of losses properly borne by Citibank to MSIP.

10

54.     MSIP therefore brings these counterclaims to protect its rights under the Capmark VI Swap and prevent Citibank from exploiting its multiple conflicting roles in the transaction to extract a $245 million windfall at MSIP's expense through a willful contract violation.

### THE PARTIES

55.     Defendant and Counterclaimant MSIP is a publicly limited company organized under the laws of the United Kingdom with its principal place of business in London, England.

56.     Plaintiff and Counterclaim Defendant Citibank is a national bank organized under the laws of the United States with its principal place of business in New York, New York.

### JURISDICTION AND VENUE

57.     This Court has jurisdiction over this claim under 28 U.S.C. § 1332(a) because this dispute is between a citizen of a State and a foreign citizen and the amount in controversy exceeds $75,000, exclusive of interest and costs.

58.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in New York.  In addition, Plaintiff and Counterclaim Defendant Citibank has submitted to the non-exclusive jurisdiction of this Court pursuant to section 13(b) of the Master Agreement.

### STATEMENT OF FACTS

**Citibank's Loan to the Capmark VI CDO**

59.     The Capmark VI Swap at the center of this dispute was entered into on July 21, 2006 between MSIP and Citibank, and relates to a loan made by Citibank to the Capmark VI CDO, created and underwritten by Citibank in July 2006.  The Capmark VI CDO's operation, including the rights and obligations of its various stakeholders and the preservation of its collateral, is governed primarily by the Capmark VI indenture entered into among Capmark VI,

as issuer, Capmark VI (Delaware) Corp., as co-issuer, and LaSalle Bank National Association as trustee (the "Trustee"), on July 24, 2006 (the "Capmark VI Indenture").

60.     In connection with the issuance of various classes of notes and the acquisition of its investment portfolio, the Capmark VI CDO entered into the Revolving Facility, pursuant to which Citibank, acting as Lender, agreed to provide the CDO with up to $366 million of revolving credit.  This Revolving Facility is memorialized under the Capmark VI Credit Agreement entered into between Citibank, as Lender, and the CDO, dated July 24, 2006. Citibank is also party to the Capmark VI Credit Agreement in its secondary role as the Revolving Facility's Administrative Agent.  Although the Capmark VI Credit Agreement was designed to accommodate a group of lenders (or a "lending syndicate") Citibank is, and always has been, the sole Lender under the Revolving Facility.  The term of the Revolving Facility is the same as that of the CDO; that is, it is scheduled to mature in 2038.

61.     Citibank has two roles under the Capmark VI Credit Agreement.  First, as mentioned above, Citibank is the sole Lender under the Revolving Facility.  Second, because the Capmark VI Credit Agreement was designed to accommodate a lending syndicate, rather than a single lender, it provides for the appointment of an "Administrative Agent" who is permitted to perform certain necessary ministerial functions under the agreement on behalf of the Lenders. This means that Citibank, in its capacity as Administrative Agent, is authorized to act on behalf of the Lenders in a number of respects (subject to certain important constraints), including in dealing with the CDO, and enforcing the Lenders' rights under both the Capmark VI Credit

Agreement and the Capmark VI Indenture.[1]  Citibank thus wears two separate hats under the Revolving Facility — its primary role as Lender and its secondary role as Administrative Agent.

62.     Amounts due to the Lenders from the CDO under the Revolving Facility are repaid in monthly installments, funded by cash flows from the CDO's investment portfolio. Pursuant to the Capmark VI Indenture, the Lenders under the Revolving Facility rank senior to the CDO's other investors (such as the noteholders or equity holders) in the priority of payments waterfall; that is, the Lenders are entitled to payments from the CDO of amounts owed under the Revolving Facility before the noteholders are entitled to receive any payments owed on the notes, or before the equity holders receive any return on their investment.  This means that on each CDO payment date, interest and principal payments are made first to the Lenders until those amounts are paid in full, and then to each of the classes of note-holders in descending order of seniority.

63.     As is common in CDOs, the "Controlling Class" rights in the Capmark VI CDO are held by the stakeholder with the senior-most entitlement to payment — here the Lenders under the Revolving Facility, acting through their Administrative Agent (*i.e.*, Citibank).  These Controlling Class rights entitle the holder to direct the CDO with respect to certain significant decisions.  For instance, pursuant to the Capmark VI Indenture, the designated Controlling Class of the Capmark VI CDO is entitled to waive certain defaults, direct the Trustee in any proceedings to enforce the Capmark VI Indenture or exercise any remedy available to the Trustee, and, most significantly for this dispute, to direct the Trustee to liquidate the CDO's assets once an event of default has occurred.

---

[1]     *See*, *e.g.*, Capmark VI Credit Agreement §§ 6.01 (Appointing Administrative Agent to act on behalf of Lenders); 5.02 (Administrative Agent shall give notice of default to CDO); 6.03 (general powers of Administrative Agent); 6.07 (Action by Administrative Agent in its capacity as Controlling Class under the Capmark VI Indenture).

64.     Under the terms of the Capmark VI Credit Agreement, the Lenders control the exercise of these Controlling Class rights.  In particular, Citibank, as Administrative Agent, is required to obtain the consent of a super-majority of the Lenders before exercising these rights. Section 6.07 provides:

> To the extent that the Lenders or the Administrative Agent constitutes the "Controlling Class" for purposes of the Indenture (as defined therein) and is required or authorized to take any action in such capacity thereunder, the Administrative Agent will be authorized to so act for all purposes hereof; *provided* **that such authorization will in each case require that the Administrative Agent receive direction or consent from the Required Lenders.**

(italics in original, bold emphasis added).  ("Required Lenders" is defined under the Capmark VI Credit Agreement as the Lenders holding over two-thirds of the outstanding loan amount under the Revolving Facility.)  Thus, pursuant to Section 6.07 of the Capmark VI Credit Agreement, Citibank, as Administrative Agent, is prohibited from exercising any Controlling Class rights under the Capmark VI Indenture without the consent of Citibank, as Required Lender.

### Citibank Enters Into A Three Year Credit Default Swap with MSIP

65.     On July 21, 2006, Citibank and MSIP entered into the Capmark VI Swap Agreement, a three-year credit default swap that became effective on July 24, 2006 and was scheduled to expire on August 10, 2009.  On information and belief, Citibank's purpose in entering into the Capmark VI Swap was to reduce its regulatory capital reserve requirements. Banks are required by law to hold specified amounts of capital in reserve to cover potential default-based losses on their loan portfolio.  The amount required to be set aside depends on the size of the loan and the risk weighting of the borrower.  However, one way for banks to reduce their capital requirement is by entering into credit default swaps with other entities in respect of those loans.  Credit default swaps are thus a routine way for banks to reduce their regulatory capital reserve requirements, and Citibank entered into the Capmark VI Swap with MSIP for just

this reason.  In other words, by entering into the Capmark VI Swap with MSIP, Citibank was able to reduce the amount of capital it was required to set aside in respect of the Capmark VI Credit Agreement and could thus enjoy immediate access to investment capital that would otherwise have been "locked down" for the duration of the Capmark VI Swap.  While the Capmark VI Swap also provided the ancillary benefit to Citibank of transferring the risk of payment defaults under the Revolving Facility to MSIP during the term of the Capmark VI Swap, that risk transfer was secondary to the immediate capital benefit that Citibank received since payment defaults within the first three years of the transaction were considered extremely unlikely as of July 2006.

66.    The Capmark VI Swap was governed by the terms of an ISDA Master Agreement entered into between the parties on January 19, 1996 (the "Master Agreement"), together with a Schedule dated January 19, 1996 (as amended from time to time), and a confirmation dated July 21, 2006 (the "Capmark VI Confirmation") (together, comprising the "Capmark VI Swap Agreement").  Under this Capmark VI Swap, MSIP agreed that if Capmark VI failed to make payments due on the Revolving Facility, or if certain other events occurred — each defined as a "Credit Event" — MSIP would pay Citibank for losses it incurred and effectively take over the Revolving Facility on Citibank's behalf.

67.    Under Section 2(a)(iii) of the Master Agreement each party's payment obligations under the Capmark VI Swap are subject to the condition precedent that no Event of Default (or Potential Event of Default) has occurred and is continuing.  An Event of Default is defined under Section 5(a)(ii) of the Master Agreement to include the failure by a party to "comply with or perform any agreement" under the Capmark VI Swap Agreement if that failure is not cured within 30 days after notice of such failure is given.  In other words, if one party is in breach of

the Capmark VI Swap Agreement, the counterparty's payment obligations are excused until such time as the default is remedied, assuming it is possible to do so.

68.     The term of the Capmark VI Swap was limited to three years only (with an expiry date of August 2009), rather than the 32-year life of the Revolving Facility (and CDO itself). Thus, as long as the Capmark VI CDO continued meeting its regular payment obligations under the Facility during that three-year term, the Capmark VI Swap would terminate and neither party would have any further obligations to the other.  In this respect, the Capmark VI Swap was limited and particular — Citibank did not bargain for protection against any and all losses it might suffer under the Facility; rather, it bargained only for protection against potential losses that might mature during the first three years of the CDO's life, which was sufficient to support the regulatory capital reduction that Citibank was seeking.  Given that the risk of the Capmark VI CDO defaulting on payments in its first three years was considered highly remote, MSIP received only minimal quarterly payments under the Capmark VI Swap that aggregated each year to only seven basis points (*i.e.,* 7/100 of 1%)  of the total potential $366 million exposure under the Facility.

### Citibank Enters Into A Second Three Year Credit Default Swap With Another Morgan Stanley Subsidiary

69.     On December 14, 2006, less than six months after Citibank entered into the Capmark VI Swap Agreement, it entered into a second three-year credit default swap with another Morgan Stanley subsidiary, Morgan Stanley Capital Services, Inc. ("MSCS"), that was scheduled to expire in January, 2010 (the "Tallships Swap").  On information and belief, Citibank's purpose in entering into the Tallships Swap was, once again, to reduce its regulatory capital reserve requirements.  The Tallships Swap was governed by the terms of an ISDA Master Agreement entered into between Citibank and MSCS on February 9, 1996, together with a

Schedule dated February 9, 1996 (as amended from time to time), and a confirmation dated December 14, 2006 (the "Tallships Confirmation") (collectively, the "Tallships Swap Agreement").

70.    Tallships Funding, Ltd. ("Tallships"), is a collateralized debt obligation similar to the Capmark VI CDO.  Tallships' operation, including the rights and obligations of its various stakeholders and the preservation of its collateral, is governed primarily by an indenture entered into among Tallships, as issuer, Tallships Funding Corp., as co-issuer, and LaSalle Bank National Association, as trustee, on December 14, 2006 (the "Tallships Indenture").

71.    In connection with the issuance of various classes of notes and the acquisition of its investment portfolio, Tallships entered into a revolving facility, pursuant to which Citibank, acting as Lender, agreed to provide the Tallships CDO with up to $250 million of revolving credit (the "Tallships Revolving Facility").  This revolving facility is memorialized under a credit agreement entered into between Citibank, as Lender, Tallships, as Issuer, and Citibank, as Administrative Agent, dated December 14, 2006 (the "Tallships Credit Agreement").

72.    As in the Capmark VI CDO, the "Controlling Class" rights in Tallships are held by the Administrative Agent under the Tallships Credit Agreement (*i.e.*, Citibank). Consequently, pursuant to the Tallships Indenture, Citibank as Administrative Agent is entitled to direct the Trustee to liquidate the Tallships CDO's assets once an Event of Default has occurred under the Tallships Indenture.

73.    Under the terms of the Tallships Credit Agreement, the Lenders control the exercise of these Controlling Class rights (once again like Capmark VI).  Specifically, the Tallships Credit Agreement contains a Section 6.07 that is functionally identical to Section 6.07 in the Capmark VI Credit Agreement, and prohibits Citibank, as Administrative Agent, from

exercising any Controlling Class rights under the Tallships Indenture without the consent of

Citibank, as the Required Lenders.

74.     Under the Tallships Swap, MSCS agreed that if a specified Credit Event occurred

with respect to Tallships, MSCS would pay Citibank for losses it incurred and effectively take

over the Tallships Revolving Facility on Citibank's behalf.  The Tallships Swap Agreement

provided for the same Credit Events as the Capmark VI Swap Agreement: Bankruptcy, Failure to

Pay Principal, Failure to Pay Interest, Commitment Fee or Additional Cost, and Restructuring.

### MSIP Negotiates For And Obtains Controlling Class Rights For The Capmark VI Swap

75.     As a condition to entering into the Capmark VI Swap, MSIP demanded that it be

provided with whatever voting or consent rights Citibank had as Lender under the Capmark VI

Credit Agreement for the duration of the Capmark VI Swap.  Such rights included, most

importantly, Citibank's right as Lender to direct the exercise of Capmark VI's Controlling Class

rights.  This was not an unusual provision for MSIP to demand since it is common for CDO

Controlling Class voting rights to be transferred to whichever party holds the ultimate associated

financial risk which, here, was to be held by MSIP for the three-year term of the Capmark VI

Swap.

76.     Specifically, during the Capmark VI Swap's negotiation, MSIP expressly insisted

during oral and written communications with Citibank that Citibank transfer all its "consent" and

"voting rights" as Lender under the Capmark VI Credit Agreement to MSIP.  Citibank responded

in agreement that all such rights would be transferred.  For instance, on June 22, 2006, the lead

negotiator for MSIP, Mr. George Wilkinson, sent an e-mail to the lead negotiator for Citibank,

Mr. John Costango, stating:

> As discussed, we should include language in the doc stating that no amendment, waiver,
> consent, etc. will be made or given by Citi under the Loan Agreement without the prior

written consent of MS (i.e., ***Citi passes along to MS all voting rights it has under the Loan Agreement to MS***).

(emphasis added.)  Mr. Costango, on behalf of Citibank, explicitly agreed to these terms,

replying to this request by email dated that same day with a clear "OK."

77.     As a result of these negotiations, section 6(d) was added to the Capmark VI

Confirmation.  That section provides:

> No amendment to, or waiver or consent of or with respect to, the Reference Obligation [*i.e.* the Revolving Facility] will be agreed or consented to by [Citibank] (or permitted by [Citibank] to be agreed or consented to) without the prior written consent of [MSIP].

As intended, this provision had the clear effect of passing Citibank's Controlling Class rights

under the Capmark VI Indenture to MSIP.  While the Capmark VI Indenture designated the

Administrative Agent under the Revolving Facility (*i.e.*, Citibank) as the Controlling Class,

section 6.07 of the Capmark VI Credit Agreement expressly prohibited the Administrative Agent

from exercising any such rights without the consent of the Required Lenders (*i.e.*, Citibank,

again).  Thus, under all circumstances, Citibank's "consent" was required before any Controlling

Class rights were exercised.  And, by expressly agreeing under Section 6(d) of the Capmark VI

Swap to withhold the provision of any such "consent" without having obtained the prior written

consent of MSIP, Citibank effectively transferred the right to exercise Controlling Class rights

(or, at minimum, the right to prevent the exercise of such rights) to MSIP during the term of the

Capmark VI Swap.

78.     This interpretation of Section 6(d) was reconfirmed by Mr. Costango and Mr.

Wilkinson during the subsequent negotiation of the Tallships Swap, for which they were also the

lead negotiators.  Specifically, during the course of those negotiations, Mr. Costango and Mr.

Wilkinson confirmed via oral and written communications their understanding that the Capmark

VI Swap had transferred Citibank's voting rights under the Capmark VI Credit Agreement to MSIP for the duration of the Swap.

79.     For example, in discussing how voting rights should be transferred under the Tallships Swap, on November 29, 2006, Mr. Costango sent an e-mail to Mr. Wilkinson that was entitled "Voting rights," stating:

> We are struggling to recall how this was handled in capmark. ***Lawyers are telling me that we don't pass through voting rights but I seem to remember you being comfortable with the arrangement in capmark.*** Do you recall how we worked that out?

(emphasis added.)  Minutes after receiving this e-mail, Mr. Wilkinson replied: "I think ***we just relied on the language that stated the credit agreement would not be amended without our prior written consent***" (emphasis added) — a reference to Section 6(d) of the Capmark VI Swap agreement.  At no point did Mr. Costango (or anyone else at Citibank) question or dispute the statement by Mr. Wilkinson that voting rights in respect of Capmark VI had been transferred to MSIP through the operation of Section 6(d) of the Capmark VI Confirmation.  Had Citibank expressed any disagreement at the time with MSIP's interpretation, MSIP would have insisted that any such disagreement be resolved in favor of MSIP's position as a condition to MSCS agreeing to enter into the Tallships Swap.

80.     In fact, the parties' further negotiations in respect of the Tallships Swap demonstrated Citibank's agreement that voting rights had been transferred to MSIP under the Capmark VI Swap.  In the same e-mail exchange described above, Mr. Wilkinson also stated that he wanted to include a more elaborate contractual provision regarding Controlling Class voting rights in the Tallships Swap, stating that  "I would prefer to be more specific in this trade."  To this end, Mr. Wilkinson attached to the e-mail a proposed "rider" that could be added to the Tallships Swap that went beyond the "consent" rights that had been included in the Capmark VI

Swap — which effectively gave MSIP a veto right over any proposed vote by Citibank — to also provide for MSCS's affirmative right to direct Citibank how to vote each time it had the opportunity to cast a vote as the Controlling Class.  It was entitled "Voting Provisions," and stated in part:

> [Citi] agrees that to the extent it is entitled to act in its capacity as a member of the Controlling Class or otherwise to consent to or vote with respect to any Proposed Action (as defined below) in its capacity as the Advance Swap Counterparty or Revolving Credit Agreement Agent under the Indenture, prior to [Citi] giving its written consent to, or casting its vote for or against, any waiver, amendment, vote, modification or other action of a similar nature under the Indenture (the "**Proposed Action**"), [Citi] shall … seek [MSCS's] written direction as to whether to give such consent or how to cast such vote and … act in accordance with such written direction from [MSCS].

That rider, with revisions, became Section 6(e) of the Tallships Swap, which also included a Section 6(d) that was verbatim to the Section 6(d) that had been included in the Capmark VI Swap.

81.     In response to the proposed "Voting Provisions" rider, Mr. Costango sent an e-mail to Mr. Wilkinson on December 7, 2006, stating "I have had a bunch of conversations with the internal legal people on the voting language.  They have raised some additional concerns with our language of the 'what if this happens' variety.  I will summarize them here."  Mr. Costango went on to describe a number of additional provisions — all of which dealt specifically with the exercise of Controlling Class voting rights under the Tallships Indenture — that Citibank was requesting be added to the "Voting Provisions" section in the Tallships Swap.  Mr. Costango then sought to justify why these additional provisions were needed when no similar provisions had been included in the Capmark VI Swap by referencing the fact that MSIP's rights in Capmark VI were limited to "consent" — *i.e.*, veto — rights, whereas MSCS's rights in Tallships would allow it to affirmatively direct Citibank how to vote even if it was not otherwise planning to vote at all:

> I've thought a lot about why changes like this are warranted here compared to Capmark, and I believe the difference is that ***in Capmark we agreed to not make any change without consent*** and here we are agreeing to consult you in all cases even if we don't want to make a change.  So it's more complicated.

(emphasis added.)  This explanation thus further reconfirmed the parties' understanding of the Capmark VI Swap as having provided for MSIP's right to consent to any actions that Citibank intended to take as the Controlling Class under the Capmark VI Indenture during the term of the Capmark VI Swap.

### The Capmark VI CDO Suffers An Event Of Default But Continues To Meet Its Obligations Under the Revolving Facility

82.     On August 5, 2008, the Capmark VI CDO suffered an Event of Default under section 5(h) of the Capmark VI Indenture when it failed the Class A Principal Coverage Test as a result of the principal amount of the securities in the Capmark VI CDO's portfolio falling below a specified threshold.  This default did not involve the Capmark VI CDO's failure to meet any payment obligation.  Indeed, notwithstanding the "coverage" default, the CDO continued thereafter to meet its obligations when due, including making its regular payments under the Revolving Facility.  Thus, on the next payment date following the occurrence of the default — August 10, 2008 — the CDO made its full monthly interest repayment under the Facility.  The CDO similarly met its obligations under the Revolving Facility in September, October, November and December 2008, and then again in January and February 2009.  Because the CDO continued to meet its obligations in this way, no Credit Event was triggered under the Capmark VI Swap that would otherwise have required MSIP to take over the Revolving Facility and make payments of any shortfall to Citibank.  There was, furthermore, no reason to think that the CDO would not be able to continue meeting its obligations under the Revolving Facility well into the future, and certainly beyond the remaining five months before the Capmark VI Swap would expire pursuant to its terms in August 2009.

**Citibank Breaches The Capmark VI Swap Agreement And Directs The Trustee To Liquidate The CDO In Order To Accelerate Losses Under The Facility And Trigger A Premature Credit Event**

83.     Faced with the impending expiration of the Capmark VI Swap, which would leave Citibank responsible for any future losses that might develop under the Revolving Facility, Citibank decided to embark on a plan to trigger a payment default under the Revolving Facility in the hopes of transferring all financial responsibility for the Revolving Facility to MSIP.  In furtherance of that plan, on March 9, 2009, Citibank, wearing its "Administrative Agent" hat, exercised its putative rights as Capmark VI's Controlling Class and directed the Trustee to liquidate all of the CDO's collateral.  However, notwithstanding its contractual obligation to do so, Citibank never sought, nor received, any consent from MSIP prior to issuing this direction to the Trustee.  Citibank's direction to the Trustee to liquidate the CDO therefore constituted a willful breach of its contractual obligations under the Capmark VI Swap.

84.     On April 20, 2009, MSIP issued a notice to Citibank notifying Citibank that its direction to liquidate the CDO without MSIP's consent constituted a breach of section 6(d) of the Capmark VI Confirmation and effected a Potential Event of Default under the Master Agreement that would mature into an actual Event of Default if not remedied within 30 days.  MSIP further informed Citibank that while it remained in breach of the Capmark VI Swap, MSIP's payment obligations were excused pursuant to section 2(a)(iii) of the Master Agreement.

85.     Despite this notification, the liquidation of the Capmark VI CDO's assets proceeded through the summer of 2009 and the sale and disposition of the CDO's collateral was completed on July 13, 2009 — less than a month before the expiration of the Capmark VI Swap. Just as Citibank had planned, the liquidation of the CDO accelerated the amounts due to Citibank as Lender under the Revolving Facility such that the entire $366 million became due and payable on the final disposition of Capmark VI's assets.  However, given the then-current distressed

23

market conditions, the proceeds from the liquidation of the Capmark VI CDO's assets were insufficient to meet this obligation and the CDO was unable to repay $245 million of the $366 million owed under the Revolving Facility.  The CDO thus defaulted on its obligations under the Facility.

86.    On July 24, 2009 — with about two weeks left before the expiration of the Capmark VI Swap — Citibank issued a purported "Credit Event Notice" and "Notice of Physical Settlement" to MSIP seeking payment for the $245 million in losses that Citibank had triggered through its improper direction to liquidate the Capmark VI CDO's assets.

87.    On July 27, 2009, MSIP notified Citibank that because of Citibank's breach of the Capmark VI Swap Agreement, together with Citibank's failure to remedy this breach within 30 days, an Event of Default had occurred under the Capmark VI Swap and was continuing such that the conditions precedent to MSIP's payment obligations under the Capmark VI Swap were not satisfied, thereby excusing MSIP from making any payments to Citibank in respect of the Capmark VI Swap.

88.    On August 7, 2009, Citibank purported to terminate the Capmark VI Swap, and on September 25, 2009, Citibank filed this action.

89.    MSIP therefore brings these counterclaims to protect its rights under the Capmark VI Swap and prevent Citibank from exploiting its multiple conflicting roles in the Capmark VI CDO transaction to transfer to MSIP hundreds of millions of dollars in losses that should properly be borne by Citibank.

## FIRST COUNTERCLAIM

**(Declaration that an Event of Default has occurred under the Capmark VI Swap and that the conditions precedent to MSIP's payment obligations are not satisfied)**

90.     MSIP realleges and incorporates by reference paragraphs 47 to 89 of the Counterclaim as if fully set forth herein.

91.     MSIP and Citibank have a dispute regarding their respective rights and obligations in connection with the Capmark VI Swap, Credit Agreement and Indenture.

92.     MSIP takes the following positions:

(a)     Section 6(d) of the Capmark VI Confirmation prohibited Citibank, in its capacity as Required Lender under the Capmark VI Credit Agreement, from consenting under Section 6.07 of the Credit Agreement to the exercise of Controlling Class rights under the Capmark VI Indenture without the prior written consent of MSIP during the term of the Capmark VI Swap.

(b)     Citibank breached Section 6(d) of the Capmark VI Confirmation when, on or about March 9, 2009, it consented to a direction being given to the Capmark VI Trustee on behalf of the Controlling Class to liquidate the assets held by Capmark VI pursuant to Section 5.5(a)(ii) of the Capmark VI Indenture.

(c)     Citibank's breach of Section 6(d) was a Potential Event of Default under Section 5(a)(ii) of the Master Agreement and became an Event of Default under that provision when Citibank failed to remedy the breach on or before the thirtieth day after MSIP provided notice of the breach to Citibank on April 20, 2009.

(d)     Citibank's Event of Default remained continuing through the expiration of the Capmark VI Swap Agreement on August 10, 2009, and, pursuant to Section 2(a)(iii) of the Master Agreement, therefore constituted the failure of a condition precedent to any payment obligation by MSIP under the Capmark VI Swap Agreement.

(e)  MSIP therefore has no payment obligation under the Capmark VI Swap Agreement in respect of the purported "Credit Event" described by Citibank in its notices to MSIP, dated July 24, 2009.

93.  Citibank takes opposing positions with respect to issues set forth in paragraph 92, and contends that MSIP is obligated to make payments to Citibank in respect of the purported "Credit Event" described by Citibank in its notices to MSIP, dated July 24, 2009.

94.  This dispute among the parties is both ripe and justiciable as Citibank has filed a Complaint against MSIP seeking payment under the Capmark VI Swap Agreement.  A declaration from the Court of the parties' rights and obligations will resolve these continuing and future disputes.

## SECOND COUNTERCLAIM
### (Breach of Contract)

95.  MSIP realleges and incorporates by reference paragraphs 47 to 94 of the Counterclaim as if fully set forth herein.

96.  Section 6(d) of the Capmark VI Confirmation prohibited Citibank, in its capacity as Required Lender under the Capmark VI Credit Agreement, from consenting under Section 6.07 of the Credit Agreement to the exercise of Controlling Class rights under the Capmark VI Indenture without the prior written consent of MSIP during the term of the Capmark VI Swap.

97.  Citibank breached Section 6(d) of the Capmark VI Confirmation when, on or about March 9, 2009, it consented to a direction being given to the Capmark VI Trustee on behalf of the Controlling Class to liquidate the assets held by Capmark VI pursuant to Section 5.5(a)(ii) of the Capmark VI Indenture.

98.  MSIP has fulfilled each and every one of its material contractual obligations under the Capmark VI Swap Agreement.

99.     MSIP has suffered financial harm as a result of Citibank's breach and is entitled to damages.

### THIRD COUNTERCLAIM
### (Reformation)

100.    MSIP realleges and incorporates by reference paragraphs 47 to 99 of the Counterclaim as if fully set forth herein.

101.    During the negotiation of the Capmark VI Swap, Citibank and MSIP expressly agreed that Citibank would obtain MSIP's consent prior to exercising any Controlling Class rights under the Capmark VI Indenture during the term of the Capmark VI Swap.  This agreement was reconfirmed in communications between the lead negotiators for Citibank and MSIP following the execution of the Capmark VI Swap.

102.    To the extent that the written terms of the Capmark VI Swap fail to reflect the agreement reached between Citibank and MSIP, that failure was on account of either mutual mistake by the parties, or unilateral mistake by MSIP and improper conduct by Citibank in seeking to conceal the mistake through expressing its agreement with MSIP's understanding of the parties' agreement.

103.    To the extent needed, MSIP is therefore entitled to have the Capmark VI Swap reformed to reflect the terms of the actual agreement reached by the parties.

### FOURTH COUNTERCLAIM
### (Equitable Estoppel)

104.    MSIP realleges and incorporates by reference paragraphs 47 to 103 of the Counterclaim as if fully set forth herein.

105.    Both before and after the execution of the Capmark VI Swap, Citibank stated its agreement or expressed its assent with MSIP's interpretation of Section 6(d) of the Capmark VI

Confirmation as providing for the transfer to MSIP of consent rights over Citibank's exercise of Controlling Class rights under the Capmark VI Indenture during the term of the Capmark VI Swap.

106.    Citibank made these representations in the contexts of seeking MSIP's agreement to enter into the Capmark VI Swap and seeking MSCS's agreement to enter into the Tallships Swap.

107.    MSIP relied to its detriment upon Citibank's express agreement or assent by entering into the Capmark VI Swap as drafted and by permitting MSCS to enter into the Tallships Swap without requiring as a condition that any disagreements with regard to the interpretation of Section 6(d) of the Capmark VI Confirmation first be resolved in favor of MSIP's position.

108.    Citibank was thereafter equitably estopped from seeking to challenge MSIP's interpretation of Section 6(d) of the Capmark VI Confirmation as requiring Citibank to obtain MSIP's prior written consent to the exercise of Controlling Class rights by Citibank during the term of the Capmark VI Swap.

## **REQUEST FOR RELIEF**

WHEREFORE, MSIP respectfully prays for damages and the entry of judgment on its Counterclaims against Citibank as follows:

A.    A declaration that an Event of Default has occurred under the Capmark VI Swap Agreement with Citibank as the defaulting party.

B.    A declaration that the conditions precedent to MSIP's payment obligations under the Capmark VI Swap have not been satisfied and that MSIP is thereby excused from making

any payments under the Capmark VI Swap in respect of the purported "Credit Event" described by Citibank in its notices to MSIP, dated July 24, 2009.

C.      Awarding MSIP compensatory damages against Citibank for breach of the Capmark VI Swap Agreement, in amounts to be determined at trial by a jury together with pre-judgment interest at the maximum rate allowable by law.

D.      To the extent that the Court finds that the written terms of the Capmark VI Swap Agreement do not accurately reflect the parties' agreement, reformation of the Capmark VI Confirmation to conform its terms to the parties' express agreement.

E.      Awarding MSIP its attorneys fees and other out-of-pocket expenses incurred by reason of the enforcement and protection of its rights under the Capmark VI Swap Agreement.

F.      Awarding to MSIP such other and further relief, in law and equity, as this Court deems just and proper.

Dated:   New York, New York
         April 2, 2010

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: _____

    Michael B. Carlinsky
    Jonathan E. Pickhardt
    Simona Gory
    Amos E. Friedland

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*michaelcarlinsky@quinnemanuel.com*
*jonpickhardt@quinnemanuel.com*
*simonagory@quinnemanuel.com*
*amosfriedland@quinnemanuel.com*

*Attorneys for Defendant Morgan Stanley &*
*Co. International, PLC*