UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

CITIBANK, N.A.,

          **Plaintiff and
          Counterclaim Defendant,**

          **- against -**

MORGAN STANLEY & CO.
INTERNATIONAL, PLC,

          **Defendant and
          Counterclaimant.**

------------------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 8197 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/12/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       This case involves yet another high-stakes dispute arising from the recent economic turmoil. While the financial instruments around which this action revolves are complex, the Court's current task is straightforward: to ascertain whether a contract between financial titans Citibank, N.A. ("Citibank") and Morgan Stanley & Co. International, PLC ("MSIP") is unambiguous. Specifically, the question presented is whether Citibank breached the terms of a credit default swap when Citibank ordered the liquidation of a security without first obtaining MSIP's written consent. Because the swap agreement unambiguously permits

such action by Citibank, Citibank's motion for judgment on the pleadings and for dismissal of MSIP's original counterclaims is granted, and MSIP's motion for judgment on the pleadings is denied.  Nonetheless, Citibank must reply to MSIP's newly-added counterclaims for reformation and equitable estoppel, which are not addressed in these motions.

## II.    BACKGROUND

### A.    The Capmark VI Collateral Debt Obligation

In July 2006, Capmark VI Ltd ("Capmark") issued a collateralized debt obligation (the "Capmark VI CDO") — a security collateralized by a portfolio of fixed-income assets, such as residential mortgages, loans, and other securities (collectively, the "Collateral").[1]  The rights to the cash flow from the Collateral are divided into several classes — or "tranches" — of Notes that investors purchase.[2] The Notes mature in 2038.[3]

The Capmark VI CDO is governed primarily by a July 24, 2006

---

[1]      See Complaint ("Compl.") ¶ 10; Answer and Counterclaim ("Counter") ¶¶ 19, 59.

[2]      See Compl. ¶ 10; Counter ¶¶ 10, 60.  Generally in collateralized debt obligations, senior tranches receive payment before junior and equity tranches. Losses on the underlying assets are applied in reverse order of seniority and junior tranches protect senior tranches from losses on the underlying portfolio.  To compensate for the greater risk, junior tranches are paid higher interest rates.

[3]      See Compl. ¶ 10; Counter ¶ 10.

2

indenture (the "Indenture").[4]  The parties to the Indenture are:  Capmark, as issuer, Capmark VI (Delaware) Corporation, as co-issuer, and LaSalle Bank National Association, as trustee (the "Trustee").[5]  Under the Indenture, the Trustee serves as custodian of the Collateral.[6]  After an "Event of Default," such as when the value of the Collateral falls and remains below a certain threshold, a majority of the senior stakeholders — or the "Controlling Class" — of the Capmark VI CDO may instruct the Trustee in various respects.[7]  For example, following an Event of Default, the Controlling Class may "direct" the Trustee to liquidate the Collateral.[8]

### B.      Citibank's Loan to Capmark

On July 24, 2006, Citibank agreed to provide up to $366 million in revolving credit to the Capmark VI CDO (the "Revolving Facility").[9]  The Revolving Facility, which also matures in 2038, is memorialized by a July 24,

---

[4]      *See* Compl. ¶ 12; Counter ¶ 59; *see also* Indenture, Ex. A to Declaration of Rachel M. Cherington, Citibank's Counsel, in Support of Citibank's Motion for Judgment on the Pleadings and Dismissal of Counterclaims ("Cherington Decl.").

[5]      *See* Compl. ¶ 12; Counter ¶ 59; Indenture at 1.

[6]      *See* Compl. ¶ 12; Counter ¶ 63.

[7]      *See* Compl. ¶ 27; Counter ¶ 63; *see also* Indenture §§ 5.2-5.5, 5.8, 5.13.

[8]      Indenture § 5.5(a)(ii).  *Accord* Compl. ¶ 27; Counter ¶ 63.

[9]      *See* Compl. ¶ 11; Counter ¶¶ 11, 59-60.

2006 credit agreement between Citibank and Capmark (the "Credit Agreement").[10]

Under the Credit Agreement, Citibank serves as both Lender and Administrative Agent.[11]  Although the Credit Agreement was designed to accommodate a group — or "syndicate" — of Lenders of the Revolving Facility, Citibank has always been the only Lender.[12]  In its role as Administrative Agent of the Revolving Facility, Citibank performs certain ministerial functions on behalf of the (unrealized) syndicate of Lenders.[13]

Amounts due to the Lenders from the Capmark VI CDO under the Revolving Facility are repaid in monthly installments, funded by cash flow from the Collateral.[14]  The Lenders rank senior to other Capmark VI CDO investors, such as noteholders, in the priority of payments.[15]  Accordingly, Citibank, as sole Lender, has always been the Capmark VI CDO stakeholder with the senior-most

---

[10]     See Compl. ¶ 11; Counter ¶ 60; see also Credit Agreement, Ex. B to Cherington Decl.

[11]     See Compl. ¶ 11; Counter ¶ 61.

[12]     See Compl. ¶ 11; Counter ¶¶ 60, 61.

[13]     See Compl. ¶ 11; Counter ¶ 61.

[14]     See Counter ¶ 62.

[15]     See Compl. ¶ 13; Counter ¶ 62.

entitlement to payment.[16]  As such, Citibank has always comprised the entire

Controlling Class.[17]

> ### C.    Citibank and MSIP's Credit Default Swap

On July 21, 2006, Citibank and MSIP entered into a credit default

swap under which the occurrence of any of four defined "Credit Events" obligates

MSIP to pay Citibank any losses it sustained under the Revolving Facility (the

"Swap").[18]  As discussed below, the relevant Credit Event here is "Failure to Pay

Principal."

The Swap consists of:  (1) a July 21, 2006 confirmation (the "Swap

Confirmation") that incorporates (2) an International Swaps and Derivatives

---

[16]     See Compl. ¶ 13; Counter ¶ 62.

[17]     See Compl. ¶ 28; Counter ¶ 63.

[18]     See Compl. ¶¶ 9, 18-20; Counter ¶¶ 59, 65-67.  A credit default swap
is a contractual form of risk protection.  It is a financial instrument by which one
private party (the protection buyer) pays a premium to another party (the protection
seller) in exchange for the protection seller assuming the risk that a third party (the
reference entity) might default on payment obligations under a financial instrument
(the reference obligation), or that another "credit event" might increase the risk
represented by the reference obligation.  The protection buyer makes periodic
payments to the protection seller, and if no credit event occurs during the term of
the swap, the protection seller keeps the payments and incurs no further
obligations.  If a credit event specified in the credit default swap occurs during the
term of the swap, the protection seller pays the protection buyer an agreed upon
amount.  See, e.g., Aon Fin. Prods., Inc. v. Societe Generale, 476 F.3d 90, 96 (2d
Cir. 2007); Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,
375 F.3d 168, 172 (2d Cir. 2004).

Association, Inc. ("ISDA") Master Agreement, as amended from time to time (the "Master Agreement"), and (3) 2003 ISDA Credit Derivatives Definitions (the "2003 ISDA Definitions") (collectively, the "Swap Agreement").[19]  It is governed by New York law.[20]

Under the Swap Confirmation, Citibank is the "Buyer," MSIP is the "Seller," Capmark is the "Reference Entity," and the Revolving Facility is the "Reference Obligation."[21]  The term of the Swap is three years, from July 2006 through August 2009.[22]  For this protection, Citibank paid approximately $750,000 to MSIP over the life of the Swap.[23]

Section 6(d) of the Swap Confirmation provides certain rights to MSIP with respect to the Revolving Facility.  Entitled "Reference Obligation Amendments", this provision states:

---

[19]     *See* Compl. ¶ 41; Counter ¶ 66; *see also* Swap Confirmation, Ex. C to Cherington Decl.; Master Agreement, Ex. D to the Cherington Decl.; 2003 ISDA Definitions, Ex. E to the Cherington Decl. (excerpts only).

[20]     *See* Master Agreement at Amend. (Nov. 12, 2004) § 5.

[21]     Swap Confirmation at 2.  *Accord* Compl. ¶ 17; Counter ¶ 71.

[22]     *See* Swap Confirmation at 2; Compl. ¶ 18; Counter ¶ 68.

[23]     *See* Swap Confirmation at 2-3; Compl. ¶¶ 17, 19; Counter ¶ 68. Specifically, Citibank paid a fixed annual rate of 0.07 percent of $366 million — the commitment to the Revolving Facility.  *See* Swap Confirmation at 2-3; Compl. ¶ 19; Counter ¶ 68.

> No amendment to, or waiver or consent of or with respect
> to, the Reference Obligation [the Revolving Facility] will
> be agreed or consented to by Buyer [Citibank] (or permitted
> by Buyer to be agreed or consented to) without the prior
> written consent of the Counterparty [MSIP].[24]

The Swap Agreement also contains an integration clause providing that it

"constitutes the entire agreement and understanding of the parties with respect to

its subject matter and supersedes all oral communication and prior writings with

respect thereto."[25]   Additionally, the Master Agreement provides that one party's

breach of the Swap Agreement excuses the counterparty's payment obligations

until such time as the default is remedied, assuming it is possible to do so.[26]

### D.    The Capmark VI CDO Suffers an Event of Default

On August 5, 2008, the Capmark VI CDO suffered an Event of

Default under the Indenture, when the principal balance of the Collateral fell below

$366 million.[27]   When such an Event of Default occurs, section 5.5(a) of the

Indenture obligates the Trustee to retain the Collateral unless two-thirds of the

---

[24]    Swap Confirmation § 6(d).

[25]    Master Agreement § 9(a).

[26]    *See id.* § 5(a)(ii).

[27]    *See* Compl. ¶ 26; Counter ¶ 72.

7

Controlling Class directs the sale and liquidation of the Collateral.[28]  Pursuant to this provision, on March 9, 2009, Citibank directed the Trustee to sell and liquidate all of the Collateral of the Capmark VI CDO.[29]  The proceeds were insufficient to cover the $366 million outstanding under the Revolving Facility, and the shortfall was substantial — $246,368,966.51.[30]

### E.   MSIP Refuses to Pay Citibank Under the Swap Agreement

As noted above, MSIP's obligations under the Swap Agreement are triggered by a Credit Event (not to be confused with an Event of Default under the Indenture).  The relevant Credit Event here is Failure to Pay Principal, which the Swap Confirmation defines as "(i) a failure by the Reference Entity [Capmark] to

---

[28]      Specifically, section 5.5(a) of Indenture provides:

> If an Event of Default shall have occurred and be continued when any Class of Rated Notes is Outstanding, the Trustee shall retain the Collateral securing the Rated Notes intact, collect and cause the collection of proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Rated Notes in accordance with the Priority of Payments . . . unless:
>
>> . . .
>> (ii)   not less than 66 2/3% of the Controlling Class . . . direct the sale and liquidation of the Collateral.

[29]      *See* Compl. ¶ 30; Counter ¶ 73.

[30]      *See* Compl. ¶ 32; Counter ¶ 52.

pay an Expected Principal Amount on the Final Amortization Date . . . ."[31]  The

"Expected Principal Amount" on the Final Amortization Date is the outstanding

principal.[32]  The "Final Amortization Date" includes "the date on which the assets

securing the Reference Obligation [the Revolving Facility] or designated to fund

amount due in respect of the Reference Obligation are liquidated, distributed, or

otherwise disposed of in full and the proceeds thereof are distributed or otherwise

disposed of in full."[33]

        When the Collateral was liquidated in full on July 13, 2009, the

proceeds resulting from the liquidation and paid on the Revolving Facility were

less than the amount outstanding on the Revolving Facility (the Expected Principal

Amount).[34]  Therefore, according to Citibank, a Failure to Pay Principal Credit

Event Occurred.[35]

        However, when Citibank attempted to transfer the Revolving Facility

to MSIP pursuant to the Swap Agreement in order to collect on the approximately

$245 million loss, MSIP took the position that Citibank's direction to liquidate the

---

[31]    Swap Confirmation at 12-13.

[32]    *See id.* at 12.

[33]    *Id.* at 13.

[34]    *See* Compl. ¶¶ 24-25; Counter ¶ 75.

[35]    *See* Compl. ¶ 25.

Collateral without MSIP's consent constituted a breach of section 6(d) of the Swap

Confirmation, thereby excusing MSIP from making any payments to Citibank in

respect of the Swap.[36]  It is undisputed that Citibank never obtained MSIP's

consent to the liquidation of the Collateral.[37]

### F.    Proceedings in this Court; the Pending Motions

In September 2009, Citibank filed suit in this Court, alleging that

MSIP breached the Swap Agreement by refusing to pay Citibank the

approximately $245 million that Citibank lost vis-a-vis the Revolving Facility.  In

November 2009, MSIP answered and counterclaimed that Citibank breached the

Swap Agreement by liquidating the Collateral without MSIP's consent.[38]  In

January 2010, Citibank replied to MSIP's Answer and Counterclaims.

Citibank now moves for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c), and dismissal under Rule 12(b)(6) of

MSIP's counterclaims.  MSIP also moves for judgment on the pleadings on its

---

[36]     *See* Compl. ¶¶ 34-35; Counter ¶¶ 74-76.

[37]     *See* Counter ¶ 73; Citibank's Reply to Counterclaims ¶ 7.

[38]     Specifically, MSIP brought two counterclaims — one for a
declaration that the conditions precedent to MSIP's payment obligations are not
satisfied, and another for breach of contract. *See* Counter ¶¶ 80-89.  In April 2010,
MSIP filed an Amended Answer and Counterclaims that added two new
counterclaims — for reformation and equitable estoppel.  This latest pleading, to
which Citibank has not replied, is not presently before the Court.

counterclaims.

## III.   APPLICABLE LAW

### A.   Judgment on the Pleadings; Motion to Dismiss

At any time after the pleadings close and before the trial commences, a party may move for a judgment on the pleadings under Rule 12(c).[39]  A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law.[40]

"'The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.'"[41]  In either instance, the court must accept as true the non-movant's allegations, along with the allegations in the movant's pleading that the non-movant has admitted, and must draw all reasonable inferences in the non-movant's

---

[39]     *See Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1998 WL 851591, at *1 (S.D.N.Y. Dec. 9, 1998) (citing 2 *Moore's Federal Practice* § 12.38 at 12-99).

[40]     *See Burns Int'l Sec. Servs. v. International Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1994); *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

[41]     *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 450 (S.D.N.Y. 2009) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006)).

favor.[42]  The court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[43]

The allegations in a complaint must meet a standard of "plausibility."[44]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]."[45]  Plausibility "is not akin to a probability requirement;" rather plausibility requires "more than a sheer possibility . . . ."[46]  Pleading a fact that is "merely consistent" does not satisfy the plausibility standard.[47]

The court "must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."[48]  A document is considered incorporated by reference if it is "in a

---

[42]     *See id.*; *Frater*, 1998 WL 851591, at \*1 (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)).

[43]     *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[44]     *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

[45]     *Ashcroft v. Iqbal*, — U.S. —, —, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[46]     *Id.* (quotation marks omitted).

[47]     *Id.* (quotation marks omitted).

[48]     *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

pleading . . . adopted by reference elsewhere in the same pleading or in any other

pleading . . . ."[49]  A court may also consider a document not specifically

incorporated by reference but on which the complaint heavily relies and which is

integral to the complaint.[50]   This is particularly true when the non-movant either

had the document in its possession or knew of the document when bringing suit.[51]

     In addition, a court "'may . . . consider matters of which judicial

notice may be taken.'"[52]  On the other hand, if a court is presented with material

outside of the pleadings and not subject to judicial notice, it should either exclude

the material in its consideration of the motion to dismiss or for judgment on the

pleading, or consider the material after converting the motion into one for

summary judgment.[53]

    **B.**    **New York Contract Law**

     "Under New York law, '[t]he fundamental, neutral precept of contract

---

[49]    Fed. R. Civ. P. 10(c).

[50]    *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[51]    *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008).

[52]    *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer*, 937 F.2d at 773).

[53]    *See Chambers*, 282 F.3d at 154.

interpretation is that agreements are construed in accord with the parties' intent.'"[54]

"Typically, the best evidence of intent is the contract itself; if an agreement is

'complete, clear and unambiguous on its face[, it] must be enforced according to

the plain meaning of its terms.'"[55]  "Where the language of the contract is

unambiguous, and reasonable persons could not differ as to its meaning, the

question of interpretation is one of law to be answered by the court."[56]  However,

when a contract is ambiguous, its interpretation becomes a question of fact not

appropriately resolved on a motion for judgment on the pleadings or for

dismissal.[57]

       "'Whether or not a writing is ambiguous is a question of law to be

resolved by the courts.'"[58]  Such questions of law are properly disposed of through

---

[54]     *Eternity Global Master Fund*, 375 F.3d at 177 (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)).

[55]     *Id.* (quoting *Greenfield*, 98 N.Y.2d at 569) (alteration in original).

[56]     *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985).

[57]     *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994).

[58]     *Eternity Global Master Fund*, 375 F.3d at 178 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).

a motion for judgment on the pleadings or for dismissal.[59]

> "[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[60]

"[E]xtrinsic evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."[61]  "The language of a contract is not ambiguous . . . simply because the parties urge different interpretations, or if one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'"[62]

"In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so

---

[59]    *See State Bank of India v. Walter E. Heller & Co.*, 655 F. Supp. 326, 326-27 (S.D.N.Y. 1987).

[60]    *Eternity Global Master Fund*, 375 F.3d at 178 (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003)).

[61]    *Waldman v. Riedinger*, 423 F.3d 145, 150 (2d Cir. 2005) (quotation marks omitted).  *Accord RM Realty Holdings Corp. v. Moore*, 884 N.Y.S.2d 344, 349 (1st Dep't 2009) ("A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms without reference to extrinsic evidence.").

[62]    *Dessert Beauty Inc. v. Platinum Funding Corp.*, 519 F. Supp. 2d 410, 418 (S.D.N.Y. 2007) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005)) (alteration in original).

15

as to give full meaning and effect to all of its provisions.'"[63] "'[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'"[64]

## IV.   ANALYSIS

This dispute can be resolved by reference solely to the contractual documents properly considered by the Court on this motion — the Indenture, Credit Agreement, and Swap Agreement — together with MSIP's admissions. Allegations and evidence extrinsic to the contractual documents, therefore, have not been considered.[65]

It is undisputed that the consent rights MSIP asserts Citibank violated derive exclusively from section 6(d) of the Swap Confirmation, which is quoted in its entirety above.  MSIP argues that when Citibank ordered liquidation of the

---

[63]    *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)) (alteration in original).

[64]    *Id.* (quoting *Shaw Group*, 322 F.3d at 124) (quotation marks omitted; alteration in original).

[65]    *E.g.*, Counter ¶ 69 ("As a condition to entering into the Swap, MSIP demanded that it be provided with whatever voting or consent rights Citibank had as Lender under the Credit Agreement for the duration of the Swap."); Confirmation Between Morgan Stanley Capital Services, Inc. and Citibank Regarding the "Tallships Funding" Credit Default Swap, Ex. A to Declaration of Jonathan E. Pickhardt, MSIP's Counsel, in Opposition to Citibank's Motion for Judgment on the Pleadings.

16

Capmark VI CDO, Citibank provided a "consent of or with respect to" the

Revolving Facility, thereby implicating MSIP's rights under section 6(d).  Citibank

counters that it did not provide a consent under section 6(d) but rather issued a

"direction" pursuant to the Indenture.[66]  Thus, the parties' cross motions boil down

to whether Citibank's conduct implicated MSIP's consent rights under section

6(d).

       MSIP admits that Citibank, in its role as Administrative Agent of the

Revolving Facility, *directed* the Trustee to liquidate the Collateral.[67]  Nonetheless,

MSIP cites to section 6.07 of the Credit Agreement and argues that Citibank, in its

role as Lender to the Revolving Facility, provided a consent pursuant to section

6(d).  Section 6.07 provides:

> To the extent that the Lenders or the Administrative Agent
> constitutes the "Controlling Class" for purposes of the
> Indenture (as defined therein) and is required or authorized
> to take any action in such capacity thereunder, the
> Administrative Agent will be authorized to so act for all
> purposes hereof; provided that such authorization will in

---

    [66]    MSIP argues that Citibank's distinction between "consent" and
"direction" cannot be considered on these motions because the Complaint contains
no such allegation.  However, no such allegation is required for the Court to
consider the difference between "consent" and "direction".  This distinction is only
relevant *in response to* MSIP's argument that Citibank gave a consent in addition
to a direction.  Thus, Citibank's allegation that it directed the liquidation is
sufficient.

    [67]    *See* Counter ¶¶ 29, 73-74.

> each case require that the Administrative Agent receive
> *direction* or *consent* from the Required Lenders.[68]

MSIP argues that because this provision requires the Administrative Agent (i.e.,

Citibank) to obtain "authorization" before ordering the liquidation of the Capmark

VI CDO, Citibank was required to *authorize* itself to take such action.  Thus,

according to MSIP, when Citibank caused the Trustee to liquidate the Collateral, it

occurred in two separate steps: *First*, Citibank, as Lender, *authorized* itself, as

Administrative Agent, to direct the Trustee.  *Second*, Citibank, as Administrative

Agent, *directed* the Trustee to undertake the liquidation.  MSIP further argues that

because the definition of "consent" in section 6(d) includes "authorisation,"[69] when

Citibank, as Lender, *authorized* the liquidation of the Capmark VI CDO, Citibank

provided the *consent* that triggered MSIP's rights under section 6(d).

Even assuming that section 6.07 is applicable — a point Citibank does

not concede[70] — MSIP's linguistic gymnastics and strained reasoning is not

---

[68]     Credit Agreement § 6.07 (emphasis added and removed).  "Required
Lenders" is defined as the Lenders holding not less than two-thirds of the
aggregate commitment under the Revolving Facility. *See id.* § 1.01.

[69]     Master Agreement § 14 (emphasis added) ("'[C]onsent' includes a
consent, approval, action, authorisation, exemption, notice, filing, registration or
exchange control consent.").

[70]     Citibank argues that section 6.07 is inapplicable because the
Revolving Facility was never syndicated.  While Citibank admits that section 1.02
of the Credit Agreement provides that "[t]he definitions of terms herein shall apply

persuasive.  First, I reject MSIP's focus on Citibank's two roles under the Credit

Agreement.  That Citibank was required to consent to or authorize its own action

makes no sense.  Because Citibank was always the sole Lender to the Revolving

Facility, Citibank was always the only principal for which it was acting as

Administrative Agent.  Thus, under the circumstances, Citibank was

simultaneously sole Lender, Controlling Class, and Administrative Agent.  As

such, MSIP's admission that Citibank *directed* the liquidation as Administrative

Agent is tantamount to an admission that Citibank did nothing but issue a

direction, which is fatal to MSIP's position.

    Nor do I accept MSIP's attempt to read "direction" to fall within the

definition of "consent" by way of "authorization" and "authorisation."  Not only is

"direction" conspicuously absent from the plain terms of section 6(d), "direction"

is also not included within the definition of "consent" found in the Master

Agreement.[71]  The fact that "consent" includes "authorisation" under the Master

---

equally to the singular and the plural forms of the terms defined[,]" Citibank
nonetheless highlights that section 6.07 uses the word "Lenders" in plural form and
argues that  "[p]rior to syndication, it is impossible for Citibank to issue a direction
or give a consent to itself that is contrary to the interests of the other Lenders —
there are none."  Citibank's Memorandum in Support of its Motion for Judgment
on the Pleadings and Dismissal of Counterclaims, at 18.

     [71]     *See* Master Agreement § 14.  The Master agreement does not define
"authorisation."  *See id.*

Agreement does not mean or imply that every method of "authorisation" is a "consent." Indeed, the plain language of section 6.07 makes clear that "authorization" may be effected by either a consent *or* a direction.

Furthermore — and as section 6.07 itself demonstrates — the contractual documents at issue here repeatedly distinguish between the words "direction" (or "direct") and "consent."[72] This is not surprising given that the two words have different meanings: while "consent" is a word of acquiescence, "direction" is a word of action.[73] Similarly, "authorization" and "direction" are also utilized differently in the contracts[74] — a distinction recognized in New York

---

[72]    *See, e.g.*, Indenture §§ 6.3(a) & (f), 14.2(a) & (b), 14.3; Credit Agreement §§ 7.01, 7.02(a) & (b).

[73]    *Black's Law Dictionary* defines the noun "consent" as "[a]greement, approval, or permission as to some purpose . . . ." *Black's Law Dictionary* at 346 (9th ed. 2009). *Accord United States v. 141st St. Corp.*, 911 F.2d 870, 878 (2d Cir. 1990) ("Consent is 'compliance or approval esp[ecially] of what is done or proposed by another.'" (quoting *Webster's Third New International Dictionary* 482 (1971))).
         By contrast, the noun "direction" means "[a]n act of guidance . . . [a]n order; an instruction on how to proceed." *Black's Law Dictionary* at 526. Likewise, the verb "direct" means "[t]o aim (something or someone) . . . [t]o cause (something or someone) to move on a particular course . . . [t]o guide (something or someone); to govern . . . [t]o instruct (someone) with authority . . . [t]o address (something or someone)." *Id.* at 525.

[74]    *See, e.g.*, Indenture § 6.18 ("[Trustee is] *authorized* and *directed* to retain from amounts otherwise distributable") (emphasis added); *id.* § 14.2(a) ("[a]ny request, demand, *authorization*, *direction*, notice, *consent*, waiver or other action") (emphasis added). The Credit Agreement also distinguishes between the

20

law.[75]

If these highly sophisticated parties truly intended "consent" to include "direction" via "authorization" or "authorisation", they could and would have so provided.  To merge these terms as if they were one would render meaningless the distinction between them.

In sum, Citibank's issuance of a direction under the Indenture did not implicate MSIP's consent rights under section 6(d) of the Swap Confirmation.  Therefore, Citibank was permitted to direct the liquidation of the Capmark VI CDO without acquiring MSIP's prior written consent.  MSIP's attempt to introduce ambiguity where there is none cannot prevent this result.

## V.   CONCLUSION

For the reasons stated above, Citibank's motion for judgment on the pleadings and for dismissal of MSIP's original counterclaims is granted.  MSIP's motion for judgment on the pleadings is denied.  The Clerk of Court is directed to

---

words "authorization" and "direction".  *Compare* Credit Agreement § 4.03(a) ("organizational action to *authorize* such execution") (emphasis added) *with id.* § 4.03(c) ("the Trustee, acting at the *direction* of the Investment Advisor") (emphasis added).

[75]    *See, e.g.*, *In re Hilliard's Estate*, 86 N.Y.S.2d 158, 159 (Sur. Ct. N.Y. Co. 1948) ("The word 'authorize' connotes a grant of discretion.  The word 'direct' connotes a mandate.").  *Black's* defines "authorize" as "[t]o give legal authority; to empower . . . [t]o formally approve; to sanction."  *Black's Law Dictionary* at 153.

close these motions (documents ## 15 and 21).

Because judgment is granted to Citibank on limited pleadings, I am not entering final judgment.  Specifically, MSIP recently added counterclaims for reformation and equitable estoppel that are not at issue in the present motions.[76] Citibank shall reply to these counterclaims within twenty (20) days of the date of this Opinion and Order.

A conference is scheduled for June 10, 2010, at 5:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     May 12, 2010
           New York, New York

---

[76]     *See supra* note 38.  In support of reformation, MSIP asserts that Citibank and MSIP reached an agreement, via oral and written communications, that the Swap Confirmation would be amended so as to transfer *all* of Citibank's consent and voting rights as a Lender under the Credit Agreement to MSIP for the duration of the Swap.  If MSIP is able to prove that such an agreement exists, then it appears that Citibank may have indeed breached the Swap Agreement.

22

## - Appearances -

**For Plaintiff:**

Gregory P. Joseph, Esq.
Rachel Cherington, Esq.
Gregory P. Joseph Law Office LLC
485 Lexington Avenue, 30th floor
New York, New York 10017
(212) 407-1200

**For Defendant:**

Michael Carlinsky, Esq.
Jonathan Pickhardt, Esq.
Simona Gory, Esq.
Amos Friedland, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000