**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

CITIBANK, N.A.,

                 **Plaintiff and**
                 **Counterclaim Defendant,**

          - against -

MORGAN STANLEY & CO.
INTERNATIONAL, PLC,

                 **Defendant and**
                 **Counterclaimant.**

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/8/10

**OPINION AND ORDER**

**09 Civ. 8197 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        In the wake of the economic turmoil that recently engulfed this nation and beyond, financial institutions are facing the consequences of the deals they struck and the risks they assumed in better times. The courts are being called upon to closely examine complex and lengthy contracts in order to ascertain who agreed to what and, more to the point, who owes money to whom. Here, the players are two of the most sophisticated financial institutions in the world — Citibank, N.A. ("Citibank") and Morgan Stanley & Co. International, PLC ("MSIP"). The stakes are large — approximately $245 million.

In an opinion and order filed May 12, 2010 (the "May 12 Opinion"), I concluded that MSIP breached the unambiguous terms of a credit default swap agreement with Citibank.[1]  Accordingly, I granted judgment on the pleadings to Citibank on its sole claim for breach of contract and dismissed MSIP's two mirror-image counterclaims.  While that motion was pending, MSIP added two new counterclaims for reformation of the contract and equitable estoppel.  Citibank now moves for judgment on the pleadings on these two remaining counterclaims, which were explicitly not addressed in the May 12 Opinion.  For the reasons stated below, the motion is denied as to MSIP's counterclaim for reformation but granted as to the counterclaim for equitable estoppel.

## II.   BACKGROUND

### A.   Overview

The background of this case and the contracts at issue are fully set forth in the May 12 Opinion.[2]  Suffice it to say that, in 2006, Capmark VI Ltd issued a collateralized debt obligation (the "Capmark VI CDO") — a security backed by mortgages and other assets.  The Capmark VI CDO is governed primarily by a July 24, 2006 indenture (the "Indenture" or the "Capmark VI

---

[1]   *See Citibank, N.A. v. Morgan Stanley & Co. Int'l*, No. 09 Civ. 8197, — F. Supp. 2d —, 2010 WL 1948547, at *5-*6 (S.D.N.Y. May 12, 2010).

[2]   *See id.* at *1-*4.

Indenture").

   At the same time, Citibank agreed to provide up to $366 million in revolving credit to the Capmark VI CDO (the "Revolving Facility"). This credit agreement was memorialized on July 24, 2006 (the "Credit Agreement" or the "Capmark VI Credit Agreement"). The Credit Agreement was structured to accommodate syndication and, therefore, provides for Citibank to serve as "Administrative Agent" to act on behalf of the syndicate of lenders. The Credit Agreement was never syndicated, however, leaving Citibank as the sole lender to the Revolving Facility. As such, Citibank was the senior stakeholder in (that is, the "Controlling Class" of) the Capmark VI CDO at all relevant times. As a result, Citibank held certain rights under the Indenture, including the right to direct that the Collateral be liquidated if the value of those assets fell below Citibank's obligation under the Revolving Facility ($366 million).

   Also at the same time, Citibank and MSIP entered into a credit default swap — an agreement that essentially transferred risk related to the Capmark VI CDO from Citibank to MSIP for three years (the "Swap Agreement" or the "Capmark VI Swap Agreement"). MSIP was paid $750,000 by Citibank in return for assuming this risk. The Swap Agreement consists of (1) a July 21, 2006 confirmation (the "Swap Confirmation" or the "Capmark VI Swap Confirmation")

that incorporates (2) an International Swaps and Derivatives Association, Inc.

("ISDA") Master Agreement, as amended from time to time (the "ISDA Master

Agreement"), and (3) 2003 ISDA Credit Derivatives Definitions (the "2003 ISDA

Definitions").

In 2008, the value of the Capmark VI CDO collapsed.  In March

2009, Citibank exercised its rights under the Indenture and directed that the

Collateral be liquidated.  Approximately $121 million was recouped from the sale,

leaving a shortfall of $245,368,966.51.

In July 2009, Citibank attempted to collect the shortfall from MSIP.

MSIP refused on the ground that Citibank breached Section 6(d) of the Swap

Confirmation by ordering the liquidation without first obtaining MSIP's written

consent.  Section 6(d) of the Swap Confirmation provides certain rights to MSIP

with respect to the Revolving Facility:

> No amendment to, or waiver or consent of or with respect
> to, the Reference Obligation [the Revolving Facility] will
> be agreed or consented to by Buyer [Citibank] (or permitted
> by Buyer to be agreed or consented to) without the prior
> written consent of the Counterparty [MSIP].[3]

Finally, I note that the ISDA Master Agreement contains an

---

[3]      Swap Confirmation § 6(d), Ex. C to the Declaration of Rachel M.
Cherington, Citibank's Counsel, in Support of Citibank's First Motion for
Judgment on the Pleadings and Dismissal of Counterclaims ("Cherington Decl.").

integration clause providing that "[t]his agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto."[4]  The ISDA Master Agreement further provides that Citibank and MSIP are "not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth herein, in any Credit Support Document or in any Confirmation."[5]  I shall refer to this latter clause as the "no-reliance clause."

## B.    Proceedings in this Court

In September 2009, Citibank filed suit in this Court against MSIP for breach of contract.  MSIP asserted two mirror-image counterclaims.  In January 2010, Citibank moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and dismissal under Rule 12(b)(6) of MSIP's counterclaims. MSIP also moved for judgment on the pleadings on its counterclaims, arguing that Citibank agreed to transfer all of its voting rights — including Controlling Class rights — to MSIP through Section 6(d) of the Swap Confirmation.  The motion was fully briefed on March 12, 2010.

---

[4]    Master Agreement § 9(a), Ex. D to the Cherington Decl..

[5]    Schedule to ISDA Master Agreement part 5(d), Ex. D to the Declaration of Sandra M. Lipsman, Plaintiff's Counsel, in Support of Plaintiff's Motion for Judgment on the Pleadings on MSIP's Amended Counterclaims ("Lipsman Decl.").

5

On April 5, 2010, MSIP filed, with Citibank's consent and leave of the Court, an Amended Answer and Counterclaims.  As is relevant here, MSIP added a third counterclaim for reformation and a fourth counterclaim asserting equitable estoppel.

On May 12, 2010, I granted judgment on the pleadings to Citibank on its claim, dismissed MSIP's first and second counterclaims, and denied MSIP's motion to the contrary.  I held that the contractual documents were unambiguous.

> Citibank's issuance of a direction under the Indenture did not implicate MSIP's consent rights under Section 6(d) of the Swap Confirmation.  Therefore, Citibank was permitted to direct the liquidation of the Capmark VI CDO without acquiring MSIP's prior written consent.  MSIP's attempt to introduce ambiguity where there is none cannot prevent this result.[6]

I rejected MSIP's strained reading of the contractual documents that (1) Citibank, as sole lender to the Revolving Facility, authorized itself, as Administrative Agent of the (unrealized) syndicate of lenders, to direct that the Collateral be liquidated, and (2) when Citibank provided such authorization to itself, Citibank effected a consent that triggered MSIP's rights under Section 6(d) of the Swap Confirmation.

> Because Citibank was always the sole Lender to the Revolving Facility, Citibank was always the only principal for which it was acting as Administrative Agent.  Thus, under the circumstances, Citibank was simultaneously sole

---

[6]     *Citibank*, 2010 WL 1948547, at *6.

> Lender, Controlling Class, and Administrative Agent. As such, MSIP's admission that Citibank directed the liquidation as Administrative Agent is tantamount to an admission that Citibank did nothing but issue a direction, which is fatal to MSIP's position.[7]

I also rejected MSIP's attempt to read "direction" (in the Indenture) to fall within the definition of "consent" (in the Swap Confirmation) by way of "authorization" (in the Credit Agreement). Among other things, I observed that the contractual documents repeatedly and explicitly distinguish between the concepts of consent and direction, and that those words have different meanings. "If these highly sophisticated parties truly intended 'consent' to include 'direction' via 'authorization' . . . , they could and would have so provided. To merge these terms as if they were one would render meaningless the distinction between them."[8]  In short, I held that the term "consent" in Section 6(d) of the Swap Confirmation did not capture the "direction" Citibank issued under the Indenture.

### C.    MSIP's Counterclaims for Reformation and Equitable Estoppel

The May 12 Opinion explicitly did not address MSIP's newly-added counterclaims for reformation and equitable estoppel.[9]  I will now summarize the

---

[7]    *Id.*

[8]    *Id.*

[9]    *See id.* at *1, *3 n.38, *6.

7

allegations that form the basis of these claims.  As for reformation, MSIP alleges:

> During the negotiation of the Capmark VI Swap, Citibank and MSIP expressly agreed that Citibank would obtain MSIP's consent prior to exercising any Controlling Class rights under the Capmark VI Indenture during the term of the Capmark VI Swap.  This agreement was reconfirmed in communications between the lead negotiators for Citibank and MSIP following the execution of the Capmark VI Swap.
>
> To the extent that the written terms of the Capmark VI Swap fail to reflect the agreement reached between Citibank and MSIP, that failure was on account of either mutual mistake by the parties, or unilateral mistake by MSIP and improper conduct by Citibank in seeking to conceal the mistake through expressing its agreement with MSIP's understanding of the parties' agreement.[10]

As for equitable estoppel, MSIP alleges:

> Both before and after the execution of the Capmark VI Swap, Citibank stated its agreement or expressed its assent with MSIP's interpretation of Section 6(d) of the Capmark VI Confirmation as providing for the transfer to MSIP of consent rights over Citibank's exercise of Controlling Class rights under the Capmark VI Indenture during the term of the Capmark VI Swap.
>
> Citibank made these representations in the contexts of seeking MSIP's agreement to enter into the Capmark VI Swap and seeking MSCS's agreement to enter into [a different credit default swap].
>
> MSIP relied to its detriment upon Citibank's express agreement or assent by entering into the Capmark VI Swap as drafted and by permitting MSCS to enter into the Tallships Swap without requiring as a condition that any

---

[10]   MSIP's Amended Answer and Counterclaims ("Am. Counter") ¶¶ 101-102.

disagreements with regard to the interpretation of Section 6(d) of the Capmark VI Confirmation first be resolved in favor of MSIP's position.

Citibank was thereafter equitably estopped from seeking to challenge MSIP's interpretation of Section 6(d) of the Capmark VI Confirmation as requiring Citibank to obtain MSIP's prior written consent to the exercise of Controlling Class rights by Citibank during the term of the Capmark VI Swap.[11]

As alluded to in the above allegations, MSIP highlights three e-mail exchanges between Citibank's and MSIP's lead negotiators on the Capmark VI Swap and on a different credit default swap (the "Tallships Swap").[12]  Because these e-mail exchanges are integral to the pleadings, I look to the actual communications, as opposed to MSIP's allegations as to what they state.

### 1.    Capmark VI Swap Negotiations:  June 22, 2006 E-mails

As a condition to entering into the Capmark VI Swap, "MSIP

---

[11]    *Id.* ¶¶ 105-108.

[12]    MSIP's allegations also allude to oral communications but no specifics are provided.  In its opposition to the present motion, MSIP states in a footnote that it could plead these oral communications with more particularity.  *See* MSIP's Memorandum of Law in Opposition to Citibank's Second Motion for Judgment on the Pleadings on MSIP's Amended Counterclaims ("MSIP Opp.") at 11 n.13.  For example, MSIP's lead negotiator on the Capmark VI Swap testified in his deposition:  "'When [Citibank's lead negotiator and I] discussed the topics of the passage of voting rights from Citi to Morgan Stanley . . . [he] was in agreement that the rights that Citi had as lender under the loan facility would pass to Morgan Stanley for so long as Morgan Stanley was on risk.'"  *Id.* (quoting deposition transcript).

demanded that it be provided with . . . Citibank's right as Lender to direct the exercise of Capmark VI's Controlling Class rights."[13]  On June 22, 2006, a month before the Capmark VI Confirmation was signed, the lead negotiator for MSIP, George Wilkinson, sent an e-mail to the lead negotiator for Citibank, John Costango, stating:

> As discussed, we should include language in the doc [sic] stating that no amendment, waiver, consent, etc. will be made or given by Citi under the Loan Agreement without the prior written consent of MS (i.e., *Citi passes along to MS all voting rights it has under the Loan Agreement to MS*).[14]

That same day, Costango responded "OK" but noted that his comment was "preliminary."[15]

As a result of these negotiations, Section 6(d), which is quoted in full above, was added to the Capmark VI Confirmation.[16]  According to MSIP, "[a]s intended, this provision had the clear effect of passing Citibank's Controlling Class rights under the Capmark VI Indenture to MSIP."[17]  (Of course, as I held in the

---

[13]     Am. Counter ¶ 75.

[14]     Ex. F to the Lipsman Decl. (emphasis added).

[15]     *Id.*

[16]     *See* Am. Counter ¶ 77.

[17]     *Id.*

May 12 Opinion, Section 6(d) did not pass Citibank's Controlling Class rights under the Capmark VI Indenture to MSIP.)

### 2.   Tallships Swap Negotiations

MSIP also relies on e-mails that Wilkinson and Costango exchanged while they were negotiating the separate Tallships Swap in November and December 2006.  MSIP was not a party to the Tallships Swap; rather, the agreement was between Citibank and Morgan Stanley Capital Services ("MSCS"), a Morgan Stanley entity separate from MSIP.

### a.   November 29, 2006 E-mails

On November 29, 2006, Costango sent an e-mail with the heading "Voting rights," in which he said, among other things:

> We are struggling to recall how this was handled in capmark.  Lawyers are telling me that we don't pass through voting rights but I seem to remember you being comfortable with the arrangement in capmark.  Do you recall how we worked that out?[18]

Wilkinson responded that same day with the following:

> I think in Capmark we just relied on the language that stated the credit agreement would not be amended without our prior written consent.  I would prefer to be more specific in this trade.  See attached rider.[19]

---

[18]   Ex. G to Lipsman Decl.

[19]   *Id.*

11

The attached rider, entitled "Voting Provisions", stated:

> [Citi] agrees that to the extent it is entitled to act in its capacity as a member of the Controlling Class or otherwise to consent to or vote with respect to any Proposed Action (as defined below) in its capacity as the Advance Swap Counterparty or Revolving Credit Agreement Agent under the Indenture, prior to [Citi] giving its written consent to, or casting its vote for or against, any waiver, amendment, vote, modification or other action of a similar nature under the Indenture (the "**Proposed Action**"), [Citi] shall . . . seek [MSCS's] written direction as to whether to give such consent or how to cast such vote and . . . act in accordance with such written direction from [MSCS].[20]

That rider, with revisions, became Section 6(e) of the Tallships Swap,[21] which also included a Section 6(d) that was verbatim to the Section 6(d) in the Capmark VI Confirmation.[22]

### b.   December 7, 2006 E-mail

In response to the proposed "Voting Provisions" rider, Costango sent an e-mail to Wilkinson on December 7, 2006, stating "Chaka [Wade of Citibank] and I have had a bunch of conversations with the internal legal people on the voting language.  They have raised some additional concerns with our language of

---

[20]     *Id.* (alterations in original).

[21]     *See* Ex. I to Lipsman Decl.

[22]     *See* Am. Counter. ¶ 80.

the 'what if this happens' variety."[23]  After summarizing those concerns — "all of which dealt specifically with the exercise of Controlling Class voting rights under the Tallships Indenture"[24] — Costango stated:

> I've thought a lot about why changes like this are warranted here compared to Capmark, and I believe the difference is that in Capmark we agreed to not make any change without consent and here we are agreeing to consult you in all cases if we don't want to make a change.  So it's more complicated.[25]

MSIP alleges that the November and December e-mails — in addition to other unspecified oral communications[26] — "further confirmed the parties' understanding of the Capmark VI Swap as having provided for MSIP's right to consent to any actions that Citibank intended to take as the Controlling Class under the Capmark VI Indenture."[27]

## III.   STANDARD FOR JUDGMENT ON THE PLEADINGS

At any time after the pleadings close and before the trial commences,

---

[23]     Ex. H to Lipsman Decl.

[24]     Am. Counter ¶ 81.

[25]     Ex. H to Lipsman Decl.

[26]     *See supra* note 12.

[27]     Am. Counter ¶ 81.

a party may move for a judgment on the pleadings under Rule 12(c).[28]  A party is
entitled to judgment on the pleadings only if it is clear that no material issues of
fact remain to be resolved and that it is entitled to judgment as a matter of law.[29]

       "'The standard for addressing a Rule 12(c) motion for judgment on
the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to
state a claim.'"[30]  In either instance, the court must accept as true the non-movant's
allegations, along with the allegations in the movant's pleading that the non-
movant has admitted, and must draw all reasonable inferences in the non-movant's
favor.[31]  The court need not accord "[l]egal conclusions, deductions or opinions
couched as factual allegations . . . a presumption of truthfulness."[32]

       The allegations in a complaint must meet a standard of

---

[28]    *See Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1998 WL
851591, at *1 (S.D.N.Y. Dec. 9, 1998) (citing 2 *Moore's Federal Practice* § 12.38
at 12-99).

[29]    *See Burns Int'l Sec. Servs. v. International Union, United Plant Guard
Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1994); *Carballo ex rel. Cortes v. Apfel*, 34
F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

[30]    *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 450
(S.D.N.Y. 2009) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir.
2006)).

[31]    *See id.*; *Frater*, 1998 WL 851591, at *1 (citing *Sheppard v. Beerman*,
18 F.3d 147, 150 (2d Cir. 1994)).

[32]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)
(quotation marks omitted).

"plausibility."[33]  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that [plaintiff is

entitled to relief]."[34]  Plausibility "is not akin to a probability requirement;" rather

plausibility requires "more than a sheer possibility . . . ."[35]  Pleading a fact that is

"merely consistent" does not satisfy the plausibility standard.[36]

The court "must limit itself to the facts stated in the complaint or in

documents attached to the complaint as exhibits or incorporated in the complaint

by reference."[37]  A document is considered incorporated by reference if it is "in a

pleading . . . adopted by reference elsewhere in the same pleading or in any other

pleading . . . ."[38]  A court may also consider a document not specifically

incorporated by reference but on which the complaint heavily relies and which is

integral to the complaint.[39]   This is particularly true when the non-movant either

---

[33]     *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

[34]     *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[35]     *Id.* (quotation marks omitted).

[36]     *Id.* (quotation marks omitted).

[37]     *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[38]     Fed. R. Civ. P. 10(c).

[39]     *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

had the document in its possession or knew of the document when bringing suit.[40]

In addition, a court "'may . . . consider matters of which judicial notice may be taken.'"[41]  On the other hand, if a court is presented with material outside of the pleadings and not subject to judicial notice, it should either exclude the material in its consideration of the motion to dismiss or for judgment on the pleading, or consider the material after converting the motion into one for summary judgment.[42]

## IV.    DISCUSSION

### A.    MSIP States a Claim for Reformation

It is undisputed that New York law governs MSIP's remaining counterclaims.  A claim for reformation of a written instrument must set forth "'(1) an agreement other than that expressed in the instrument; (2) the written instrument sought to be reformed; and (3) mutual mistake of the parties, or the mistake of one party and the fraud of the other.'"[43]

---

[40]    *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008).

[41]    *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer*, 937 F.2d at 773).

[42]    *See Chambers*, 282 F.3d at 154.

[43]    *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 549 (S.D.N.Y. 2007) (quoting 16 N.Y. Jur. 2d *Cancellation of Instruments* § 86 (2007)).

In a case of mutual mistake, the parties have reached an
oral agreement and, unknown to either, the signed writing
does not express that agreement.  In a case of fraud, the
parties have reached agreement and, unknown to one party
but known to the other (who has misled the first), the
subsequent writing does not properly express that
agreement.[44]

"'[R]eformation of a contract should be allowed only where mutual

mistake or fraud is clearly established, particularly when the negotiations were

conducted by sophisticated, counseled business people.'"[45]

The burden upon a party seeking reformation is a heavy one
since it is presumed that a deliberately prepared and
executed written instrument accurately reflects the true
intention of the parties:  The proponent of reformation must
show in no uncertain terms not only that mistake or fraud
exists, but exactly what was really agreed upon between the
parties.[46]

---

[44]    *Chimart*, 498 N.Y.S.2d at 347 (citations omitted).

[45]    *Id.* (quoting *Briand Parenteau Assocs. Inc. v. HMC Assocs.*, 638
N.Y.S.2d 817, 819 (3d Dep't 1996)).  *Accord Chimart Assoc. v. Paul*, 498
N.Y.S.2d 344, 347 (1986) ("Because the thrust of a reformation claim is that a
writing does not set forth the actual agreement of the parties, generally neither the
parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of
parol or extrinsic evidence, of the claimed agreement.  However, this obviously
recreates the very danger against which the parol evidence rule and Statute of
Frauds were supposed to protect — the danger that a party, having agreed to a
written contract that turns out to be disadvantageous, will falsely claim the
existence of a different, oral contract.  To this end . . . reformation has been limited
both substantively and procedurally." (citations omitted)).

[46]    *William P. Pahl Equip. Corp. v. Kassis*, 588 N.Y.S.2d 8, 12 (1st Dep't
1992) (concluding dismissal of reformation warranted where plaintiff failed to

17

"To plead a claim for mutual mistake, the factual allegations must establish that both contracting parties shared the same erroneous belief as to a material fact, and their acts do not in fact accomplish their mutual intent."[47]

        Here, MSIP clearly alleges the first and second elements of a claim for reformation: that the parties came to an understanding that "Citibank would obtain MSIP's consent prior to exercising any Controlling Class rights under the Capmark VI Indenture during the term of the Capmark VI Swap[,]"[48] but failed to reduce that agreement to writing in Section 6(d) of the Swap Conformation.[49]

---

sufficiently allege mutual mistake or fraud) (quotation marks and brackets omitted). *Accord Barclay Arms, Inc. v. Barclay Arms Assocs.*, 542 N.Y.S.2d 512, 513-14 (1989) (affirming dismissal of reformation claim and stating "[a] bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation"); *Stonebridge Capital, LLC v. Nomura Int'l PLC*, 891 N.Y.S.2d 56, 58 (1st Dep't 2009) (affirming dismissal of reformation claim where claimant "failed to allege that the parties reached an agreement that was not reflected in the transaction documents, failed to state 'exactly' what such agreement was, and thus failed to overcome the strong presumption against mutual mistake claims").

    [47]    *FSP, Inc. v. Société Générale*, No. 02 Civ. 4786, 2005 WL 475986, at *15 (S.D.N.Y. Feb. 28, 2005).

    [48]    Am. Counter ¶ 101.

    [49]    *See William P. Pahl Equip. Corp.*, 588 N.Y.S.2d at 12 ("In order to obtain reformation of a written instrument" and withstand a motion to dismiss, the movant must allege that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake on one side and fraud on the other, omitted some provision agreed upon, or inserted one not agreed upon." (quotation marks omitted)).

Thus, whether MSIP states a claim for reformation turns on whether there are sufficient factual allegations of mutual mistake or fraud by Citibank. More specifically, do the three e-mail exchanges documented above, along with the contractual documents, make it plausible that — despite the plain terms of Section 6(d), the integration clause, and the no-reliance clause — the parties were mutually mistaken or Citibank committed fraud on MSIP?  In addition, the allegations must satisfy the particularity requirements of Rule 9(b).[50]

I have carefully reviewed the communications among Citibank's and MSIP's negotiators and conclude that, when drawing all reasonable inferences in MSIP's favor, these communications — along with MSIP's more general allegations, viewed as true for the purposes of this motion — sufficiently support a claim for reformation based on mutual mistake.[51]  In particular, I note that the June 22 e-mail exchange, in which Citibank's negotiator (Costango) stated "OK" in

---

[50]     Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

[51]     Because MSIP states a claim for reformation based on mutual mistake, I do not address whether MSIP also states a claim for reformation based on fraud.  Mutual mistake and fraud are not separate causes of action; rather, they are merely different theories by which MSIP might prevail on its single claim for reformation.  Thus, in subsequent proceedings, the parties will be permitted to argue for/against reformation under both theories, though MSIP need only succeed on one to prevail.

response to MSIP's negotiator's (Wilkinson) expectation that "Citi [would] pass[]

along to MS all voting rights it has under the Loan Agreement to MS."  While this

language on its face is limited to the Credit Agreement, and while the Controlling

Class rights at issue were exercised under the Indenture, MSIP correctly notes that

the only reason Citibank had rights under the Indenture is because of the Credit

Agreement.[52]  Thus, it is plausible, based on the June 22 e-mail exchange, that

MSIP and Citibank shared the understanding that Controlling Class rights would

transfer to MSIP, despite the final language of Section 6(d) of the Swap

Confirmation.[53]

        Citibank makes a number of arguments that undermine the notion that

MSIP and Citibank agreed to pass Controlling Class rights to MSIP.  For example,

Citibank observes that (1) Costango's response "OK" in the June 22 e-mail

exchange was labeled elsewhere as "preliminary"; and (2) MSIP has not alleged

---

[52]    *See* MSIP Opp. at 13.  While not part of MSIP's pleadings, I note that, according to MSIP, Chaka Wade, one of Citibank's negotiators on the Tallships Swap, testified in his deposition that, in the context of collateralized debt obligations, the term "voting rights" includes Controlling Class rights.  *See id.* at 12.  Additionally, MSIP cites to "experts" in the field to argue that the notion that "the term 'voting rights' encompass[es] Controlling Class rights is also consistent with custom, usage, and practice in the CDO industry."  *Id.* at 13 n.14.

[53]    While MSIP has not pleaded with particularity oral communications in support of its claims, I note that MSIP has offered to amend its pleadings to provide further support to its allegation that MSIP and Citibank agreed to pass Controlling Class rights.  *See supra* note 12.

20

that Costango had authority to bind Citibank, observing that Costango was not a

signatory to the final contracts.  Whatever persuasive value these arguments

possess, they do not defeat the plausibility of MSIP's claim.[54]

> The November 29 and December 7 e-mail exchanges, which took

place during the Tallships negotiation, are somewhat ambiguous and can be read to

support both parties' arguments here.[55]  In support of MSIP's position, on

November 29, under the subject line "Voting rights," the negotiator for Citibank

(again, Costango) asked the negotiator for MSCS (again, Wilkinson) how the

parties handled "[v]oting rights" in the Capmark VI Swap, stating that "[l]awyers

are telling me that we don't pass through voting rights but I seem to remember you

being comfortable with the arrangement in capmark.  Do you recall how we

---

[54]    *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344-
45 (S.D.N.Y. 2010) (("[C]ourts have recognized that to survive a motion to dismiss
. . . , a plaintiff need only raise a sufficient inference that some sort of agency
relationship existed between the purported principal and agent.  To satisfy this
burden on a motion to dismiss, circumstantial evidence is sufficient to establish the
agent's authority to act for the principal." (quotation marks and citations omitted)).
Here, it is undisputed that Costango was Citibank's lead negotiator on the Capmark
VI Swap, a fact that raises a sufficient inference that an agency relationship existed
between Costango and Citibank.

[55]    Citibank argues that the November and December communications
are "out of time" because they occurred after the Capmark VI Swap was executed.
Citibank Mem. at 16.  This argument is misplaced because these communications
reflect "the prior or contemporaneous understanding of the parties" at the time the
Capmark VI Swap was finalized.  *Compania Embotelladoria del Pacifico, S.A. v.
Pepsi Cola Co.*, 607 F. Supp. 2d 600, 604 (S.D.N.Y. 2009).

worked that out?"[56]  Certainly the statement that "[l]awyers are telling me that we don't pass through voting rights" suggests that Controlling Class rights did not pass from Citibank to MSIP in the Capmark VI Swap; however, Costango's follow-on comment — "but I seem to remember you being comfortable with the arrangement in capmark" — strongly indicates otherwise.  Furthermore, this last statement bears more directly on the parties' understanding contemporaneous to the Capmark VI negotiations than the statement "[l]awyers *are telling* me that we don't pass through voting rights."

Of course, Wilkinson responded:  (1) "I think in Capmark we just relied on the language that stated the credit agreement would not be amended without our prior written consent"— a reference to Section 6(d) of the Capmark VI Swap Confirmation — and (2) in Tallships, "I would prefer to be more specific . . . ."[57]  This last sentence suggests that while Wilkinson believed that Controlling Class rights had passed in Capmark VI, he had a concern that they did not and, therefore, wanted to be more specific in that regard.  To this end, Wilkinson proposed additional language that ultimately became Section 6(e) of the Tallships Confirmation, which was explicit in referring to rights under the Indenture.

---

[56]     Ex. G to Lipsman Decl.

[57]     *Id.*

On December 7, Costango responded:  "I've thought a lot about why changes like this are warranted here compared to Capmark, and I believe the difference is that in Capmark we agreed to not make any change without consent and here we are agreeing to consult you in all cases if we don't want to make a change.  So it's more complicated."[58]  This sentence is plausibly read to support MSIP's position that, in Capmark VI, Citibank agreed "to not make any change without consent", including the exercise of Controlling Class rights under the Capmark VI Indenture, whereas in Tallships, Citibank wanted more room to reject a position taken by MSCS.

Viewing MSIP's allegations as true, looking principally to the three e-mail exchanges MSIP has included in its pleadings, and drawing all reasonable inferences in MSIP's favor, it is plausible the MSIP and Citibank agreed to pass Controlling Class rights from Citibank to MSIP in the Capmark VI Swap but failed to reduce that agreement to writing in Section 6(d) of the Swap Confirmation. While Citibank may very well succeed on summary judgment or at trial, MSIP has sufficiently pleaded a claim for reformation based on mutual mistake.

**B.    MSIP Fails to State a Claim for Equitable Estoppel**

In order to state a claim for equitable estoppel, MSIP must plead:  "(1)

---

[58]    Ex. H to Lipsman Decl.

a misrepresentation by [Citibank], (2) reasonable reliance by [MSIP], and (3) prejudice."[59]  The claim must be pled with particularity, in accordance with Rule 9(b).[60]

Because "[p]arol evidence of any alleged policy to the contrary may not . . . be introduced to contradict, alter or vary the express terms of the contract,"[61] MSIP concedes that its "equitable estoppel claim . . . is based on [alleged] *post-contractual* misrepresentations by Citibank."[62]  That is, MSIP's equitable estoppel claim is based on the communications between the lead negotiators for MSCS — not MSIP — and Citibank that occurred during the negotiation of the Tallships Swap.[63]

---

[59]      *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

[60]      *See Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793, 2005 WL 500377, at *8 (S.D.N.Y. Mar. 2, 2005).

[61]      *Le Bovici v. Jamaica Sav. Bank*, 439 N.Y.S.2d 688, 689 (2d Dep't 1981) ("The parol evidence rule cannot be ignored merely because a party claims an estoppel. . . .  A truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built." (quotation marks omitted)), *aff'd*, 449 N.Y.S.2d 954 (1982).  *Accord Ansam Assocs., Inc. v. Cola Petroleum, Ltd*, 760 F.2d 442, 447 (2d Cir. 1985) ("Parol evidence is not admissible to show prior oral representations contrary to the plain and unambiguous writing. . . .  Where the plain writing is inconsistent with the alleged prior oral agreement there is no basis for a claim of an estoppel.").

[62]      MSIP Opp. at 22 n.25.

[63]      *See* Am. Counter ¶¶ 78-79, 105.

This concession is fatal to MSIP's equitable estoppel claim because MSIP cannot show prejudice *with respect to its entering the Capmark VI Swap* based on any misrepresentations made *during the later Tallships negotiation*. Putting to the side that MSIP was not even a party to the Tallships Swap, MSIP's equitable estoppel claim concerns injury MSIP allegedly suffered vis-a-vis the Capmark VI Swap. MSIP is not suing here for any injury suffered by MSCS due to entering Tallships. Because MSIP's rights were unaffected by Tallships, MSIP's equitable estoppel claim must fail.

MSIP attempts to avoid this result by arguing that "MSIP would not have allowed MSCS to enter the Tallships Swap unless Citibank agreed to amend the Capmark [VI] Swap."[64] In other words, MSIP contends that "Citibank . . . prejudiced MSIP by denying it an opportunity to require Citibank to amend the Capmark [VI] Confirmation so as to transfer Controlling Class rights to MSIP."[65] But this is simply not plausible because MSCS negotiated the entirely new Section 6(e) in order to address rights under the Indenture, and did not rely on Section 6(d) in Tallships (which was identical to Section 6(d) in the Capmark VI Confirmation) for that purpose. The e-mails between Costango and Wilkinson indicate that

---

[64] MSIP Opp. at 25. *Accord* Am. Counter ¶¶ 79, 107.

[65] *Id.*

because MSCS was concerned that Controlling Class rights did not transfer through Section 6(d), MSCS proposed language that became Section 6(e) in Tallships in order to ensure that MSCS had a say in the exercise of voting rights under the Tallships Indenture.

## V.    CONCLUSION

For the reasons stated above, Citibank's motion for judgment on the pleadings is denied as to MSIP's counterclaim for reformation and granted as to MSIP's counterclaim for estoppel, which is dismissed with prejudice.  The Clerk of Court is directed to close this motion (Docket Entry # 44).

A conference is scheduled for November 10, 2010, at 4:30 p.m.  This conference will serve as a pre-motion conference should either or both parties seek to move for summary judgment.  If neither party intends to move for summary judgment, this conference will be for the purpose of scheduling trial matters.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      October 8, 2010
            New York, New York

26

**- Appearances -**

**For Plaintiff:**

Gregory P. Joseph, Esq.
Peter R. Jerdee, Esq.
Sandra M. Lipsman, Esq.
Rachel Cherington, Esq.
Gregory P. Joseph Law Office LLC
485 Lexington Avenue, 30th floor
New York, New York 10017
(212) 407-1200

**For Defendant:**

Kathleen M. Sullivan, Esq.
Michael B. Carlinsky, Esq.
Jonathan E. Pickhardt, Esq.
Andrew S. Corkhill, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000