UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------------- X

CITIBANK, N.A.,

   **Plaintiff and**
   **Counterclaim Defendant,**

  **- against -**

MORGAN STANLEY & CO.
INTERNATIONAL, PLC,

   **Defendant and**
   **Counterclaimant.**

------------------------------------------------------- X

**OPINION AND ORDER**


**09 Civ. 8197 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

   This case arises out of a dispute over a credit default swap ("CDS")
agreement between two of the most sophisticated financial institutions in the world
— Citibank, N.A. ("Citibank") and Morgan Stanley & Co. International, PLC
("MSIP"). In an opinion and order dated May 12, 2010 (the "May 12 Opinion"), I
concluded that MSIP breached the unambiguous terms of that agreement.[1]
Accordingly, I granted judgment on the pleadings to Citibank on its sole claim for

---

[1] *See Citibank, N.A. v. Morgan Stanley & Co. Int'l*, 724 F. Supp. 2d
398, 404-07 (S.D.N.Y. 2010) ("May 12 Opinion").

breach of contract and dismissed MSIP's two mirror-image counterclaims.  In a

subsequent opinion and order dated October 8, 2010 (the "October 8 Opinion"), I

addressed Citibank's motion for judgment on the pleadings on MSIP's two

remaining counterclaims – equitable estoppel and reformation – granting the

motion as to the counterclaim for equitable estoppel but denying it as to the

counterclaim for reformation.[2]  Now before the Court are cross-motions for

summary judgment on MSIP's counterclaim for reformation.  For the reasons that

follow, MSIP's motion is denied and Citibank's motion is granted.

## II.   BACKGROUND

### A.   The Agreements

In 2006, Capmark VI Ltd. ("Capmark") issued a collateralized debt

obligation (the "Capmark CDO") – an asset-backed security ("ABS") backed by

mortgages and other assets (the "Collateral").  The Capmark CDO is governed

primarily by a July 24, 2006 indenture (the "Indenture").[3]

---

[2]      *See Citibank, N.A. v. Morgan Stanley & Co. Int'l*, 724 F. Supp. 2d
407, 420 (S.D.N.Y. 2010) ("October 8 Opinion").  This Opinion assumes
familiarity with the legal standards, analyses, and conclusions contained in the
May 12 and October 8 Opinions.

[3]      *See* Indenture, Ex. A to 1/9/10 Declaration of Rachel M. Cherington,
Counsel for Citibank, in Support of Citibank's Motion for Judgment on the
Pleadings and Dismissal of Counterclaims [Docket No. 17].

Citibank provided $366 million in revolving credit to the Capmark
CDO (the "Revolving Facility") that was memorialized by a Credit Agreement
("Credit Agreement" or "Capmark Credit Agreement") dated July 24, 2006 among
Capmark as Issuer, Citibank as Lender, and Citibank as Administrative Agent.[4]
Citibank was the senior stakeholder – that is, the "Controlling Class" – in the
Capmark CDO at all relevant times.[5]  As a result, Citibank held certain rights under
the Indenture, including the right to direct that the Collateral be liquidated if the
value of those assets fell below Citibank's obligation under the Revolving Facility
($366 million).[6]

The Capmark CDO experienced an event of default in August of
2008.[7]  In March of 2009, after the value of the Capmark CDO had collapsed,
Citibank exercised its rights under the Indenture and directed that the Collateral be

---

[4]      *See* MSIP's Statement of Undisputed Facts Pursuant to Local Rule
56.1 ("MSIP 56.1") ¶ 3; Capmark Credit Agreement, Ex. A-1 to Declaration of
Andrew S. Corkhill, Counsel for MSIP, in Support of MSIP's Motion for
Summary Judgment ("Corkhill Decl.").

[5]      *See* Indenture §§ 5.2-5.5, 5.8, 5.13; MSIP 56.1 ¶ 11.

[6]      *See* Indenture § 5.5(a)(ii).  This dispute centers on whether Citibank
and MSIP mutually agreed that those liquidation (and other) rights in fact passed to
MSIP.

[7]      Citibank's Statement of Undisputed Facts Pursuant to Local Rule 56.1
("Citibank 56.1") ¶ 81.

liquidated.[8]  Approximately $121 million was recouped from the sale, leaving

Citibank with a shortfall of $245,368,966.51.[9]

Meanwhile, three days before the Capmark Credit Agreement was

executed, Citibank had purchased credit protection on the Revolving Facility from

MSIP via a credit default swap, memorialized by a letter of confirmation dated July

21, 2006 between MSIP and Citibank (the "Capmark Swap Agreement" or the

"Capmark CDS Confirmation").[10]  Under the terms of that agreement, the

occurrence of any of four defined "Credit Events" occurring on the "Reference

Entity" (the Capmark CDO) – including a "Failure to Pay Principal" credit event –

obligated MSIP to pay Citibank any losses that it (Citibank) sustained under the

Revolving Facility.[11]  The ISDA Master Agreement contains an integration clause

---

[8]      *See* Complaint ("Compl.") [Docket No. 1] ¶ 30; Answer and Counterclaim ("Counter") [Docket No. 11] ¶ 73; Indenture § 5.5(a)

[9]      *See* Compl. ¶ 32; Counter ¶ 52.

[10]     *See* MSIP 56.1 ¶ 4; Capmark Swap Agreement, Ex. A-1 to 1/21/11 Declaration of Rachel M. Cherington, Counsel for Citibank, in Support of Citibank's Motion for Summary Judgment and Opposition to MSIP's Motion for Summary Judgment ("Cherington Decl.").  The Capmark Swap Agreement "supplements, forms a part of, and is subject to, the [1/19/1996] [International Swaps and Derivatives Association, Inc. ("ISDA")] Master Agreement" between Citibank and MSIP.  *See* Capmark Swap Agreement at 1.

[11]     *See* Citibank 56.1 ¶ 70.  The Swap Agreement defines a "Failure to Pay Principal" credit event as "(i) a failure by the Reference Entity [The Capmark CDO] to pay an Expected Principal Amount on the Final Amortization Date . . . ."

providing that "[t]his agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto."[12]  The ISDA Master Agreement further provides that Citibank and MSIP are "not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth herein, in any Credit Support Document or in any Confirmation"[13] (the "no-reliance clause").

When the Collateral was liquidated in full on July 13, 2009 (pursuant

---

Capmark Swap Agreement at 12-13.  The "Expected Principal Amount" on the Final Amortization Date is the outstanding principal.  *See id.* at 12.  The "Final Amortization Date" includes "the date on which the assets securing the Reference Obligation [the Revolving Facility] . . . are liquidated, distributed, or otherwise disposed of in full and the proceeds thereof are distributed or otherwise disposed of in full."  *Id.* at 13.  Suffice it to say that a Failure to Pay Principal credit event was highly unlikely to occur until the Capmark CDO's maturity date – 29 years *after* protection from MSIP expired – in the absence of a liquidation directed by the Controlling Class under the Indenture.  *See* Citibank 56.1 ¶ 71; MSIP's Response to Citibank's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("MSIP Response to Citibank 56.1") ¶ 71; Declaration of Frank Ianco, Expert retained by Citibank, in Support of Citibank's Motion for Summary Judgment and Opposition to MSIP's Motion for Summary Judgment ("Ianco Decl.") ("If the parties had agreed to full and unfettered transfer of controlling class rights for the 3-year term of the Capmark CDS, this would essentially have reduced the Failure to Pay Principal Credit Event to an economic near-impossibility.").

[12]     ISDA Master Agreement, Ex. A-2 to Cherington Decl., § 9(a).

[13]     Schedule to ISDA Master Agreement, Ex. A-2 to Cherington Decl., Part 5(d).

to Citibank's directive), the $245,368,966.51 amount outstanding on the Revolving Facility triggered a Failure to Pay Principal Credit Event under the Swap Agreement, obligating MSIP to pay Citibank the $245,368,966.51 shortfall.[14]  I have already held that, under the unambiguous terms of section 6(d) of the Swap Agreement (discussed further below), "Citibank's issuance of a direction under the Indenture did not implicate MSIP's consent rights under Section 6(d) of the Swap Confirmation."[15]  In other words, MSIP's consent was not required in order for Citibank to direct liquidation of the Collateral – the liquidation that triggered the Credit Event obligating MSIP to pay Citibank $245,368,966.51.  The question now before the Court is whether – notwithstanding the unambiguous language of section 6(d) – the parties "mutually intended to transfer to [MSIP] all voting rights – including Controlling Class rights – associated with the Capmark Credit Agreement"[16] such that Citibank's liquidation of the Capmark CDO constituted a breach of the Capmark Swap Agreement, excusing MSIP from paying Citibank the $245,368,996.51 shortfall.

## B.    Capmark Swap Negotiations; June 22, 2006 Emails

---

[14]    *See* May 12 Opinion, 724 F. Supp. 2d at 407.

[15]    *Id.*

[16]    Memorandum of Law in Support of MSIP's Motion for Summary Judgment ("MSIP Mem.") at 1.

In the parties' negotiations over the terms of the Capmark Swap Agreement, John Costango (Citibank) was the banker with "primary responsibility with respect to the day-to-day negotiations with Morgan Stanley."[17]  For MSIP, George Wilkinson "worked with the business unit within [Citibank's Global Proprietary Credit Group] to negotiate and execute CDS documents,"[18] including the Capmark Swap Agreement.  However, other Citibank agents – including Adam Bentch, Steven Kolyer,[19] and Don Bendernagel (attorneys in Citibank's derivatives legal group[20]); Grant Buerstetta (an attorney with Citibank's outside counsel, Clifford Chance); William Aprigliano (Citibank's "regulatory capital" corporate

---

[17]   Transcript of 4/29/10 Deposition of John Costango ("Costango Dep."), Ex. B-4 to Cherington Decl. & Ex. B-1 to Corkhill Decl. & Ex. B-5 to Supplemental Declaration of Andrew S. Corkhill in Support of MSIP's Opposition to Citibank's Motion for Summary Judgment and Reply to Citibank's Opposition to MSIP's Motion for Summary Judgment ("Supp. Corkhill Decl.") at 29:25-30:5.

[18]   Transcript of 6/25/10 Deposition of George Wilkinson ("Wilkinson Dep."), Ex. B-4 to Corkhill Decl. & Ex. B-12 to Cherington Decl. & Ex. B-1 to Supp. Corkhill Decl. & Ex. D to Supplemental Declaration of Rachel M. Cherington in Support of Citibank's Reply to MSIP's Opposition to Citibank's Motion for Summary Judgment ("Supp. Cherington Decl."), at 26:6-8.  Wilkinson is a member of the bar of the State of New York.  *See id.* at 4:25-5:3.

[19]   Bentch testified that Kolyer was responsible for inserting section 6(d) into what became the Capmark Swap Agreement.  *See, e.g.*, Transcript of 11/5/10 Deposition of Adam Bentch ("Bentch Dep."), Ex. B-5 to Corkhill Decl. & Ex. B-2 to Cherington Decl. & Ex. B-1 to Supp. Corkhill Decl. & Ex. A-2 to Supp. Cherington Decl., at 193:15-20.

[20]   *See id.* at 153:12-16.

representative[21]); and Nestor Dominguez (who "ultimately . . . said, okay, do the trade"[22]) were involved in drafting, reviewing, or approving the Capmark Swap Agreement.[23]   Kevin Starrett signed the Capmark Swap Agreement on Citibank's behalf and said "done" on the phone.[24]

On June 22, 2006, a month before the Capmark CDS Confirmation was signed, Wilkinson (MSIP) sent an email to Costango (Citibank) setting forth "[s]ome additional comments on the CDS doc."[25]   The first item read:

> (i) As discussed, we should include language in the doc stating that no amendment, waiver, consent, etc. will be made or given by Citi under the Loan Agreement without the prior written consent of MS (i.e., *Citi passes along to MS all voting rights it has under the Loan Agreement to MS*).[26]

Fourteen minutes later, Costango (Citibank) wrote that he would "not be able to focus on these comments in full tonight, but . . . will give you my quick thoughts

---

[21]     *See* Transcript of 8/11/10 Deposition of William Aprigliano ("Aprigliano Dep."), Ex. B-6 to Corkhill Decl. & Ex. B-1 to Cherington Decl. & Ex. A-1 to Supp. Cherington Decl., at 23:6-12.

[22]     Costango Dep. at 29:14-22.

[23]     Citibank 56.1 ¶ 82; MSIP Response to Citibank 56.1 ¶ 82.

[24]     MSIP Response to Citibank 56.1 ¶ 82.

[25]     6/22/06 Email from Wilkinson to Costango ("June 22 Email"), Ex. C to Corkhill Decl.

[26]     *Id.* (emphasis added).

before I head out today."[27]  Forty minutes later, Costango responded by inserting his

"preliminary comments in CAPS" into the text of Wilkinson's email.[28]  He typed

the words "OK"[29] under Wilkinson's first "comment" regarding "voting rights"

quoted above.

Wilkinson (MSIP) testified that "when [he and Costango (Citibank)]

discussed the topics of the passage of voting rights from Citi to Morgan Stanley in

respect of this transaction, John Costango was in agreement that the rights that Citi

had as a lender under the loan facility would pass to Morgan Stanley for so long as

Morgan Stanley was on risk."[30]  Wilkinson also testified that he had the same

"conversations" concerning voting rights in the Capmark transaction with Michael

Edman, Ross Feldman, Erick May, and Joseph Naggar – other MSIP employees –

prior to the close of the transaction.[31]  Costango testified that he has no recollection

of any discussion with Wilkinson concerning voting rights prior to his receipt of the

---

[27]     6/22/06 Email from Costango to Wilkinson, Ex. D to Cherington Decl.

[28]     Second 6/22/06 Email from Costango to Wilkinson, Ex. C to Corkhill Decl. ("See my preliminary comments in CAPS below. . . .  Can we discuss this in more detail tomorrow?").

[29]     *Id.*

[30]     Wilkinson Dep. at 80:24-81:6.

[31]     *See id.* at 35:12-18.

June 22 Email.[32]  Nor did any other MSIP employee testify to remembering a

conversation with Citibank or with Wilkinson concerning the passage of rights.[33]

On June 25, 2006, Costango forwarded Wilkinson's June 22 Email

both to Citibank's in-house counsel and to Clifford Chance.[34]  Five days later,

Costango forwarded Wilkinson a revised draft Capmark CDS Confirmation

---

[32]    *See* Costango Dep. at 272:5-11 ("[O]ther than what this email seems
to imply actually happened, I don't . . . have a recollection [of having any
discussions with Mr. Wilkinson concerning voting rights in respect of Capmark
prior to receiving the June 22 Email.]").

Wilkinson also testified that he and Costango had at least three oral
conversations in April 2009 concerning the parties' understanding of the passage
of voting rights in the Capmark Swap.  Leaving aside for the moment that
Wilkinson's testimony as to Costango's statements during these conversations is
inadmissible hearsay (since Costango was not an employee or agent of Citibank or
any Citibank affiliate at the time the statements were allegedly made), Costango
had no recollection of allegedly reconfirming during these conversations his
alleged understanding that Citibank had agreed to transfer Controlling Class rights
to MSIP under the Capmark Swap.  *See id.* at 323:7-329:25.  Costango testified
that he remembered only one telephone conversation, in which no specifics were
discussed, and one in-person meeting.  *See id.* at 328:17-329:5.  However, he
testified that he could not *dispute* Wilkinson's recollection as to what he said on
those calls (or call) or during their in-person meeting.  *See id.* at 327:10-328:3,
328:11-16.

[33]    *See* Transcript of 7/29/10 Deposition of Michael Edman ("Edman
Dep."), Ex. B-5 to Cherington Decl. & Ex. A-3 to Supp. Cherington Decl. at
56:11-57:25; Transcript of 7/28/10 Deposition of Ross Feldman ("Feldman Dep."),
Ex. B-6 to Cherington Decl. at 72:8-73:25; Transcript of 8/17/10 Deposition of
Joseph Naggar ("Naggar Dep."), Ex. B-7 to Cherington Decl. & Ex. A-4 to Supp.
Cherington Decl. at 135:21-136:8.

[34]    *See* MSIP 56.1 ¶ 24.

prepared by Clifford Chance, with the caveat that he "received this from outside counsel but our internal counsel has not yet reviewed thoroughly."[35]  The attached draft confirmation included a new section "6(d)" entitled "Reference Obligation Amendments" – added as a consequence of Wilkinson's June 22 Email[36] – that read:

> No amendment to, or waiver or consent of or with respect to, the Reference Obligation [the Revolving Facility] will be agreed or consented to by Buyer [Citibank] (or permitted by Buyer to be agreed or consented to) without the prior written consent of the Counterparty [MSIP].[37]

Citibank's in-house counsel on the Capmark transaction authorized the inclusion of the language in section 6(d).[38]

### 2.    The Tallships Swap

Citibank provided a revolving credit facility to another CDO, the Tallships Funding, Ltd. CDO ("Tallships"), memorialized by a Revolving Credit Agreement (the "Tallships Credit Agreement").[39]  Citibank purchased credit

---

[35]    6/30/06 Email from Costango to Wilkinson, Ex. F to Corkhill Decl.

[36]    *See* Citibank's Response to MSIP's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Citibank Response to MSIP 56.1") ¶ 26.

[37]    Attachment to 6/30/06 Email from Costango to Wilkinson, Ex. F to Corkhill Decl.

[38]    *See* MSIP 56.1 ¶ 27.

[39]    *See id.* ¶ 4; Tallships Credit Agreement, Ex. A-3 to Corkhill Decl.

protection on the Tallships Credit Agreement from Morgan Stanley Capital

Services Inc. ("MSCS"), memorialized by a letter of confirmation dated December

14, 2006 between MSCS and Citibank (the "Tallships Swap Agreement").[40]  Unlike

the Capmark Swap Agreement, the Tallships Swap Agreement effectively gave

MSCS the ability to direct (in certain circumstances) Citibank's exercise of

Controlling Class rights.[41]

The Tallships Swap shared certain similarities with the Capmark Swap.

*First*, under both agreements, Citibank paid 7 basis points per annum of notional

exposure for approximately three years' credit protection.[42]  *Second*, both swaps

were "non-coterminous," meaning the maturity date of the swaps (three years) did

not match the maturity date of the underlying Reference Obligations.[43]  *Third*,

---

[40]     *See* MSIP 56.1 ¶ 5; Tallships Swap Agreement, Ex. A-4 to Corkhill Decl.  MSCS was also "invested" in the Tallships CDO, having purchased a portion of the equity tranche.  *See* Feldman Dep. at 126:5-13.

[41]     *See* Tallships Swap Agreement § 6(e).

[42]     *See* Citibank Response to MSIP 56.1 ¶ 8.

[43]     *See* Citibank 56.1 ¶ 69.  To Wilkinson's knowledge, MSIP had never entered into a non-coterminous CDS other than Capmark and, subsequently, Tallships.  *See id.* ¶ 74.  Other Citibank and MSIP employees testified similarly that they were unaware of any non-coterminous CDS-on-CDO transactions apart from the Capmark Swap and Tallships Swap.  *See* Costango Dep. at 51:5-23; Transcript of 8/4/10 Deposition of Mihail Nikolov ("Nikolov Dep."), Ex. B-8 to Cherington Decl. & Ex. B-4 to Supp. Corkhill Decl., at 167:18-23; Feldman Dep. at 108:9-25; Naggar Dep. at 115:24-116:8.

Citibank claimed "regulatory capital" ("reg cap")[44] relief in respect of both

Capmark and Tallships.[45]  *Fourth*, while both the Capmark Credit Agreement and

---

[44]     *See generally* Federal Reserve Supervisory Release 96-17 (GEN) dated August 12, 1996, Ex. M to Cherington Decl., at 1, 3.  An Office of the Comptroller of the Currency ("OCC") Interpretive Letter indicates that whether a non-coterminous CDS qualifies for regulatory capital relief depends on the extent to which it protects against actual realized credit losses, not credit risk associated with deteriorating credit quality.  *See* OCC Interpretive Letter #945 dated November 2002, Ex. M to Cherington Decl. (approving partial regulatory capital relief even though the non-coterminous CDS "[did] not protect the bank from changes in value of the reference assets due to deteriorating credit quality of the issuers or changes in market conditions.").

[45]     *See* MSIP ¶ 49; *see also* Citibank 56.1 ¶ 75 ("Citi entered into the Capmark CDS, among other reasons, to obtain relief from reg cap requirements – i.e., to reduce the amount of capital held against the Revolving Facility."). However, Citibank has taken the position in this litigation that "[a]s to Tallships, this proved to be in error."  Citibank Response to MSIP 56.1 ¶ 49 (citing Aprigliano Dep. at 32:15-33:10).  As discussed in greater detail below, Citibank contends that it would not have transferred Controlling Class rights to MSIP in Capmark because doing so would have limited Citibank's ability to obtain regulatory capital relief.  *See* MSIP 56.1 ¶ 44.  Yet William Aprigliano – who testified as Citibank's Rule 30(b)(6) corporate representative as to the regulatory capital relief requirements in Capmark and Tallships – did not recall whether Citibank considered, at the time the Capmark Swap was negotiated, that it needed to retain Controlling Class rights in order to obtain regulatory capital relief.  *See* Aprigliano Dep. at 193:13-21.  Nor did he consider whether transferring Controlling Class rights to MSIP would impact Citibank's ability to obtain regulatory capital relief in Tallships – because he did not review the Tallships Swap, the Tallships Back-to-Back Swap (see below), or any other aspect of the Tallships transaction at the time it was negotiated.  *See id.* at 57:11-13.  In fact, Aprigliano could not recall whether, prior to the weeks leading up to his deposition, he had *ever* previously considered whether transferring Controlling Class rights to MSIP impacted Citibank's ability to obtain reg cap relief.  *See id.* at 63:5-22.

the Tallships Credit Agreement provided Citibank with the option of syndicating the revolving facilities, neither was ever syndicated (or intended to be syndicated), rendering Citibank the sole holder of Controlling Class rights.[46]  The Capmark Swap was the "starting point" or the "reference point" for the Tallships Swap.[47]

### a.    Tallships Swaps Negotiations

Costango and Wade (Citibank) shared responsibility for "negotiating with MSCS concerning the business terms" of the Tallships swap.[48]  On November 28, 2006, Wilkinson (MSCS) sent an email to Wade (Citibank) – copying Anna Choe (Citibank in-house counsel), six individuals from Clifford Chance, Feldman and Naggar (MSCS), and Costango (Citibank) – requesting that

---

[46]    *See* MSIP 56.1 ¶¶ 10-11.

[47]    Transcript of 8/13/10 Deposition of Chaka L. Wade ("Wade Dep."), Ex. B-11 to Cherington Decl. & Ex. B-3 to Corkhill Decl., at 74:21-75:5.  Distinct from the Tallships Swap discussed in this paragraph, Citibank also entered into an advance swap with Tallships ("Tallships Advance Swap"), memorialized by an "Advance Swap Confirmation" dated December 14, 2006.  *See* Ex. A-4 to Cherington Decl.  Citibank then purchased credit protection *on the Tallships Advance Swap* from *MSCS* (the "Tallships Back-to-Back Swap"), memorialized by a letter of confirmation dated December 14, 2006 between MSCS and Citibank. *See* Ex. A-5 to Cherington Decl.  For the Tallships Back-to-Back Swap, Citibank paid MSCS 15 basis points per annum of the total notional exposure of $687.5 million.  *See id.*  The Tallships-Citibank Advance Swap was the "Reference Obligation" for the Citibank-MSCS "Back-to-Back Swap" (whereas the *Revolving Facility* was the "Reference Obligation" for the Capmark Swap).

[48]    Costango Dep. at 26:9-27:6.

> (v) [t]he back-to-back swap between [MSCS] and Citi should state that *Citi will pass through to [MSCS] all voting/consent rights of the Advance Swap Counterparty* under the Advance Swap. In addition, the doc should provide that failure to do so (or failure to act in accordance with the instructions of MS) will result in a MTM termination.[49]

Citibank's privilege log reflects that, on November 29, 2006 – before responding to Wilkinson's request – emails were exchanged among Choe (in-house counsel), Costango, Wade, and Buerstetta on the following subjects:

- "Communications providing [and requesting] legal advice concerning voting rights language requested by Morgan Stanley."

- "Communications reflecting a request for legal advice from Anna Choe concerning voting rights provisions in the Capmark VI CDS Confirmation."

- "Communications requesting legal advice concerning voting rights language requested by Morgan Stanley and the Capmark VI transaction."[50]

---

[49]    11/28/06 Email from Wilkinson (MSCS) to Wade (Citibank) ("November 28 Email"), Ex. G to Corkhill Decl. (emphasis added). The "Advance Swap Counterparty" referenced in Wilkinson's email was Citibank. "MTM" stands for "mark-to-market." *See* Wilkinson Dep. at 174:4-14.

[50]    Citibank Privilege Log, Ex. H to Corkhill Decl. MSIP has fought vigorously for discovery of these emails on the ground that Citibank waived privilege by placing their contents "at issue" in this litigation. At a conference held on November 10, 2010, I denied MSIP's request that Citibank be ordered to produce them, but warned that "when [Citibank's] brief comes in, if it does what [MSIP] think[s] it might do, [the waiver issue is] going to be on the table again." *See* Transcript of 11/10/10 Conference [Docket No. 58] at 25:1-7. On January 21, 2011, having reviewed Citibank's moving and opposition papers, MSIP again

Following these internal discussions, Wade (Citibank) responded to Wilkinson (MSCS) by inserting "comments and questions" into Wilkinson's email.  In particular, below Wilkinson's fifth (v) point on "voting/consent" rights (quoted above), Wade inserted the word "[Agreed]."[51]  But approximately two hours later, Costango (Citibank) sent another email to Wilkinson, copying Wade (Citibank), entitled "Voting Rights" that read:

---

moved for an order compelling Citibank to produce these emails based on "Citibank's assertions in its motion for summary judgment that, '[a]s a matter of written policy and actual practice,' (1) only in-house or approved external counsel can approve 'non-standard' provisions such as Section 6(d) of the Capmark Swap, and (2) when approving such provisions, counsel 'Looks only to [their] terms – not prior e-mails between negotiators – [to understand Citibank's rights and obligations].'"  Letter from MSIP to the Court dated January 31, 2011 at 1 (emphasis removed) (quoting Citibank's Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to MSIP's Motion for Summary Judgment ("Citibank Mem. & Opp.") at 2.  Meanwhile, Citibank argued that it "painstakingly avoided relying on . . . the subjective intent of any agent" in making its agency defense, *see discussion infra* Part IV.B, instead relying on "simply the fact of approval" of the language ultimately included in the Capmark Swap Agreement by Citibank counsel – a fact which it claimed was not privileged.  Letter from Citibank to the Court dated February 3, 2011 at 1.  According to Citibank, "Citi counsel's subjective intent is not relied on and is irrelevant. . . . There is no reference to the subjective intent or understanding of Citi counsel in Citi's brief. . . .  Citi relies on its written policy and actual practice that are purely and explicitly institutional."  *Id.* at 2.  This Court declined to order production of the emails based on waiver, but ordered them reviewed for privilege *in camera* by Magistrate Judge Gorenstein, who concluded that they were in fact privileged.  Having now reviewed both parties' fully submitted motions, I confirm my ruling that Citibank has not put its counsel's intent "at issue" in this litigation so as to waive privilege.  *See In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008).

[51]     11/29/06 Email from Wade to Wilkinson, Ex. G to Corkhill Decl.

> We are struggling to recall how this was handled in capmark. Lawyers are telling me that we don't pass through voting rights but I seem to remember you being comfortable with the arrangement in capmark. Do you recall how we worked that out?[52]

Wilkinson responded that same day with the following:

> I think in Capmark we just relied on the language that stated the credit agreement would not be amended without our prior written consent. I would prefer to be more specific in this trade. See attached rider.[53]

The attached rider, entitled "Voting Provisions," stated:

> [Citi] agrees that to the extent it is entitled to act in its capacity as a member of the Controlling Class or otherwise to consent to or vote with respect to any Proposed Action (as defined below) in its capacity as the Advance Swap Counterparty or Revolving Credit Agreement Agent under the Indenture, prior to [Citi] giving its written consent to, or casting its vote for or against, any waiver, amendment, vote, modification or other action of a similar nature under the Indenture (the "**Proposed Action**"), [Citi] shall . . . seek [MSCS's] written direction as to whether to give such consent or how to cast such vote and . . . act in accordance with such written direction from [MSCS].[54]

---

[52]      11/29/06 Email from Costango to Wilkinson, Ex. I to Corkhill Decl. According to Citibank's privilege log, three minutes later, Costango forwarded that email to Citibank's external counsel at Clifford Chance, Buerstetta, "requesting legal advice concerning section 6(d) of the Capmark VI CDS Confirmation." Citibank Privilege Log.

[53]      11/29/06 Email from Wilkinson to Costango, Ex. I to Corkhill Decl.

[54]      *Id.*

That rider, with revisions, became section 6(e) of the Tallships Swap Agreement[55]

– an Agreement which also included a section 6(d) verbatim to section 6(d) of the

Capmark CDS Confirmation.[56]  It was this provision – section 6(e) – that gave

MSCS the ability to direct, in certain circumstances, Citibank's exercise of

Controlling Class rights.

### b.    December 7, 2006 Email

One week later, on December 7, 2006, Costango sent an email to

Wilkinson entitled "Tallships -- voting" that stated, "Chaka [Wade of Citibank]

and I have had a bunch of conversations with the internal legal people on the

voting language.  They have raised some additional concerns with our language of

the 'what if this happens' variety" such as the implications of MSCS's asking

Citibank "to vote in a way that is (a) illegal or (b) commercially unreasonable for

[Citibank]."[57]  After summarizing those concerns, Costango stated:

> I've thought a lot about why changes like this are warranted here
> compared to Capmark, and I believe the difference is that in
> Capmark we agreed to not make any change without consent and
> here we are agreeing to consult you in all cases if we don't want

---

[55]    *See* Tallships Swap Agreement § 6(e).

[56]    *See id.* § 6(d); Capmark Swap Agreement § 6(d).

[57]    12/7/06 Email from Costango to Wilkinson, Ex. J to Corkhill Decl.  It
is unclear whether this email was meant to address the Tallships Back-to-Back
Swap, the Tallships Swap, or both.

to make a change.  So it's more complicated.[58]

### 3.   Citibank's Subprime Portfolio Group ("SPG")

In late 2007, in the wake of the credit crisis, Citibank transferred management of certain subprime-related assets to a "Subprime Portfolio Group" ("SPG"),[59] which was responsible for "try[ing] to figure out how to deal with more than [sixty billion dollars] worth of exposure that Citigroup was facing to CDO super senior positions" – including Capmark and Tallships.[60]  It was SPG's responsibility to examine each super-senior ("SS") transaction to determine how to mitigate Citibank's exposure, including unwinding as many transactions as possible.[61]  As part of that strategy, SPG exercised Citibank's rights (where available) to liquidate certain CDOs, including Capmark.[62]

In 2008, SPG created various iterations of a spreadsheet entitled "SS

---

[58]    *Id.*

[59]    *See* Citibank 56.1 ¶ 83.

[60]    Transcript of 9/1/10 Deposition of Brian W. Yarrington, SPG trader ("Yarrington Dep."), Ex. B-13 to Cherington Decl., at 62:17-22.  *Accord* MSIP 56.1 ¶ 53.  Net of hedges, that exposure amounted to approximately forty-three billion dollars.  *See* Yarrington Dep. at 62:5-13. Yarrington testified that Citibank had exposure to roughly fifty to sixty ABS CDO super senior positions.  *See id.* at 65:9-12.

[61]    *See* Citibank 56.1 ¶ 84.

[62]    *See* MSIP 56.1 ¶ 51; Citibank Response to MSIP 56.1 ¶ 51; Yarrington Dep. at 69:5-10.

Summary Spreadsheet," summarizing Citibank's SS exposure.[63]  Each row listed a

"Deal" to which Citibank was exposed.  Each column contained descriptive

information about the deal, including columns labeled, "Open / Closed,"

"Conditions to Liquidate" and "Citi Sole Discretion [to liquidate]?"  A "Note" at

the bottom of the spreadsheet reads, "For closed positions, decisions regarding

acceleration or liquidation are not solely in Citi's control."  Although all of the

entries for Capmark and Tallships indicate that they are "Closed" – either entirely

or through the maturity date of the three-year credit default swaps hedging

Citibank's super-senior exposure to the deal – the Capmark entries indicate that

"Citi [has] Sole Discretion," while the Tallships entries indicate that "Citi [does not

have] Sole Discretion."[64]

---

[63]     *See* SS Summary Spreadsheet dated February 19, 2008, Ex. L to
Corkhill Decl.; SS Summary Spreadsheet dated February 20, 2008, Ex. K to
Corkhill Decl.; SS Summary Spreadsheet dated May 2, 2008, Ex. H to Cherington
Decl; SS Summary Spreadsheet dated December 4, 2008, Ex. I to Cherington Decl.

[64]     Although the February 19, 2008 version of the SS Summary
Spreadsheet stated that "Citi" did *not* have sole discretion over the decision to
liquidate Capmark ("Citi Sole Discretion?": "No (GRB has control)"), the "No"
was changed to "Yes" within twenty-four hours so that the full text read "Yes
(GRB has control)."  GRB is Citibank's Global Relationship Bank.  *See* Costango
Dep. at 33:8-13.

   Neither party argues that the Court should infer anything about
liquidation rights from the fact that both positions were always marked as "closed"
– i.e., "decisions regarding acceleration or liquidation are not solely in Citi's
control."

By the time management of the Capmark Swap was transferred to SPG, Costango had left Citibank and Bentch had transferred from in-house counsel to a business position in another part of the bank.[65]  No member of SPG ever asked Costango what the parties who *negotiated* the Capmark Swap intended.[66]  Instead, SPG and the other Citibank employees involved in the decision to liquidate the Capmark CDO were advised by counsel.[67]

At some point, SPG came to the understanding that MSIP believed that Controlling Class rights had been transferred under the Capmark Swap,[68] contrary to the unambiguous language of the Swap Agreement indicating otherwise.  Some SPG employees testified that they anticipated – prior to their liquidation of the Capmark CDO – that it would lead to litigation with MSIP.[69]

### 4.   January 2008 Wilkinson Chart

In January 2008, before the present dispute arose, Wilkinson sent an email to colleagues attaching a chart summarizing certain positions held by MSIP's

---

[65]   *See* MSIP 56.1 ¶ 55.

[66]   *See id.* ¶ 56.

[67]   *See* Citibank 56.1 ¶ 87.

[68]   *See* MSIP 56.1 ¶ 58; Yarrington Dep. at 193:12-193:23.

[69]   *See* Citibank Response to MSIP ¶ 59.

Global Proprietary Credit Group ("January 2008 Wilkinson Chart").[70]  The

document contained summaries of the provisions of twenty-one deals that

Wilkinson thought were important,[71] including Tallships and Capmark.

The summary of Tallships indicates that MSIP held two swaps in

connection with that transaction – the Tallships Swap and the Tallships Back-to-

Back Swap.[72]  In the row entitled "Execution," the Tallships summary states:

"Morgan Stanley faces Citibank via CDS; Citibank faces the deal; *MS holds all*

*rights of Citibank as super senior swap counterparty*."[73]  In the row entitled

"Other," Wilkinson provided a summary of the *Tallships Swap* ("MS has also sold

$250mm of super senior protection on the Tallships Revolving Credit Agreement

for 7bps.") and then, directly below that summary, wrote, "*Voting rights passed to*

*MSCS via CDS*."[74]

---

[70]     *See* Citibank 56.1 ¶ 61; January 2008 Wilkinson Chart, Ex. C to Cherington Decl.

[71]     *See* Wilkinson Dep. at 252:13-24.  I note that the summaries contained different information for each transaction.  *See* MSIP Response to Citibank 56.1 ¶ 62.

[72]     *See* Citibank 56.1 ¶ 65; January 2008 Wilkinson Chart.

[73]     January 2008 Wilkinson Chart (emphasis added).  This description appears to apply to the Tallships Back-to-Back Swap.

[74]     *Id.* (emphasis added).  It is unclear whether this mention of "voting rights" applies to the Tallships Swap, the Tallships Back-to-Back Swap, or both.

22

In every other transaction in which Wilkinson believed voting rights were passed to a Morgan Stanley entity, the summary explicitly states so.[75]  The Capmark summary says nothing about the passage of "voting" or "super senior" rights.[76]

## III.   APPLICABLE LAW

### A.   Reformation Based on Mutual Mistake

"Reformation of contract . . . is not a matter of resolving an ambiguity in a contract but rather of supplying what the parties clearly intended to include but inadvertently omitted."[77]

> "In the proper circumstances, mutual mistake . . . may furnish the basis for reforming a written agreement."  [*Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986).] . . .  Because the remedy of reformation presents the danger "that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely

---

[75]   *See* Wilkinson Dep. at 250:8-263:2.  In fourteen of the twenty-one trades, there were voting rights in connection with the exposure.  *See* January 2008 Wilkinson Chart.  In eleven trades, those rights are held by a counterparty; in three, they are held by a Morgan Stanley entity.  *See id.*

[76]   *See id.*

[77]   *Robinson v. Metro N. Commuter R.R. Co.*, 325 F. Supp. 2d 411, 412 (S.D.N.Y. 2004) (citing *Loewenson v. London Mkt. Cos.*, 351 F.3d 58, 61 (2d Cir. 2003)).  *Accord Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219 (1978) ("Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties.").

claim the existence of a different, oral contract," [*id.* at 573] the New York courts have sharply limited the remedy of reformation both procedurally and substantively [*see id.* at 574].[78]

Procedurally, there is a "'heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties,' especially between counselled businessmen"[79] and "a correspondingly high order of evidence is required to overcome that presumption."[80]  In particular, "mutual mistake must be established by clear and convincing evidence."[81]  "'Only thus can the benefits of

---

[78]     *Collins v. Harrison-Bode*, 303 F.3d 429, 434-35 (2d Cir. 2002). *Accord Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) ("Unilateral mistake alone will not justify reformation of an instrument.").

[79]     *Healy*, 981 F.2d at 73 (quoting *Backer*, 46 N.Y.2d at 219 and citing *Chimart*, 66 N.Y.2d at 574) (citation omitted).

[80]     *Chimart*, 66 N.Y.2d at 574 (summarizing *Backer*'s finding that "[v]arious statements allegedly made during negotiations were, as a matter of law, too indefinite to form the basis for a claim of misrepresentation").

[81]     *Healy*, 981 F.2d at 73.  *Accord Chimart*, 66 N.Y.2d at 574 ("The proponent of reformation must 'show in no uncertain terms, not only that mistake . . . exists, but exactly what was really agreed upon between the parties.'") (quoting *Backer*, 46 N.Y.2d at 219); *id.* ("[New York courts] have required a party resisting pretrial dismissal of a reformation claim to tender a 'high level' of proof in evidentiary form.") (quoting *Sagan v. Sagan*, 53 N.Y.S.2d 635, 637 (1981)); *Backer*, 46 N.Y.2d at 220 (affirming grant of summary judgment dismissing reformation where "[a]s a matter of law, no showing free of contradiction or equivocation comes through from the affidavits submitted [in opposition to the motion].").  *Cf. Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 886 N.Y.S.2d 133, 143 (1st Dep't 2009) (reversing grant of summary judgment for defendant because, "[u]nlike the parties raising reformation claims in *Chimart* and *Backer*, . . . [the party seeking reformation] did not rely solely on conclusory or equivocal assertions of mistake");

the written form be preserved.'"[82]   Although a "mutual mistake must exist at the

time the agreement is signed,"[83] "the parties' course of performance under the

contract is considered to be the most persuasive evidence of the agreed intention of

the parties."[84]

## IV.   DISCUSSION

### A.   MSIP's Motion

MSIP argues that "[t]he uncontroverted evidence shows that the

parties intended to do just what Wilkinson proposed in his June 22 Email: namely,

to ensure that '***Citi passes along to MS all voting rights it has under the Loan***

***Agreement to MS***.'"[85]   However, drawing all inferences in favor of Citibank, the

---

*id.* at 142 ("[T]he course-of-performance evidence and the other evidence . . . relied on constitutes unequivocal and persuasive evidence of mutual mistake.").

[82]      *Chimart*, 66 N.Y.2d at 574 (quoting 3 Corbin, Contracts § 607, at 659-60).

[83]      *Shults v. Geary*, 660 N.Y.S.2d 497, 499 (3d Dep't 1997).

[84]       *Federal Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508 (1999) (quotation marks omitted).  *Accord Gulf Ins. Co.*, 886 N.Y.S.2d at 143 ("How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed.").

[85]      MSIP Mem. at 14 (emphasis MSIP's) (quoting June 22 Email).

non-movant in the context of MSIP's motion,[86] a reasonable trier of fact could find

that the parties were not mutually mistaken as to the meaning of section 6(d) of the

Capmark Swap Agreement.

### 1.    The June 22 Emails

While it is undisputed that Costango replied "OK" to Wilkinson's

June 22 Email – proposing the addition of language "stating that no amendment,

waiver, consent, etc. will be made or given by Citi under the Loan Agreement

without the prior written consent of MS (i.e., Citi passes along to MS all voting

rights it has under the Loan Agreement to MS)"[87] – this does not establish as an

evidentiary or legal matter that Citibank (or even MSIP) intended to transfer

Controlling Class rights under the Indenture to MSIP in the Capmark Swap.  *First*,

drawing all inferences in Citibank's favor, the phrase "all *voting rights* [Citibank]

has under the *Loan Agreement*" does not necessarily refer to Citibank's

*Controlling Class liquidation rights* under the *Indenture*.  Even if it were

undisputed that the parties mistakenly neglected to pass *some* voting rights to

---

[86]     "The standard to be applied when deciding cross-motions for summary judgment is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other." *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quotation marks omitted).

[87]     June 22 Email.

MSIP under the Capmark Swap Agreement, the phrase "all voting rights [Citibank] has under the *Loan Agreement*" does not necessarily encompass Citibank's right to direct liquidation which – as I discussed extensively in the October 8 Opinion – Citibank held by virtue of the *Indenture*.[88]  In this vein, the fact that Wade (Citibank) testified that the term voting rights is generally understood to "at least include[] controlling class rights"[89] does not render Wilkinson's email – which refers to voting rights *under a particular agreement* – unambiguous.

 *Second*, Citibank negotiators and attorneys involved in Capmark and Tallships testified that they do not understand the term "voting rights" unambiguously to include Controlling Class rights.[90]  Moreover, the parties have offered dueling expert testimony as to (1) whether it was understood in the "industry" generally that the term "voting rights" included Controlling Class

---

[88]  *See* May 12 Opinion, 724 F. Supp. 2d at 407.

[89]  Wade Dep. at 83:17-85:2.

[90]  *See* Costango Dep. at 67:19-68:10 (testifying that the term "voting rights" "can have a lot of meanings.  It depends on what we're talking about. . . . [T]he context is important . . . ."); Wade Dep. at 84:2-9 ("not sure" whether the term "voting rights" would "include whatever controlling class rights the party may have, plus additional rights"); Transcript of 10/12/10 Deposition of Anna Choe, Citibank in-house counsel ("Choe Dep."), Ex. B-3 to Cherington Decl., at 18:4-15 (Q: "In your experience, does . . . the party that possesses voting rights, have the ability under certain circumstances to direct the liquidation of the collateral of the SPV?" A: "I think it depends on the transaction.").

rights;[91] (2) whether there was a custom or practice of transferring Controlling

Class rights in CDS on ABS CDOs;[92] (3) and whether the non-coterminous nature

---

[91]     *Compare* MSIP Mem. at 4 ("It is undisputed that the phrase 'voting rights' is commonly understood in the CDO industry to encompass Controlling Class rights under a CDO's indenture.") (citing 9/1/10 Declaration of Michael Llodra, Expert retained by MSIP ("Llodra Decl.") ¶ 14 ("The term 'voting rights' is a well-accepted and understood term in the CDO industry and, especially in the context of discussions regarding the sale of super senior credit protection, would immediately and universally be understood by a CDO banker to refer to rights that included the controlling class rights under the CDO."); 9/1/10 Declaration of Scott Gordon, Expert retained by MSIP ("Gordon Decl.") ¶ 16 ("[I]n the context of negotiating the sale of CDO credit protection, the terms 'voting rights' and 'Controlling Class rights' were used interchangeably to refer to the rights of the Controlling Class under the CDO indenture.")) *with* Ianco Decl. ¶ 22 ("In my experience, a term such as 'voting rights' may be used by transactors as a shorthand in negotiations, but there is no universally-understood standard as to the details of what that term means . . . .  While it may be fair to say that 'controlling class rights' are a type of 'voting right,' the two terms are not synonymous. Controlling class rights have characteristics that make them different than [*sic*] voting rights with respect to amendments, waivers and consents.  As a result, the question of their transfer is more complex.").

[92]     *Compare* Llodra Decl. ¶ 8 ("In my experience, as a way of ensuring that their risk of loss remained remote, it has been the case that sellers of credit protection on super senior CDO tranches have required the protection buyer to pass the voting rights it had as the super senior note-holder to the protection seller during the term of the CDS."); Gordon Decl. ¶ 11 ("I am not aware of any transaction in the CDO industry in which a credit protection seller on super-senior risk did not obtain Controlling Class rights."); *id.* ¶ 12 ("[I]t became widely understood within the CDO community [prior to 2006] that Controlling Class rights were expected to follow the super-senior risk.") *with* Ianoco Decl. ¶ 14 ("In general, voting and controlling class rights are not transferred under CDS contracts. . . .  Voting rights and controlling class rights are not transferred by default or presumption.").  *See also* Citibank Mem. & Opp. at 11 ("The derivatives industry association, ISDA, rejected a proposal that would have made the transfer of such rights standard for inter-dealer CDS on [ABS], including CDS on CDOs

28

of the Capmark (and Tallships) Swaps affected these assumptions.[93]  Thus, the

June 22 Email cannot establish by clear and convincing evidence "exactly what

was really agreed upon between" Costango and Wilkinson – let alone Citibank and

MSIP.[94]

       *Third*, even assuming MSIP has proven by clear and convincing

evidence that Wilkinson thought "all voting rights [Citibank] has under the *Loan*

---

with ABS as their assets.").

[93]    *Compare* Ianco Decl. ¶ 26 ("The non-coterminous feature impacts the overall economics such that the protection buyer has a much more compelling interest in retaining such rights."); *id.* ¶ 27 (the passage of voting rights in non-coterminous transactions creates a "stark conflict of interest . . . not present in the case of a fully-coterminous CDS with a creditworthy protection seller") *with* Llodra Decl. ¶ 10 ("In my opinion, the 'non-coterminous' nature of this trade would not have any impact on whether voting rights were transferred. . . .  I cannot imagine that a credit protection seller would be willing to forego this protection simply because its CDS was for less than the term of the CDO."); Gordon Decl. ¶ 21 ("[I]n my expert opinion . . . [f]rom the protection seller's perspective, obtaining Controlling Class rights would be essential regardless of whether the credit protection was technically coterminous or non-coterminous.").  Ianco suggests that, because the Controlling Class's exercise of liquidation rights is essentially the *only* way to trigger a Failure to Pay Principal Credit Event before the CDO's maturity (or near-maturity), Citibank's transfer of liquidation rights to MSIP in Capmark would have rendered meaningless its purchase of protection for a Failure to Pay Principal Credit Event.  But that is exactly what Citibank did in Tallships.

[94]    *Backer*, 46 N.Y.2d at 219.  In any event, Citibank argues, because upon any (theoretical) syndication of the Revolving Facility, Citibank would lose sole discretion over the decision to liquidate, MSIP cannot have intended to obtain "all" voting rights.  *See* Citibank Mem. & Opp. at 14-15 at 17.

*Agreement*" included Controlling Class rights, Costango's "preliminary" response, "OK," does not unequivocally establish Costango's understanding as to what Wilkinson meant.[95]  Although Costango testified that he understood Wilkinson's November 28 Email about "voting/consent rights" in connection with Tallships to refer to Controlling Class rights under the Tallships indenture,[96] *no* Citibank agent could recall how he understood Wilkinson's reference to "all voting rights [Citibank] has under the Loan Agreement."[97]  Moreover, the fact that "Citibank"

---

[95]      *See Healy v. Rich Prods. Corp.*, No. Civ-89-1526E, 1992 WL 50924, at *7 (W.D.N.Y. Mar. 2, 1992) ("[Rich Products' attorney] included language that covered what [the Healys' attorney] had conveyed to him, and [the Healys' attorney] took no remedial action upon receiving this language from [Rich Products' attorney].  [Rich Products' attorney] could only assume that what he had covered was what [the Healys' attorney] wanted. . . .  This does not mean, however, that they had agreed on anything.  [Rich Products' attorney] may have thought that [the Healys' attorney] wanted one thing, when in fact he wanted something else – something to which [Rich Products' attorney] was not agreeing and to which he had no power to agree.").

[96]      *See* Costango Dep. at 113:12-14.

[97]      *See id.* at 272:17-22; *id.* at 318:19-319:8 ("All I can say is I was involved in putting [the Capmark Swap Agreement] together.  I'm not certain whether I knew for sure what [section 6(d)] was intended to do at the time, other than it was acceptable to us, and it appeared to be acceptable to Morgan Stanley.  Now, it's possible that my recollection could be refreshed with respect to specific conversations.  Like I said before, there might be notes or something that I haven't had a chance to review.  I have given this a lot of thought over the last few months.  I wish I remembered more and I don't."); Bentch Dep. at 161:6-23 ("Q: Do you have any reason to believe you did not review [Wilkinson's June 22 Email]? A: I don't know. . . .  I think that . . . when I came back from vacation I might have picked up at that point and been looking at what was the actual draft of the

(the institution) drafted section 6(d) of the Capmark Swap Agreement (1) using language that unambiguously did *not* transfer Controlling Class rights to MSIP (2) and titled it "Reference Obligation Amendments" supports the reasonable inference that, to the extent Citibank understood MSIP to be requesting the passage of *any* rights, it understood those rights to be confined to Citibank's right to withhold consent for amendments to and waivers and consents with respect to the Capmark Credit Agreement, not to direct liquidation of the CDO.[98]  Whether or not this was a *reasonable* interpretation on the part of Citibank – even one that flew in the face of industry practice – Citibank's lawyers' reduction of Wilkinson's request to the language that ultimately became section 6(d), and Citibank's ultimate execution of the Capmark Swap Agreement containing section 6(d), supports the reasonable inference that the parties were not *mutually* mistaken as to the passage

---

document that the parties were looking at, and not have to go back in previous e-mails to see what iterations were prior to that point."); *id.* at 175:16-25 ("Q: Do you believe that you ever saw the 'OK' e-mail . . . ?  . . . A: I don't – I don't know.").

[98]   Similarly, Costango's testimony that section 6(d) was intended "to give Morgan Stanley what they wanted" does not establish that he or anyone at Citibank understood that MSIP "wanted" *Controlling Class* rights under the Indenture, much less that *Citibank* shared such a desire.  *See* Costango Dep. at 316:23-317:15 ("Well, all I can say is, from my perspective, the intent was to give Morgan Stanley what they wanted, so we could sign the – sign the agreement.  I just don't remember exactly what that meant . . . .  It was my intent to come up with an agreement that Morgan Stanley and Citi would both sign.  That was my intent.  And I appear to have been successful.").

of Controlling Class rights under the Indenture, especially given the "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties."[99]  The most it could establish on summary judgment is unilateral mistake, which is insufficient for reformation of the contract.

   *Fourth*, Wilkinson's testimony as to Costango's "agreement that the rights that Citi had as a lender under the loan facility would pass to Morgan Stanley for so long as Morgan Stanley was on risk"[100] does not unequivocally establish Citibank's corporate intent.  Leaving aside for the moment that Costango testified that he did not remember coming to any such verbal agreement with Wilkinson prior to Wilkinson's June 22 Email, Costango was just one of many agents that worked on the Capmark Swap Agreement.  Even assuming that he was the "chief negotiator" for Citibank – and that his intent was to effect a transfer of Controlling Class rights and that his understanding was that 6(d) effected that transfer – the undisputed facts establish that (1) Wilkinson knew the parties' ultimate "intentions" would be reduced to a fully-integrated contract, (2) Costango did not have authority to override that contract by responding "OK" to a request in

---

[99]  *Chimart*, 66 N.Y.2d at 574.

[100]  Wilkinson Dep. at 80:24-81:6.

an informal email exchange a month before the closing of Capmark,[101] (3) MSIP was on notice that any executed agreement would require "Citi final internal approvals,"[102] and (4) the parties agreed that they were "not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth" in the Capmark Swap Agreement.[103] In other words, even if *Wilkinson and Costango* were mutually mistaken as to whether the parties intended to transfer Controlling Class rights, in the absence of any evidence that any of the other individuals involved in the negotiation, drafting, and execution of the Capmark CDS had such an intention,[104] and in the face of

---

[101]     *See infra* Part IV.B.

[102]     6/16/06 Email from Frontero (Citibank) to Edman (MSIP), Ex. C to Supp. Cherington Decl.  *Accord* 6/16/06 Email from Frontero (Citibank) to Wilkinson, Feldman, and Edman (MSIP) (attaching the Capmark CDS Confirmation and explaining that "[w]e are still awaiting internal approvals").

[103]     Schedule to ISDA Master Agreement, part 5(d).  Wilkinson's own January 2008 Chart also indicates that MSIP did not hold Controlling Class rights under the Capmark Swap (or the right to veto their exercise).  This supports the inference that – notwithstanding his initial alleged intent to secure the passage of such rights – he understood that the parties ultimately agreed only to the unambiguous language of section 6(d).  Drawing inferences in Citibank's favor, this supports the conclusion that Wilkinson made – and subsequently accepted that he made – a unilateral mistake.

[104]     *Cf. Fidelity and Guar. Ins. Co. v. Global Techs.*, 117 F. Supp. 2d 911, 917 (D. Minn. 2000) ("[W]here it is uncontroverted that the agent is the *sole communicator/negotiator*, it is not proper to consider the principal's intent.") (emphasis added).

unambiguous contract language that failed to transfer such rights, MSIP cannot

establish, as a matter of law, based on the June 22 Email that MSIP and *Citibank*

were mutually mistaken as to the passage of Controlling Class rights.

## 2. The Tallships Swap

MSIP contends that "[t]he undisputed evidence concerning the

Tallships negotiations likewise confirms that it was the parties' mutual

understanding that Controlling Class rights had been transferred under the

Capmark Swap."[105]  *First*, the fact that Citibank understood Wilkinson's November

28 Email – requesting that Citibank "pass through to MS all voting/consent rights

of the Advance Swap Counterparty *under the Advance Swap*"[106] – to refer to

Controlling Class rights does not wholly defeat the reasonable inference that

Citibank did *not* understand Wilkinson's June 22 Email – requesting that Citibank

"pass[] along to MS all voting rights it has *under the Loan Agreement* to MS"[107] –

to be referring to such rights.  The November 28 Email included more specific

language than the June 22 Email ("In addition, the doc should provide that the

failure to do so (or failure to act in accordance with the instructions of MS) will

---

[105]     MSIP Mem. at 16.

[106]     November 28 Email (emphasis added).

[107]     June 22 Email (emphasis added).

34

result in a MTM termination.").  Moreover, it was a request for the passage of

voting and consent rights in the Tallships *Back-to-Back* Swap Agreement, not the

Tallships Swap Agreement for which MSIP argues the Capmark Swap Agreement

served as a roadmap.

      *Second*, although the Capmark Swap Agreement served as the starting

point for the Tallships Swap Agreement, the reasonable explanation (drawing

inferences in Citibank's favor) is that both were non-coterminous, three-year

credit-default-swaps – *not* that Citibank knew it had transferred Controlling Class

rights in Capmark and intended to do so yet again.  Similarly, the reasonable

inference (if any) to draw from the flurry of internal Citibank emails that followed

Wilkinson's November 28 Email is that Citibank was realizing *for the first time*

that Wilkinson had intended to communicate a similar request in his June 22

Email.[108]  But such an after-the-fact realization does not establish *mutual* mistake

"at the time the [Capmark Swap Agreement] [was] signed."[109]

---

[108]    Incidentally, such a realization would also explain why certain
members of SPG suspected that liquidation of Capmark might lead to litigation
with MSIP.  Thus, Yarrington's testimony that Citibank "knew that Morgan
Stanley believed they had the rights to control liquidation" before SPG liquidated
Capmark does not establish that Citibank held such knowledge and shared such a
view at the time it drafted and then bound itself to section 6(d).  Yarrington Dep.
192:19-23.

[109]    *Shults*, 660 N.Y.S.2d at 499.

*Third*, Costango's November 29 "Voting rights" Email to Wilkinson ("We are struggling to recall how this was handled in Capmark") does not unequivocally support the inference that "it was the parties' mutual understanding that Controlling Class rights had been transferred under the Capmark Swap."[110] "Lawyers are telling me that we don't pass through voting rights" supports the reasonable inference that, institutionally, Citibank never thought the parties intended to transfer voting rights.  Costango's caveat – "but I seem to remember you being comfortable with the arrangement in Capmark" – can be reasonably interpreted to express Costango's surprise that Wilkinson was insisting on voting rights in Tallships when, as "lawyers are telling [him (Costango)]," Wilkinson *didn't* do so in Capmark, and yet was "comfortable with the arrangement."  And drawing all reasonable inferences in Citibank's favor, Wilkinson's response – "I think in Capmark we just relied on the language that stated the credit agreement would not be amended without our prior written consent.  I would prefer to be more specific in this trade.  See attached rider." – supports the inference that "[Wilkinson] was clearly embarrassed about his error in Capmark,"[111] *i.e.*, his unilateral mistake in failing adequately to communicate his intentions to Citibank

---

110    MSIP Mem. at 16.

111    Citibank Response to MSIP 56.1 ¶ 35.

or to ensure that such an intent was truly shared by Citibank and memorialized in the Capmark Swap Agreement.  This inference is bolstered by (1) Wilkinson's attachment of draft language to be included in the Tallships Swap Agreement – language that became section 6(e), which *supplemented* rather than *replaced* section 6(d) after extensive discussion about its implications; (2) Wilkinson's lack of concern about and failure to protest, after reading Costango's November 29 Email, Citibank lawyers' view that Citibank did not pass Controlling Class rights in Capmark;[112] and (3) Wilkinson's preparation of a chart before any dispute arose between the parties, conveying that MSIP had no Controlling Class rights in Capmark.[113]

   *Fourth*, MSIP asks this Court to infer – from Costango's subsequent email to Buerstetta (Clifford Chance) requesting legal advice concerning section 6(d) – "that Citibank itself understood that Section 6(d) was intended to effect the

---

[112] *See* Wilkinson Dep. at 186:6-12.  Wilkinson did not recall whether he ever spoke with any of the lawyers at Citibank about the passage of Controlling Class rights in Capmark; whether he ever spoke with anyone at Citibank to ask what Citibank's position was as to who held voting rights in Capmark; or asked Costango for more detail about what "lawyers [were] telling [him]."  *See id.* at 186:6-189:18.  The only "conversations" Wilkinson recalled with respect to Controlling Class rights in Capmark versus Tallships were the emails exchanged between him and Costango in which he contends that "Morgan Stanley expressed its view yet again to Citi that it was of the opinion that voting rights had passed to Morgan Stanley."  *Id.* at 190:3-8.  *Accord id.* at 191:5-10.

[113] *See* Wilkinson January 2008 Chart.

37

transfer of Controlling Class rights."[114]  But this email – at most – suggests that

*Costango*, not "Citibank," thought he recalled the parties' transferring rights, and

was puzzled that such a recollection was not reflected in the language of section

6(d).  It bears noting, however, that Costango was only one of (at least) six

Citibank agents involved in drafting, reviewing, or approving the Capmark Swap

Agreement.[115]  In any event, the content of the email is privileged, so that any

inference arising solely from the fact that it was sent is speculative.

> *Fifth*, Costango's December 7 "Tallships -- voting" Email –
>
> > I've thought a lot about why changes like this are warranted here
> > compared to Capmark, and I believe the difference is that in
> > Capmark we agreed to not make any change without consent and
> > here we are agreeing to consult you in all cases if we don't want
> > to make a change.  So it's more complicated.[116]

– does not unequivocally establish that "in Tallships, Citibank agreed to *consult*

Morgan Stanley whenever it had the ability to exercise a Controlling Class right

[whereas] in Capmark, Citibank agreed only to allow Morgan Stanley to *consent to*

*or veto* Citibank's exercise of Controlling Class rights."[117]  Costango's December 7

---

114      MSIP Mem. at 17.

115      *See infra* Part IV.B.

116      Ex. J to Corkhill Decl.

117      MSIP Mem. at 17.

Email contains no mention of "Controlling Class" rights or voting rights.  Instead, drawing inferences in Citibank's favor, it is consistent with the unambiguous terms of section 6(d), which required Citi to "ask Morgan Stanley to say yes" if Citi "was going to do something, *certain things*," as Costango later testified[118] and as I held in the October 8 Opinion.[119]  Even drawing all inferences in MSIP's favor, it merely reflects Costango's own (mistaken) understanding as to the meaning of section 6(d) vis-a-vis section 6(e) – not Citibank's.

   *Sixth*, the *reasonable* explanation for "why it took the parties two weeks to negotiate the wording of [s]ection 6(e) of the Tallships Swap Confirmation" – drawing all inferences in Citibank's favor – is that Citibank did not believe it had transferred Controlling Class rights in Capmark, but intended to do so in Tallships and, consequently, had to carefully consider the implications. Costango's statement to Wilkinson – that "the internal legal people . . . have raised some additional concerns with [Wilkinson's proposed language] of the 'what if this happens' variety"[120] – *could* support the inference MSIP asks the Court to draw, namely that "transferring to Morgan Stanley the right to direct Citibank how to act

---

[118] Costango Dep. at 147:23-148:2 (emphasis added).

[119] *See* May 12 Opinion, 724 F. Supp. 2d at 407.

[120] Ex. J to Corkhill Decl.

raised complicated issues not raised by the consent rights transferred in

Capmark."[121]  But it does not rule out the possibility that Citibank's substantial

vetting of Wilkinson's proposed language derived at least in part from Citibank's

understanding that in Tallships Citibank not only was passing to MSIP the right to

*direct* (as opposed to *consent to*) Citibank's exercise of certain rights, but also was

passing *much more substantial rights*.[122]

### 3.  Contemporaneous Evidence

MSIP asserts that Citibank offers no contemporaneous evidence that

the parties intended *not* to pass all Controlling Class rights under the Indenture to

MSIP.[123]  *First*, this statement inappropriately attempts to shift the burden of proof

from MSIP to Citibank.  *Second*, MSIP is mistaken.  In addition to the language of

the Capmark Swap Agreement, Citibank has proffered Wilkinson's January 2008

---

[121]    MSIP Mem. at 17 n.15.

[122]    In any event, it is reasonable to infer that Citibank's lawyers would
have raised the same concerns of the "'what if this happens' variety" if they had
understood Wilkinson to be requesting the conferral of veto rights in Capmark.
From a legal standpoint, the ability to *direct* another entity to exercise a right
versus the ability to *withhold consent for* another entity's exercise of that right
would seem to raise similar (albeit not identical) concerns.  In other words, such
"complicated" issues as "how long do you have to give [MSIP] to answer, and
what if [MSIP] doesn't answer, and what if [MSIP] tells you to do something you
don't want to do or something that's illegal" would seem to be implicated in the
passage of veto rights, too.  Costango Dep. at 147:5-12.

[123]    MSIP Mem. at 18-19.

Chart,[124] SPG's SS Summary Spreadsheet,[125] Citibank's internal policies and

written corporate intent,[126] Citibank's purported goal of obtaining regulatory

capital relief,[127] and Citibank's opposition to ISDA's proposal to accept as standard

the transfer of voting rights in CDSs on ABS CDOs.[128]  Certainly, if Citibank bore

the burden of proof, and if I were drawing inferences in MSIP's favor, I would not

find this evidence particularly compelling.[129]  But in light of the "high level" of

evidentiary proof MSIP must proffer to avoid pretrial dismissal of a reformation

---

[124]     *See* Citibank Mem. & Opp. at 14-15.

[125]     *See id.* at 15.

[126]     *See id.* at 20.

[127]     *See id.* at 19-20.

[128]     *See id.* at 21.

[129]     *First*, both the January 2008 Wilkinson Chart and the SS Summary
Spreadsheet were created long after the fact – the latter by members of Citibank's
SPG.  *Second,* Citibank took reg cap relief for the Tallships Swap, too – a non-
coterminous swap under which Citibank undisputedly agreed to transfer
Controlling Class rights to MSIP for the same price (7 basis points).  *Third*, the SS
Summary Spreadsheet shows that Citibank ceded control over liquidation to
protections sellers for every other CDO where Citibank purchased super senior
credit protection, undermining the argument that an email sent by Bentch to ISDA
in 2004 – urging that "Voting Rights provisions should not be applicable to CDS
on ABS," 7/29/04 Email from Bentch to ISDA, Ex. B to Bentch Decl. – serves as
"potent evidence of [Citibank's] corporate intent not to pass Controlling Class
rights."  Citibank Mem. & Opp. at 21 (emphasis omitted).

claim[130] – *i.e.*, the clarity with which it must prove Citibank's institutional intent – this contemporaneous evidence further supports my conclusion that MSIP's motion must be denied.

### B.    Citibank's Motion

Citibank moves for summary judgment on two grounds: *first*, that because Costango had authority only to *negotiate* the terms of a written agreement, but not the authority to *bind* Citibank, any alleged "understanding" between Costango and Wilkinson that is at odds with the Capmark Swap Agreement's unambiguous contractual terms cannot "bind" Citibank; and *second*, that no reasonable trier of fact could find by clear and convincing evidence that the parties intended to pass Controlling Class rights to MSIP.

Before addressing Citibank's arguments, it is necessary to provide some additional background relevant to Citibank's motion:  The parties do not dispute that Costango had authority to negotiate the terms of a written agreement.[131]  Although Wilkinson had no knowledge of whether Costango had signing authority with respect to any Citibank entity, Costango never told

---

[130]     *Sagan*, 53 N.Y.2d at 637.

[131]     *See* Citibank 56.1 ¶ 88; MSIP Mem. at 24 ("evidence . . . establishes that . . . Costango [was] authorized . . . to negotiate the terms of the Capmark Swap").

Wilkinson that he was authorized to sign on behalf of Citibank.[132]  Wilkinson

himself was not authorized to sign on behalf of MSIP,[133] but he testified that he had

the authority to review and give legal approval of the final deal documents for

MSIP.[134]  As a matter of written internal policy, Citibank Legal Department's

approval of all final, integrated written documents was required to bind Citibank to

any non-standard confirmations,[135] including the Capmark Swap Agreement.

Citibank argues that "[t]here is no legal basis on which to reform a

principal's unambiguous written agreement to reflect an imputed subjective intent

of an agent with no authority to bind the principal to any agreement" and that

"[n]one of the cases cited by MSIP reforms an unambiguous written agreement to

reflect the imputed subjective intent of an agent with limited authority."[136]  While

---

[132]   Citibank 56.1 ¶¶ 101-102.  *See also* 7/21/06 Email from Costango to
Wilkinson, Ex. E to Cherington Decl. ("When you are prepared to trade, can you
please call Kevin Starrett?  He will say 'done' for Citigroup.").

[133]   *See id.* ¶ 103.

[134]   *See* Wilkinson Dep. at 90:20-25.

[135]   *See* CIB [Citi Corporate and Investment Bank] Credit Risk Principles,
Policies and Procedures, April 2006, Ex. J to Cherington Decl., at V-16
("Confirmations must be done under the standard forms approved by CIB Legal.
Any non-standard confirmations require review and approval by CIB Legal or
approved external counsel."); *id.* at V-17 (same).  *See also* Bentch Dep. at 176:6-
16; Citibank 56.1 ¶¶ 90-93, 96.

[136]   Citibank Mem. & Opp. at 4.

the intent and understanding of the agents involved in negotiating an institution's

contract may be relevant, in some instances, in determining an institution's

intent,[137] the evidentiary basis for MSIP's claim for reformation is simply

insufficient.  MSIP's claim rests solely on its proof that Costango *may* have

believed Citibank passed voting rights to MSIP.  This cannot support reformation

---

[137]    *See, e.g.*, *Investors Ins. Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir. 1990) (director's testimony provided "only limited evidence of [the corporate entity's] intent, as [the director] was not *a primary participant in the negotiations* between [the two entities]") (emphasis added); *In re Department of Energy Stripper Well Exemption Litig.*, 855 F.2d 865, 870-71 (Temp. Emer. Ct. App. 1988) (rejecting argument that negotiator's understanding of settlement agreement should be discounted because he lacked authority to approve the settlement); *Karas v. Katten Muchin Zavis Rosenman*, No. 04 Civ. 9570, 2006 WL 20507, at *9 (S.D.N.Y. Jan. 3, 2006) ("Because the language is ambiguous, and because both Katten Muchin and Karas have offered relevant extrinsic evidence of the parties' actual intent in the form of sworn affidavits of individuals involved in the negotiations leading to the Agreement, summary judgment is not appropriate."); *Webb v. GAF Corp.*, 936 F. Supp. 1109, 1123 (N.D.N.Y. 1996) (rejecting challenge to admissibility of negotiators' testimony regarding their "subjective understanding" of provision at issue); *Geico Corp. v. Pennsylvania Power & Light Co.*, 689 F. Supp. 351, 353-54 (S.D.N.Y. 1988) (relying on affidavits of "individuals involved in the negotiation and execution of the [contract], both of whom stated . . . that there was no intent" to arbitrate); *In re PCH Associates,* 60 B.R. 870, 874-75 (S.D.N.Y. 1986) (ruling that participant in contract negotiations was qualified to testify as to parties' intent); *Gateway Dev. & Mfg., Inc. v. Commercial Carriers, Inc.*, 744 N.Y.S.2d 778, 782-83 (4th Dep't 2002) (noting that one of the defendants had submitted affidavits from "its attorneys involved in the negotiation of the [contracts at issue] that bear on the intent of the parties").  While some of these cases involve the interpretation of ambiguous contract language (as opposed to reformation of those contracts), this Court is aware of no special limitation, as a matter of law, on the type of evidence from which intent may be inferred in reformation versus contract interpretation cases – even if the standard of proof for reformation is higher.

of a contract.  Even if MSIP has established that Costango was Citibank's "chief"

negotiator, he was not the *only* negotiator.  And even assuming (1) that Costango

understood that Wilkinson's intent was to pass Controlling Class rights to MSIP

and (2) that he *himself* believed section 6(d) passed such rights, MSIP has

proffered no evidence that he ever communicated this understanding – or any

understanding with respect to the passage of Controlling Class rights – to anyone

else at Citibank.

       Moreover, it is not as if the derivatives lawyers who drafted section

6(d) are mere scribes charged with reducing bankers' intent to writing; they are

members of *teams* responsible for negotiating the rights and obligations of

Citibank when entering into complex financial contracts like the Capmark Swap

Agreement.[138]  The documentary evidence shows that the drafting process at both

MSIP and Citibank was an iterative one in which multiple individuals weighed in

---

[138]    *See* Bentch Dep. at 177:15-19 ("[T]he process is constant open communication between internal legal and external legal counsel and the transactors, to ensure that what is binding is what the firm understands the agreement to be."); *id.* at 318:20-319:3 ("[T]he only way that I can know what the negotiator is providing for in the negotiation is to talk to that person.  Like I said, it's not practice to review e-mails to deduce intent.  *It's practice to work through drafts of documents in collaboration with everybody who is relevant*.") (emphasis added).

on the content of the Capmark Swap Agreement.[139]  I have already found that the

final version of that Agreement – which required the approval of Citibank's

counsel[140] (as both Wilkinson and Costango knew) – unambiguously did *not*

transfer voting rights to MSIP.  Further, the history of Tallships strongly suggests

that, when Citibank intended to afford MSIP any power over Citibank's voting

rights under the Indenture, it did so explicitly and after extensive negotiation.  For

all of these reasons, the evidence simply does not support the argument that section

6(d) was merely an "oversight" or "scrivener's error" requiring reformation of a

---

[139]     *See, e.g.*, 6/20/06 Email from Wilkinson to Costango (copying
Frontero, Feldman, and Edman), Ex. D to Supp. Corkhill Decl. ("Attached are our
initial comments on the Capmark VI confirmation.  Note that we are still talking
internally with our 'Loan CDS' people regarding the LSTA provisions."); 6/20/06
Email from Costango to Wilkinson (copying Feldman, Edman, Frontero, Nikolov,
and one other individual), Ex. D to Supp. Corkhill Decl. ("Agree that in several
cases we can remove language which is more general . . . than we need for this
specific trade."); *id.* ("Once we receive your further comments from the loan CDS
colleagues and any thoughts on the above I will schedule a time to speak to the
appropriate legal reps on this side to answer your questions."); 7/11/06 Email from
Costango to Aprigliano (copying Bendernagel, Bentch, Nikolov, Starrett,
Dominguez, and four other individuals), Ex. F to Cherington Decl. ("Can we touch
base, if needed, on the Capmark CDS?  We've incorporated your earlier guidance
but need final approval on the terms."); 7/21/06 Email from Costango to Wilkinson
(copying Starrett and Nikolov) with Subject: "Capmark VI Supersenior Confirm
20060721_2.pdf," Ex. F to Supp. Corkhill Decl. ("Changes as discussed: (1)
removed Fixed Rate Payer Period End Dates and (2) Changed counterparty name
in header and signature block.").

[140]     *See* CIB Credit Risk Principles, Policies and Procedures at V-16
("Any non-standard confirmations require review and approval by CIB Legal or
approved external counsel.").

fully-integrated contract containing a no-reliance clause.[141]  In the absence of

contemporaneous or course-of-performance evidence[142] that anyone at Citibank –

other than *possibly* Costango – intended to pass all Controlling Class rights under

the Indenture to MSIP, or thought section 6(d) effected transfer of those rights,

MSIP has failed to establish mutual mistake by clear and convincing evidence.

Even if Costango's subjective intent were highly probative of

Citibank's intent, my discussion of MSIP's motion in Part IV.A

*supra* demonstrates that "no showing free of contradiction or equivocation comes

through from the affidavits submitted [in opposition to Citibank's motion for

---

[141]     *Cf. Fidelity & Guar. Ins. Co.*, 117 F. Supp. 2d at 918 (insurance
policy reformed because defendant never sought, and knew it never purchased,
products liability coverage that was accidentally included in the policy due to
"errors [that] were unintentional and not unlike a scrivener's error"); *Metro N.
Commuter R.R.*, 325 F. Supp. 2d at 412-13 (settlement agreement reformed where
attorneys for both parties agreed that two categories of covered employees had
inadvertently been combined under a single heading in an attachment); *Ribacoff v.
Chubb Group Ins. Cos.*, 770 N.Y.S.2d 1, 2 (1st Dep't 2003) (insurance policy
reformed where plaintiff's insurance broker, who had full authority to obtain
coverage for her principal, testified that the plaintiff told her he did not intend to
purchase jewelry coverage, that she as a result never sought it, but that it was
accidentally not excluded from the policy).

[142]     *Cf. Gulf Ins. Co.*, 886 N.Y.S. 2d at 144-45 (reversing grant of
summary judgment dismissing reformation counterclaims where undisputed
documentary evidence showed payments of several million dollars in accordance
with mutually mistaken understanding and internal post-contractual accounting
documents).

summary judgment]."[143]  MSIP has simply not shown, "'in no uncertain terms, not only that mistake . . . exists, *but exactly what was really agreed upon* between [Wilkinson and Costango].'"[144]  Yet that is the showing MSIP must make in order to overcome the "'heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties,' especially between counselled businessmen."[145]  For all of these reasons, I conclude that no reasonable trier of fact could find by clear and convincing evidence that MSIP and Citibank mutually intended for the Capmark Swap Agreement to transfer all Controlling

---

[143]     *Backer*, 46 N.Y.2d at 220.  As Citibank argues in opposing MSIP's motion,

> [a]ll documentary evidence relied on by MSIP is at best equivocal; nothing clearly and unambiguously supports MSIP's claim that both sides intended that Citi pass Controlling Class rights to MSIP. MSIP's case for summary judgment thus boils down to the following: Wilkinson swears that he came to an oral understanding with Costango that MSIP would control [] the exercise of all of Citi's 'voting rights;' that the term 'voting rights' includes Citi's Controlling Class rights under the Indenture; and that, because Costango has no recollection either confirming or contradicting that assertion, the Confirmation must be reformed.

Citibank Mem. & Opp. at 10.

[144]     *Chimart*, 66 N.Y.2d at 574 (quoting *Backer*, 46 N.Y.2d at 219) (emphasis added).

[145]     *Healy*, 981 F.2d at 73 (quoting *Backer*, 46 N.Y.2d at 219 and citing *Chimart*, 66 N.Y.2d at 574) (citation omitted).

Class rights under the Indenture to MSIP.[146] Therefore, Citibank's motion for summary judgment dismissing MSIP's claim for reformation is granted.

## V.    CONCLUSION

For the reasons stated above, MSIP's motion for summary judgment is denied, and Citibank's cross-motion is granted. The Clerk of Court is directed to close these motions (Docket Nos. 61 and 70).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    May 25, 2011
          New York, New York

---

[146]    This is all the more so where the Court has seen all of the relevant evidence and would be the trier of fact. *See, e.g., Citigroup Inc. v. VDN Sys., Inc.,* No. 08-Civ-7527, 2008 WL 5274091, at *2 (S.D.N.Y. Dec. 16, 2008) ("'[While a]ctions for money damages for breach of contract are legal in nature and are triable to a jury[, a]ctions seeking reformation of contract, rescission or cancellation of contract, or specific performance of contract are all equitable in nature, and [do not give rise to a Seventh Amendment jury trial right].'") (quoting 8 James Wm. Moore et al., *Moore's Federal Practice* § 38.30[4] (3d ed. 2008)).

**- Appearances -**

**For Plaintiff:**

Gregory P. Joseph, Esq.
Peter R. Jerdee, Esq.
Sandra M. Lipsman, Esq.
Rachel Cherington, Esq.
Gregory P. Joseph Law Office LLC
485 Lexington Avenue, 30th floor
New York, New York 10017
(212) 407-1200

**For Defendant:**

Kathleen M. Sullivan, Esq.
Michael B. Carlinsky, Esq.
Jonathan E. Pickhardt, Esq.
Andrew S. Corkhill, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, New York 10010
(212) 849-7000